# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **CHADWICK WAYNE HAYNIE,** | ) | **Bankruptcy Case No. 20-70989-JHH13** |
| | ) | |
| Debtor. | ) | |

---

| | | |
|---|---|---|
| **BRYANT BANK,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding No. 20-70036-JHH** |
| | ) | |
| **CHADWICK WAYNE HAYNIE,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.    Introduction and Overview of Undisputed Facts, Questions Presented, and Holdings

This adversary proceeding (the "AP") concerns whether defendant Chadwick Wayne Haynie ("Haynie"), a debtor in a pending chapter 13 case (the "Case"), may discharge prepetition debts allegedly owed by Haynie to plaintiff Bryant Bank. Specifically, Bryant Bank avers, in its amended complaint (AP Docs. 1, 14) (the "Amended Complaint"), that Haynie is liable to Bryant Bank for financial losses sustained by Bryant Bank when a $48,400 check deposited by Haynie in his Bryant Bank checking account was returned as invalid the day after Haynie requested, and Bryant Bank executed, a $40,012 international wire transfer from the account. (*See* AP Doc. 1 ¶¶ 11-16.)

The Amended Complaint states claims for relief under Bankruptcy Code[1] §§ 523(a)(2)(A) (debts for money, property, services, or credit to the extent obtained by false pretenses, a false representation, or actual fraud) (the "523(a)(2)(A) Claim"), 523(a)(4) (debts for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny) (the "523(a)(4) Claim"), and 523(a)(6) (debts for willful and malicious injury by the debtor to another entity or to the property of another entity) (the "523(a)(6) Claim," and, collectively with the 523(a)(2)(A) Claim and the 523(a)(4) Claim, the "523(a) Claims"). (*See* AP Doc. 14 ¶¶ 5-14.) The Amended Complaint demands entry of a nondischargeable judgment against Haynie in the principal amount of $48,400, plus interest and attorney's fees. (*See* AP Doc. 1 at 4; AP Doc. 14 at 3.)

---

[1] As used herein, "Bankruptcy Code" refers to title 11 of the United States Code.

1

Though material factual allegations in the Amended Complaint are admitted by Haynie—e.g., Haynie admits that he deposited the $48,400 check and requested the $40,012 wire transfer and that the check was returned as invalid (*see* AP Doc. 7 at 2)—Haynie's answer to the Amended Complaint (AP Doc. 15) (the "Answer") denies liability for the alleged debts and requests an adjudication that the alleged debts are dischargeable. (*See* Answer, *passim*.) Haynie also counterclaims for his fees and costs of defending the AP under Bankruptcy Code § 523(d) (the "523(d) Counterclaim"). (*See* AP Doc. 7 at 5.)

Given the length of this opinion, the court will provide a brief overview of the undisputed historical facts, as well as a summary of the questions presented by the AP and the court's holdings.

A.    The Undisputed Facts

On March 9, 2020, Haynie, a former Bryant Bank employee in good standing with the bank, deposited a $48,400 noncertified check in his personal checking account with the bank. The check was made payable to Haynie, purportedly by a business entity located in Pittsburgh, Pennsylvania, and was indorsed by Haynie without restriction or limitation. Prior to the deposit, Haynie's Bryant Bank checking account balance was a little over $2,000. Haynie made no other deposits to his Bryant Bank account on or after March 9, 2020.

Between March 9 and March 10, 2020, debits totaling just under $185 posted to Haynie's Bryant Bank account. On or before March 11, 2020 (the second day after Haynie's deposit of the $48,400 check), Bryant Bank provisionally credited the entire check amount to Haynie's personal checking account, bringing Haynie's available account balance to just over $50,200. That day debits totaling more than $44,600 posted to Haynie's account, including a $35 wire transfer fee, a $40,012 international wire transfer to a purported business entity in Mexico (which Haynie requested, and Bryant Bank accepted, on March 11, 2020), as well as other expenditures by Haynie for personal purposes, including credit card payments totaling just shy of $4,500.

On March 12, 2020 (the third day after Haynie's deposit of the $48,400 check), Bryant Bank learned of the drawee's timely return of the check. Bryant Bank attempted to cancel the $40,012 wire transfer on March 12, 2020, and redeposited the check the same day, assessing a $6 redeposit fee to Haynie's account. Bryant Bank's cancellation attempt was unsuccessful, and the drawee never honored the $48,400 check.

Between March 12 and March 17, 2020, additional debits (totaling around $240) posted to Haynie's Bryant Bank account. Bryant Bank authorized some of these debits before the check's initial return, and Bryant Bank authorized some of these debits after the check's initial return. On March 17, 2020 (the sixth business day after Haynie's deposit of the $48,400 check and the third business day after Bryant Bank's redeposit of the check), Bryant Bank reversed the provisional credit for the $48,400 check, overdrawing Haynie's Bryant Bank account by a little over $43,000, and assessed a $35 overdraft fee to the account.

There is no dispute that the $48,400 check was counterfeit (i.e., the check was invalid for fraud on the part of the person(s) who produced the counterfeit item, and the check was not authorized by the purported maker of the check). Further, at the trial of the AP, Haynie stipulated

2

that he is liable to Bryant Bank, under applicable commercial law and the parties' account agreements, for debts totaling $43,048.93—comprised of (1) the unrecovered $40,012 international wire transfer; (2) other expenditures of the $48,400 provisional credit by Haynie, for personal purposes, between March 11 and March 17, 2020 (i.e., account debits initiated by Haynie after all account funds, other than the provisional credit, had been exhausted), totaling $2,995.93; and (3) $41 in unpaid bank fees assessed to Haynie's Bryant Bank account (specifically, the $6 redeposit fee assessed on March 12, 2020 and the $35 overdraft fee assessed on March 17, 2020). Additionally, at the trial, Bryant Bank reduced its demand to $43,048.93 and affirmatively waived any claim to prejudgment interest or attorney's fees.

        B.      The Ultimate Questions and Answers

Broadly speaking it is established that the counterfeit check and wire transfer were part of a fraudulent scheme and that Bryant Bank suffered financial losses as the result of Haynie's uses of his Bryant Bank account to facilitate the scheme. In short, the AP presents few questions of law. Primarily, the questions before the court pertain to Haynie's knowledge and intent concerning his role in perpetrating the fraudulent scheme's success and to Bryant Bank's alleged reliance on Haynie's conduct (i.e., questions of fact).

For the reasons hereinafter set forth, the court holds: (1) Haynie's debts to Bryant Bank for Haynie's personal expenditures of the provisional credit (totaling $2,995.93), the overdraft fee ($35), and the fee for the redeposit of the check ($6) are excepted from discharge under Bankruptcy Code § 523(a)(2)(A); (2) Haynie's debt to Bryant Bank for the $40,012 wire transfer is dischargeable, under Bankruptcy Code §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6); and (3) Haynie's request for fees and costs of defending the AP, under Bankruptcy Code § 523(d), is denied.

## II.    The Pre-Trial Orders, Trial, and Post-Trial Filings

Following an initial scheduling conference in the AP, the court entered a scheduling order (AP Doc. 17) (the "Scheduling Order"), which, among other things, set a pre-trial conference in the AP and required the parties to submit a proposed pre-trial order. The parties timely submitted a proposed pre-trial order (AP Doc. 28) (the "Proposed Pre-Trial Order"), and, following the pre-trial conference, the parties submitted a revised pre-trial order, which the court approved and entered (AP Doc. 30) (the "Pre-Trial Order"). The parties stipulated to certain facts and legal conclusions in the Pre-Trial Order. (*See* Pre-Trial Order at 1-4.)

The court held a bench trial on the 523(a) Claims and the 523(d) Counterclaim (the "Trial") on August 27, 2021, which lasted one day.[2] Each party offered all of the party's Trial exhibits (collectively, the "Exhibits") at the beginning of (or shortly after beginning) the party's evidentiary presentation, and, in each instance, the court admitted the parties' Exhibits (Plaintiff's Exhibits 1 through 10 and Defendant's Exhibits A through H) without objection.[3] Haynie was the only

---

[2] The audio recording of the Trial is docketed in the AP as Document 33 (the "Trial Audio").

[3] Although the Exhibits were admitted in summary fashion, the undersigned reminded the parties that the court would rely on witness testimony and arguments of counsel to elucidate the purposes for which the Exhibits were offered. Nevertheless, there are admitted Exhibits for which neither party offered witness testimony or argument to explain the Exhibit's particular significance (leaving it to the court to deduce the Exhibit's relevance, if any). Notably, some of

3

witness called to testify at the Trial (by either party). Counsel for the parties stipulated to additional facts and legal conclusions at the Trial. (*See* Trial Audio.)

During the Trial, Haynie's counsel orally moved for judgment on the 523(a) Claims at the close of Bryant's Bank's case-in-chief, and Bryant Bank's counsel orally moved for judgment on the 523(d) Counterclaim at the close of Haynie's case-in-chief. (*See id.*) In both instances, the court declined to render any judgment until the close of the evidence. *See generally* Fed. R. Civ. P. 52(c); Fed. R. Bankr. P. 7052.[4]

At the request of Bryant Bank, and without objection by Haynie, the court permitted, but did not require, the parties to submit simultaneous proposed findings of fact and conclusions of law or post-trial briefs. (*See* Trial Audio.) Haynie timely submitted proposed findings of fact and conclusions of law on the 523(a) Claims (AP Doc. 35) ("Haynie's Proposed Findings and Conclusions"). Bryant Bank timely filed a post-trial brief regarding the 523(a) Claims and the 523(d) Counterclaim (AP Doc. 34) ("Bryant Bank's Post-Trial Brief"). After reviewing the parties' post-trial submissions, the court entered an order allowing, but not requiring, further briefing or oral argument. (*See* AP Doc. 38.) No party filed further briefs or requested further oral argument by the court ordered deadlines, and the court took the AP under advisement. (*See* AP Docket, *passim.*)

## III. The Parties' Disputes Regarding the 523(a) Claims

As set forth above, the $48,400 invalid check and the unrecovered $40,012 international wire transfer were part of a fraudulent scheme, and Haynie involved Bryant Bank in the scheme when he indorsed and deposited the invalid check in his Bryant Bank account and expended funds provisionally credited to his account for the check. Further, each provisional credit expenditure resulted in a financial loss to Bryant Bank, for which Haynie is admittedly liable to Bryant Bank under the parties' agreements and applicable commercial law.

Although Bryant Bank's framing of the legal and factual issues in the AP evolved at the Trial and afterwards,[5] the determinative factual and legal questions in the AP are relatively straightforward, requiring the court to ascertain, as a matter of federal bankruptcy and common law, the degree of Haynie's culpability for the wire transfer and the other provisional credit expenditures that resulted in Bryant Bank's losses. That said, to answer these questions the court

---

the Exhibits consist of document copies of poor print quality, making portions of these Exhibits illegible; at least one Exhibit, Plaintiff's Exhibit 4, offered as a true and correct copy of an agreement signed by Haynie, does not include Haynie's signature; some Exhibits consist of multiple email chains or portions of email chains; some such Exhibits include references to email attachments that are not part of the Exhibit; and one Exhibit copy provided to the court by Bryant Bank, Plaintiff's Exhibit 9, contained a page that was not part of the Exhibit presented by Bryant Bank to the courtroom deputy and maintained by the clerk of court as part of the official Trial record. The court has not considered this unadmitted copy or any other unoffered or unadmitted exhibits, including, without limitation, any exhibits filed with the Proposed Pre-Trial Order that were not offered or admitted at the Trial.

[4] As the Trial was a bench trial, not a jury trial, Rule 50 of the Federal Rules of Civil Procedure is not applicable. *See* Fed. R. Civ. P. 50; *see also* Fed. R. Bankr. P. 9015.

[5] For instance, to substantiate its 523(a)(4) Claim, Bryant Bank alleged theft by deception in the Amended Complaint and in Bryant Bank's Post-Trial Brief, but the Pre-Trial Order frames Bryant Bank's 523(a)(4) Claim as one for embezzlement. (*Compare* Amended Complaint ¶ 12, *and* Bryant Bank's Post-Trial Brief at 30-33, *with* Pre-Trial Order at 6.)

4

must scrutinize the evidentiary record, infer key historical facts from circumstantial evidence, and make several factual findings based on evaluations of the parties' conduct.

To support its 523(a) Claims, Bryant Bank avers that Haynie was at least a witting participant in the fraudulent scheme, i.e., Haynie knew that critical facts—like the fact that the $48,400 check was not valid and the fact that the $40,012 wire transfer had no legitimate purpose—were not as Haynie's conduct implied to Bryant Bank, or, if Haynie lacked such knowledge, it is only because Haynie closed his eyes to what he had every reason to believe were the facts. (*See* Amended Complaint ¶ 8; Pre-Trial Order at 4-8; Trial Audio; Bryant Bank's Post-Trial Brief at 25-27.) Bryant Bank further alleges that Haynie not only intended to deceive Bryant Bank through his fraudulent misrepresentations but that Haynie willfully and maliciously injured Bryant Brank through his actions. (*See* Amended Complaint ¶¶ 9, 13-14; Pre-Trial Order at 4-8; Trial Audio; Bryant Bank's Post-Trial Brief at 21, 27-30.)

Bryant Bank alternatively alleges (albeit not in the Amended Complaint), that regardless of Haynie's actual knowledge and intent, the knowledge and intent of the fraudulent actor(s)—who recruited Haynie to deposit the invalid check and to request the international wire transfer (and who Bryant Bank has been unable to identify or locate)—may be imputed to Haynie for purposes of establishing the knowledge and intent elements of the 523(a)(2)(A) Claim. (*See* Pre-Trial Order at 4-8; Trial Audio; Bryant Bank's Post-Trial Brief at 11-27.)  In support of its imputation arguments, Bryant Bank alleges that Haynie entered into a conspiracy with the fraudster(s) (i.e., an agreement to commit an unlawful act or to accomplish a lawful end by unlawful means)—giving rise to a mutual agency relationship between Haynie and the fraudster(s)—or that Haynie's business relationship with the fraudster(s) otherwise makes him vicariously liable for the fraudster(s)' tortious conduct. (*See id.*)  Specifically, Bryant Bank claims: (1) Haynie was acting as the agent of fraudulent principal(s); (2) Haynie was a business partner of the fraudster(s); or (3) Haynie was engaged in a joint venture with the fraudster(s). (*See id.*)  Bryant Bank has not asserted partnership or joint venture by estoppel (i.e., Bryant Bank has not argued that Haynie made any representations to Bryant Bank regarding the existence of a partnership or joint venture or other business relationship on which Bryant Bank is alleged to have relied). (*See* Amended Complaint, *passim*; Pre-Trial Order, *passim*; Trial Audio; Bryant Bank's Post-Trial Brief, *passim*.)[6]

_____

[6] As alluded to above, the Amended Complaint does not specifically plead agency, or facts which would establish an agency relationship between Haynie and any third party, nor is conspiracy pled by Bryant Bank in the Amended Complaint. (*See* Amended Complaint, *passim*.)  In the Pre-Trial Order, Bryant Bank argued (for the first time to the court) that Haynie was acting as the agent of a fraudulent principal and sought to impute the knowledge and intent of the principal's purported representative(s) to Haynie. (*See* Pre-Trial Order at 4-8; *see also id*. at 5 ("There can be no doubt that Defendant was an agent of the principal, the [C]ompany…").)  During Bryant Bank's closing arguments, and in Bryant Bank's Post-Trial Brief, Bryant Bank's counsel expanded on these imputation arguments, raising conspiracy, partnership, and joint venture theories of imputation for the first time before the court. (*See* Trial Audio; Bryant Bank's Post-Trial Brief at 11-27.)  Haynie has not challenged the timeliness of Bryant Bank's agency-based claims or its conspiracy claim (after having had the opportunity to do so); as such, the court deems the issue of Haynie's alleged conspiracy with, and agency relationship to, the fraudster(s) tried by the implied consent of the parties. *See* Fed. R. Civ. P. 15(b); Fed. R. Bankr. P. 7015.  That said, the court need not reach Bryant Bank's conspiracy or agency claims to resolve the AP (as the court hereinafter finds that Bryant Bank has otherwise proven the knowledge and intent elements of its 523(a)(2)(A) Claim by a preponderance of the evidence) (*see infra* Part VI), and, therefore, the court declines to reach these issues.

Haynie maintains that he was an unwitting participant in, and victim of, the successful fraudulent scheme—denying knowledge of the fact that the $48,400 check was invalid at the times of the relevant transactions and attesting to his subjective belief that he had been hired, legitimately, to solicit North Americans to invest in a foreign business entity and to receive and transfer investment payments on behalf of said foreign entity. (*See* AP Doc. 7 at 3; Answer, *passim*; Pre-Trial Order at 4, 9-10; Trial Audio; Haynie's Proposed Findings and Conclusions at 1-2.) Haynie also denies Bryant Bank's imputation claims, arguing: (1) the only agency relationship evidenced by the record (if any) is one between Haynie, as agent, and said foreign entity, as principal—an entity that is stipulated to exist and is not alleged to have participated in the fraudulent scheme; and (2) imputing the knowledge of a fraudulent principal to the principal's agent "incorrectly reverses the imputation rule of agency." (Haynie's Proposed Findings and Conclusions at 2-4; *see also* Pre-Trial Order at 9; Trial Audio.)

Haynie further disputes that Bryant Bank justifiably relied on Haynie's conduct when it decided to act in the ways that it did. (*See* Amended Complaint ¶ 10; Answer ¶ 10; Trial Audio.) Specifically, Haynie criticizes Bryant Bank's decision to provisionally credit the entirety of the check funds within two business days after Haynie's deposit of the $48,400 check and Bryant Bank's decision to accept Haynie's request to internationally wire $40,012 in provisionally credited check funds on the second business day after the deposit. (*See* Trial Audio.)

Bryant Bank counters: (1) Bryant Bank was not required, by commercial law (specifically Regulation CC)[7] or contract, to place a hold on the deposited check; (2) when deciding to act in the ways that it did, Bryant Bank actually relied on Haynie's misrepresentations (express or implied) regarding the $48,400 check's validity and the legitimacy of Haynie's indorsement, deposit, and wire transfer request, as well as the fact that Haynie was a known customer in good standing with the bank; and (3) the court should find Bryant Bank was justified in doing so. (*See* Trial Audio; Bryant Bank's Post-Trial Brief at 31-32.)

## IV. The Parties' Disputes Regarding the 523(d) Counterclaim

Haynie filed the 523(d) Counterclaim to recover the costs of, and a reasonable attorney's fee for, the AP. (*See* AP Doc. 7 at 5; Trial Audio.) Haynie argues that his debts to Bryant Bank are consumer debts because the debts consist of debits from his personal checking account and include expenditures for personal purposes. (*See* Trial Audio.) Haynie also argues that Bryant Bank's position in the AP was not substantially justified. (*See* AP Doc. 7 at 5; Trial Audio.)

Bryant Bank argues that Haynie's debts do not satisfy the Bankruptcy Code's definition of consumer debt, pointing to the fact that the $40,012 international wire transfer, for (admittedly) nonpersonal purposes, makes up the bulk of Haynie's stipulated liability. (*See* Trial Audio.; Bryant Bank's Post-Trial Brief at 33-38.) Bryant Bank also posits that its position in the AP was substantially justified, arguing that the factual and legal bases for its positions in the AP were reasonable, Haynie was in the best position to provide insight and information as to how the fraud occurred, and Bryant Bank undertook a diligent investigation of the matter. (*See* Trial Audio; Bryant Bank's Post-Trial Brief at 38-42.)

---

[7] As used herein, "Regulation CC" refers to part 229 of subchapter A of chapter II of title 12 of the Code of Federal Regulations, entitled "Availability of Funds and Collection of Checks."

## V. <u>Findings of (Most) Facts and Summary of Relevant Evidence</u>[8]

In making the findings of fact set forth in this Part V, the court has considered the parties' pleadings, the parties' factual stipulations, Haynie's Trial testimony, and the admitted Exhibits, which include, as Plaintiff's Exhibit 10, the transcript of Haynie's May 19, 2021 deposition in the AP without exhibits (the "<u>Deposition Transcript</u>"). Findings of outcome-determinative facts—e.g., the court's determinations as to the elements of Bryant Bank's 523(a) Claims—are reserved for Part VI.

### A. <u>Haynie's Education and Post-Graduate Work Experience</u>

Haynie received a Bachelor of Arts degree from the University of Alabama ("<u>UA</u>") in communication and information sciences in August 2013. Haynie's concentration at UA was broadcast news. Prior to attending UA, Haynie studied television, film, and performing arts for one year at the Savannah College of Art and Design. Haynie did not take classes relating to banking, finance, or accounting during college. Haynie holds Google certifications in Google analytics, Google ads for Google search, Google display, and Google video, as well as an ethics in advertising certification from the American Advertising Federation. Haynie regards himself as computer-literate and can create documents, flyers, and websites.

For the first four years out of college, Haynie worked in radio and collegiate athletics. Haynie then accepted a marketing job with Express Oil Change and Tire Engineers in Birmingham, Alabama, where he worked for about a year before taking a job with Bryant Bank in August 2018.

At Bryant Bank, Haynie worked as a marketing coordinator. Haynie's office at Bryant Bank was located at Bryant Bank's main branch in Tuscaloosa, Alabama (the "<u>Main Branch</u>"), just off the lobby. Haynie did not work in the banking side of Bryant Bank's business, had no access to Bryant Bank customer account information, and did not open accounts or process deposits or withdrawals. Although Haynie acknowledged having interactions with upper-level management while employed at Bryant Bank, Haynie attested to attending only one or two leadership meetings during this time.

Over the course of his employment with Bryant Bank, Haynie completed various, web-based, training courses for which he received certificates of completion from a business or organization referred to as BAI (collectively, the "<u>BAI Courses</u>"). Admitted of record, collectively

---

[8] Part V of this opinion is lengthy, perhaps inordinately so. However, given the manner in which the parties' arguments and evidence were presented, the undersigned believes a detailed summary of the evidentiary record, and the inferences drawn therefrom, is warranted. For the reader's ease (and the undersigned's convenience), and because there is no Trial transcript (only the Trial Audio), record cites in Part V are provided only for quotations, and footnotes are used liberally to describe Exhibits, as well as to provide citations for legal standards and definitions that the court assumes are not disputed and that are pertinent to the court's factual findings. If the court has mislabeled a conclusion of law as a finding of fact, or if the court has mislabeled a finding of fact as a conclusion of law, the court's finding should be construed as a conclusion, and vice versa. Because linguistic errors in certain Exhibits are highlighted by Bryant Bank as red flags ignored by Haynie, the court has not attempted to correct any such errors in Exhibit quotations. That said, the court has made minor formatting changes (e.g., removing extra spaces between lines), and the court has omitted potentially sensitive information (e.g., personally identifiable information) when quoting from the Exhibits.

as Plaintiff's Exhibit 1, are certificates of completion that evidence Haynie completed six BAI Courses on November 29, 2018: (1) "USA PATRIOT Act: The Financial Perspective (Retiring 12-31-21)" (score 91%),[9] (2) "Cybercrime Essentials for Financial Institutions" (score 90%), (3) "CIP: Identity Verification and Compliance" (score 83%),[10] (4) "Cybersecurity: Computer Security Basics" (score 80%), (5) "Information Security: Preventing Identity Theft" (score 94%), and (6) "Privacy Compliance Basics" (score 100%). (Pl.'s Ex. 1 at 1, 3-4, 6, 8, and 10.) These certificates also evidence that Haynie completed two BAI Courses on August 5, 2019: (1) "Cybercrime Essentials for Financial Institutions" (score 80%) and (2) "Understanding Privacy: The Essentials" (score 92%). (*Id*. at 2, 9.) Finally, the certificates evidence that Haynie completed two BAI Courses on October 1, 2019: (1) "Identity Theft: Minimize the Risk" (score 91%) and (2) "Money Laundering, Fraud, and Suspicious Activities [Mini-Course]" (score 100%). (*Id*. at 5, 7.)

According to Haynie's testimony at the Trial, the BAI Courses were broad, online, regulatory compliance courses required of all Bryant Bank employees on an annual basis, and all Bryant Bank employees were required to take the courses until they earned passing scores. Haynie testified that he did not recall the specifics of any of the BAI Courses and did not recall taking any BAI Courses relating to check scams.

Regarding the BAI Course titled "CIP: Identity Verification and Compliance" (*id*. at 1), Haynie testified that he did not recall what the BAI Course covered, but, when asked why such a course might be important to a bank, Haynie answered, "if someone creates a bank account with a fake identity, and essentially takes money from the bank, it's you know, nonrecoverable, or hard to recover." (Trial Audio.)

Regarding the BAI Course titled "Money Laundering, Fraud, and Suspicious Activities [Mini-Course]" (Pl.'s Ex. 1 at 7), Haynie testified that he did not recall the substance of the BAI Course but said he "would assume it covered what the title is" and acknowledged that he scored 100% on the BAI Course assessment. (Trial Audio.) Haynie also acknowledged that the purpose of the course was to teach bank employees about suspicious activities that may signal financial fraud schemes.

Regarding the BAI Course titled "Information Security: Preventing Identity Theft" (Pl.'s Ex. 1 at 6), Haynie acknowledged that the purpose of the course was to help bank employees prevent identity theft and that the course covered the definition of identity theft, the types of

---

[9] The USA PATRIOT Act of 2001 requires financial institutions to establish anti-money laundering programs, by, among other things, developing "internal policies, procedures, and controls;" designating "a compliance officer;" providing "an ongoing employee training program;" and establishing "an independent audit function to test programs." *See* 31 U.S.C. § 5318(h)(1)(A)-(D). The Act also provides for regulations requiring financial institutions to implement procedures for verifying the identities of persons seeking to open accounts. *See id*. § 5318(*l*)(1).

[10] "CIP" refers to customer identification programs required of financial institutions, under 31 C.F.R. § 1020.220, to assist the federal government in fighting money laundering and other crimes. *See generally* 31 C.F.R. § 1020.220(a)(1) (eff. Mar. 1, 2011 to Nov. 15, 2020) ("A bank must implement a written Customer Identification Program (CIP) appropriate for its size and type of business that, at a minimum, includes each of the requirements of paragraphs (a)(1) through (5) of this section. If a bank is required to have an anti-money laundering compliance program…then the CIP must be a part of the anti-money laundering compliance program."); *id*. § 1020.220(a)(5)(iii) ("If appropriate, a bank may use the following sample language to provide notice to its customers:…To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.").

customer information to protect, and how to detect identity theft. Haynie further testified that the training most relevant to his position in marketing was on the topic of safeguarding a customer's personal information, such as the customer's name, email address, mailing address, and telephone number.

Regarding a BAI Course titled "Cybercrime Essentials for Financial Institutions" (*id.* at 2-3), Haynie recalled that the training focused on cybersecurity and preventing cyber-attacks accomplished by phishing, malware, and ransomware.

It is undisputed that the BAI Course titles were generally indicative of course content, that Haynie took assessments at the end of each BAI Course to measure what he had learned, and that Haynie's BAI Course scores were accurate. That said, no evidence, other than Haynie's above-described recollections of the BAI Courses, was offered regarding BAI or the BAI Courses (e.g., the evidentiary record does not reflect the length of any BAI Course, the specific content of any BAI Course, or the basis for any BAI Course score, nor does it contain information about BAI as an organization).

In late December 2019 or early January 2020, Haynie left Bryant Bank, on good terms, to take a marketing position with UA, managing digital marketing for undergraduate admissions and UA branding campaigns. As of the Trial date, Haynie remained in this position at UA.

B.    <u>Haynie's Bank Accounts</u>

Around the time that Haynie started his marketing job at Bryant Bank, he opened a preferred personal checking account with the bank (the "<u>Account</u>"). Admitted as Plaintiff's Exhibit 2 is a copy of the "Account Agreement and Signature Card" for the Account (the "<u>Account Agreement</u>"), which is dated August 22, 2018 and signed by Haynie, as well as three of the eight additional agreements or disclosures referenced therein—"Terms and Conditions of Your Account" (the "<u>Account Terms</u>"), "Your Ability to Withdraw Funds" (the "<u>Funds Availability Disclosure</u>"), and "Electronic Fund Transfers – Your Rights and Responsibilities" (the "<u>EFT Disclosure</u>," and collectively with the Account Agreement, the Account Terms, and the Funds Availability Disclosure, the "<u>Admitted Account Agreements</u>"). (*See* Pl.'s Ex. 2, *passim*.)

At the time of the deposit that is the subject of the AP, the Account was Haynie's primary bank account. Haynie also had a personal checking account with USAA. Haynie testified that his USAA account had been open for several years, that the USAA account had a very small balance, and that Haynie did not use the USAA account. When Haynie filed for bankruptcy relief (in September 2020), Haynie had a personal checking account, and a personal savings account, with Wells Fargo Bank, but, when Haynie made the subject deposit, he had not yet opened these accounts.

C.    <u>The Job Offer</u>

In September 2018 (shortly after starting his marketing job at Bryant Bank), Haynie accepted a LinkedIn connection invitation from a person identifying themselves as "Kennedy

Jamie" (the "Recruiter").[11] Haynie testified that, on January 8, 2020 (shortly after Haynie started work at UA), the Recruiter messaged Haynie via LinkedIn to congratulate Haynie on his new UA position. Haynie further testified that, on January 9, 2020, the Recruiter messaged Haynie again to let Haynie know that the Recruiter had looked through Haynie's LinkedIn profile and believed Haynie would be a good fit for a "sales representative" position with an "oil multinational company." (Trial Audio.) According to Haynie's testimony, the Recruiter then sent a follow up message to Haynie (via LinkedIn) on January 13, 2020, informing Haynie that the Recruiter had shared Haynie's contact information with Hyundai Oilbank (the "Company").[12] Haynie testified that he ignored these initial messages.

According to Haynie's testimony, the Recruiter then contacted Haynie via LinkedIn again, on January 27, 2020, to ask if Haynie had received an email from the Company. Haynie attested to receiving an email from a person purporting to represent the Company, and identifying themselves as Jong Bak-Moon, the same day.[13] Haynie testified that the email provided information about the Company and the proposed position with the Company.

Explaining his understanding of the job, Haynie testified at the Trial: "They [the Company] would provide leads, and the point of my job was to be, you know, someone from North America who, you know, would have better communication and, I guess, speed up their process." (Trial Audio.) During his deposition, Haynie testified: "The way it was presented to me was that they wanted people who were North Americans to speak with other North Americans. You know…I really didn't find that as being that odd." (Deposition Transcript 33:16-20.)

Haynie further testified that, after receiving another follow up message from the Recruiter via LinkedIn on February 3, 2020, asking the Recruiter some questions about the job, and conducting some "light" online research about the Company (*id*. 26:1-2), Haynie submitted a resume to the Company.[14] As to Haynie's understanding of what the Company did, Haynie testified during his deposition:

---

[11] The only LinkedIn communications of record comprise Defendant's Exhibit B—a screenshot of a LinkedIn notification dated "Sun, Mar 22, 7:44 PM" (presumably 2020), showing that Haynie had "1 new message" from "Kennedy Jamie OWNER at KJM Company" (Def.'s Ex. B at 1), and a July 6, 2020 automated response email from "LinkedIn Customer Support" to the Haynie Email Address (as said term is hereinafter defined), acknowledging receipt of a July 6, 2020 message from Haynie which stated:

> I fell victim to a scam that was initiated on LinkedIn. I would like to have a full printout of the messages between myself and the scammer on LinkedIn to give to my attorney, however the conversation is no longer in my messages. The account name was Kennedy Jamie. I have attached the last email notification I received. If you could please help by providing the messages, I would greatly appreciate it.

(*Id*. at 2.)

[12] In the Admitted Company Emails, the Consulting Agreement, and the Power of Attorney (as said terms are hereinafter defined), the Company is referred to as Hyundai Oilbank, Hyundai Oilbank Corporation, or Hyundai Oilbank Co.

[13] This email is not part of the evidentiary record.

[14] Haynie's resume is not part of the evidentiary record (nor is any email or other correspondence submitting the same to the Company).

It's a large corporation.  They have, you know, contracts.  I know from when I was just doing some research online, they had contracts with the U.S. military, but they are an oil provider.  And what was said to me about this position [was that the Company] was seeking investments for projects being done in North America.

(*Id.* 26:14-21.)

D.    The Consulting Agreement

Haynie attested to receiving a contract for the position with the Company by email on February 5, 2020 and further attested to signing and returning the contract.[15]  Haynie authenticated Plaintiff's Exhibit 4, entitled "Memorandum of Understanding," as a true and correct copy of this contract (the "Consulting Agreement").  The Consulting Agreement is dated February 6, 2020 and purports to be signed by Jong Bak-Moon, as "Head of Operations" for the Company.  (Consulting Agreement at 2, 4.)  The copy of the Consulting Agreement admitted as Plaintiff's Exhibit 4 is not signed by Haynie.

Per the Consulting Agreement, Haynie was to communicate with potential investors assigned to Haynie by the Company for five to ten minutes a day, receive payments from investors, and send such payments to a project coordinator for the Company.  Specifically, the Consulting Agreement states, in pertinent part:

3.    The Consultant shall devote 5-10 minutes daily to commune with the particular investor assigned to the consultant….

4.    CONSULTANT'S (YOU) SOLE DUTY:

As a [Company] Consultant, your sole duty will be to discuss with our potential investor gain their confidence, know how much each investor hope to invest, receive payments and send to our project coordinator which will be provided to you at that point in time (You will be our eyes and ears).  As our first time representative, I will talk and walk you through your first job with [the Company].  When you start working with us, you will be required to spare few minutes each day to discuss with investors through phones or emails for correspondence from investors and if the need arises, you can travel to meet up with the investtor (All expenses paid by us). You don't need to leave your current job or engagement while working with us.

(*Id.* ¶¶ 3-4.)

The Consulting Agreement also specifies the details of Haynie's compensation structure, stating:

5.    PAYMENT TO CONSULTANT:

_____

[15] This correspondence is not part of the evidentiary record.

A. You shall receive a monthly Consulting fee of $5,000.00 and $ 60,000.00 USD annually during the duration of this contract.

B. Consultant shall deduct 7% instant commission for every transaction transacted through consultant.

C. Representative (You) will earn a dividend of 10% each of total funds initially paid in by an investor after a space of six (6) months. For every amount invested by the investor paid through our representative (you)[.] You will receive a dividend of 10% at the end of six (6) months after the semi-maturity of the shares purchased by the investor…

(*Id.* ¶ 5.)

Among other provisions, the Consulting Agreement also provides:

6. COMPANY CONTRACTOR:

Both the Company and the Consultant agree that the Consultant will act as a dependent contractor in the performance of their duties under this contract. Accordingly, the Consultant will NOT be responsible for payment of all taxes…arising out of the Consultant's activities in accordance with this contract…. [The Company] will be responsible for all taxes incurred during the whole process.

(*Id.* ¶ 6.)

E.    Haynie's Acceptance of the Job

On February 10, 2020, Haynie received an email,[16] purportedly signed by the Company's CFO/VP, Kyoo Yong-lee (the "CFO"), and the Company's Executive Director, Jong Bak-Moon (the "Director"),[17] and sent from an email address having the username "coperateoffice." (Pl.'s Ex. 3.)[18]   The email notified Haynie of his employment by the Company and purported to appoint

---

[16] This email is part of a February 10, 2020 email chain between Haynie and purported representatives of the Company, a copy of which is admitted as Plaintiff's Exhibit 3. Defendant's Exhibit D consists of copies of emails, email chains, or portions thereof between purported representatives of the Company and Haynie that were sent or received by Haynie on February 11, February 12, February 13, February 15, February 17, February 18, February 23, February 24, February 27, March 6, March 9, and March 11, 2020. Plaintiff's Exhibit 3 and Defendant's Exhibit D are referred to herein, collectively, as the "Admitted Company Emails." Notably, while the Power of Attorney (as said term is hereinafter defined), a referenced email attachment, is admitted as Plaintiff's Exhibit 5 and Defendant's Exhibit E, it does not appear that the other attachments referenced in the Admitted Company Emails comprising Defendant's Exhibit D are part of the evidentiary record.

[17] As set forth above, a Jong Bak-Moon purportedly signed the Consulting Agreement as Head of Operations for the Company, and Haynie attested to earlier emails with a Jong Bak-Moon (regarding the position with the Company) that were not offered into evidence by either party.

[18] Haynie's personal Gmail account address (the "Haynie Email Address") appears in the sender or recipient line of each Admitted Company Email. Three (3) other email addresses (collectively, the "Company Email Addresses") appear in the sender or recipient lines of the Admitted Company Emails. The Company Email Addresses share a common domain name that includes part of the Company's name. The earliest Admitted Company Email has a

Haynie as the Company's representative in the United States. The email asked Haynie to confirm his acceptance of the appointment by email to the CFO at Company Email Address 2. The body of this February 10, 2020 email to Haynie reads:

> We received and deliberated on your RESUME / WORK INFO. We have made a decision on your application as our External Representative Agent. I am happy to inform you that you have been officially employed by the company. We urgently seek an External Representative Agent on behalf of the [Company].

> I ([CFO] of [the Company]) do hereby appoints

> CHAD HAYNIE…to represent [the Company] in His/Her Country of Residence. This Appointment takes immediate effect from today.

> This appointment gives you the full legal right to represent our company in your region. As a matter of urgency, I would need you to confirm your appointment by email response to me at [Company Email Address 2] because your work starts immediately.

> I await your response and approval directly to me only on [Company Email Address 2], once I receive your response, you will be informed and given further instruction.

(*Id.*)

---

username of "coperateoffice" and a top-level domain ("TLD") of ".org" ("Company Email Address 1"). (Pl.'s Ex. 3.) However, as instructed in the body of said email, Haynie responded to a different Company Email Address, having the username of "kyooyong-lee" and a TLD of ".org" ("Company Email Address 2"). (*Id.*) The Admitted Company Emails sent between February 12 and February 27, 2020 include Company Email Address 2 as the sender or recipient. An Admitted Company Email dated March 6, 2020 (and purportedly signed by the Director) instructed Haynie to direct further communications with the Company to a Company Email Address having a username of "kyooyong-lee" and TLD of ".net" ("Company Email Address 3"). (Def.'s Ex. D at 12.) This Admitted Company Email (sent from Company Email Address 3) reads (in pertinent part):

> **NOTICE**:

> Please be advised that most our company email addresses and websites are currently under routine maintenance. Therefore all current employees and regional representatives (such as you) of [the Company] are henceforth expected and advised to direct all your present and future business related email conversations/information to us here at [Company Email Address 3] i.e. Henceforth, we advice that you (our representative) must address all further information and business progress with our assigned investor, to us here @ [Company Email Address 3] , as we are current conducting a routine maintenance on our other official addresses and online platforms.

> We apologize for any inconvenience this may have cost you at this time. Thanks for your revered understanding as you comply.

(*Id.*) The Admitted Company Emails from March 6, March 9, and March 11, 2020 list Company Email Address 3 as the sender or recipient.

Haynie responded to Company Email Address 2 on February 10, 2020, stating: "This email is to confirm my appointment as External Representative Agent. I look forward to working with you and [the Company]." (*Id.*)

On February 11, 2020, Haynie received another email from Company Email Address 2, purportedly signed by the CFO, the body of which reads:

> We are glad that you have accepted to become one of our Professional Representative Agent in your region. We have a big rush of investors lining up in your area and we wouldn't want to lost any. Attach to this email are documents you will be sharing with investors coming your way. You are to study and be able to throw light on them when potential investors asks certain questions. Kindly know that you will be reached out by our attorney serving you a copy of POWER OF ATTORNEY, giving you the legal right to carry out business on our behalf.
>
> Contents attached are:
>
> - Real Estate Building Plan for International Workers,
> - [Company] Super Chart, Showing LNG Terminal Plans and Current Shares. and
> - [Company] FLIER, showing the different Stock sales Packages.
>
> NOTE: Please Fill out completely the details that is applicable in your country on the list below, for [Company] Documentation, Reference and Salary/Benefit remuneration (Mandatory):
>
> First name:
> Middle Name:
> Last Name:
> Date of Birth (DD/ MM/ YYYY):
> Nationality:
> Residential Address:
> Tel:
> Email:
> Initial Company Name:
> Initial Position:
> Bank Name:
> Business Account Name:
> Type of Account:
>
> NOTE: All information provided by representative to [the Company] will be treated confidentially (eyes only) and will not be shared with a third party unless agreed upon by our representative and [the Company].
>
> READ CAREFULLY: Lets make sure we are all on same page before assigning you to investors. Kindly know that you should try to secure investors that comes

14

your way because you are entitled to (7%) commission from every successful investment through you. kindly be of positive assistance to investors, in the manner they wish to proceed with payments by making available or putting in place "Funds Receiving Arrangements" that best work for each investor as requested at that point in time (either by wire transfer, Mobile cheque Deposit e.t.c), further more you will be guided to make deposit of the investment funds you successfully collect from investors, to a Regional Coordinator which will be provided to you at that stage in the process.

ASSIGNMENT: As our External representative, you are to contact the following companies / private investors about our shares, and you are to formally brief them regarding our investment packages and wait for their feedback.

You are to formally inform them of your place with [the Company]. Kindly know that you are to contact and inform them that you are working on behalf of [the Company] and you have been given the Power of Attorney by us to act on our behalf. You are to send a copy of the Power of Attorney to them for possible confirmation. You are to contact them directly about our Investment Benefits / Shares plan.

You are expected to work with the contacts below as your first assignment. Kindly reach out to them via the email below as soon as possible. Below are their contact information.

LIST OF INVESTORS

(1)

| | |
|---|---|
| Name: | Orlin Crandon[19] |
| Email: | [omitted]@gmail.com[20] |
| Position: | Managing Director |
| Phone: | 1-705-[omitted]-[omitted] |
| Company: | Crandon Brokers |

(2)

| | |
|---|---|
| Name: | Mr Valero Freeman |
| Email: | [omitted]@contractor.net[21] |
| Position: | Managing Director |
| Company: | Freeman Inc. |

….

(Def.'s Ex. D at 1-3.)

---

[19] As used herein, the "Investor" refers to Orlin Crandon.
[20] This email address is referred to hereinafter as "Investor Email Address 1."
[21] This email address is referred to hereinafter as "Investor Email Address 2."

Haynie responded to this email on February 12, 2020, writing: "Please see the requested information below. Also, should I wait to reach out to these contacts until I have received the documentation from the attorney?" (*Id*. at 1.) For his "Bank Name," Haynie listed "USAA" (not Bryant Bank); for his "Business Account Name," Haynie listed "Classic Checking;" and for "Type of Account," Haynie listed "Checking." (*Id*.) Haynie did not provide an "Initial Company Name" or an "Initial Position" in his February 12, 2020 email to Company Email Address 2. (*Id*.)

As to Haynie's subjective mental state at the time he accepted the position, Haynie admitted that the job seemed "too good to be true" and that he was skeptical (at first), pointing to his initial skepticism as the reason he did not immediately respond to the Recruiter regarding the position with the Company and did not "jump right on" the opportunity when the Recruiter initially contacted him through LinkedIn in early and mid-January. (Trial Audio.) However, Haynie went on to testify that he believed that the job with the Company was legitimate when he accepted the position and that everything, at every step of the way, "checked out." (*Id*.)

Notably, the only tasks required of Haynie by the Consulting Agreement were to communicate with assigned potential investors for a few minutes each day, to receive payments from investors, and to send payments to a project coordinator—for which Haynie was to receive a $5,000 monthly salary, a seven percent instant commission on investments transacted through him, as well as a ten percent dividend on investments transacted through him after a period of six months. The Consulting Agreement also stated that Haynie did not need to leave his current job to work for the Company. Although Haynie acknowledged that this "side job" for the Company promised to pay more than his full-time UA job paid (an annual salary of about $50,000), Haynie testified that this did not "strike him as odd" or "send up any red flags" because "we have several people in our division who make more on their side jobs" than they make at UA. (*Id*.) Haynie did not otherwise address how he came to believe that the job did not promise unreasonably high compensation for very little work.

Haynie also did not testify as to whether there were any stated qualifications for the job, and the record before the court does not evidence any. However, explaining his subjective beliefs concerning his qualifications for the job, Haynie attested to believing (then and at the Trial) that his prior education and work experience (particularly his marketing background) qualified him to accept a job soliciting North Americans to invest in the Company. This is notable for several reasons. As set forth above, soon after accepting the position, Haynie learned that he was to email "Stock sales Packages" to two individuals for purposes of soliciting investments in the Company, to personally collect the individuals' investment payment(s) if they elected to invest in the Company, and to "make deposit of the investment funds" successfully collected by Haynie "to a Regional Coordinator" who would be identified at a later time. (Def.'s Ex. D at 2.) Stated more precisely, from the outset, the job required that Haynie, operating from his home in Tuscaloosa, Alabama: (1) email (purported) Company documents to two individuals for purposes of soliciting the individuals to invest in (purported) Company securities; (2) personally collect investment payment(s) from the individual(s) (via third party wire transfer, check, or other means); (3) receive or deposit such investment payment(s) in a personal bank account; and (4) after deducting his transaction-based commission(s), transfer the collected investment payment(s) to an unidentified third party.

Significantly, Haynie did not attest to any knowledge, training, or experience regarding the securities industry. Haynie is not registered as a broker or dealer with the Securities and Exchange Commission, nor does Haynie purport to work for a registered broker or dealer. Haynie has never taken a securities qualification exam. Haynie is not a member of a self-regulatory organization. Haynie did not testify as to whether the prospective investors were accredited or whether the Company securities were registered. In other words, Haynie (objectively) was not, and is not, qualified to engage in the business of effecting or facilitating securities transactions in the United States—a fact that Haynie, presumably, would have discovered had he investigated whether he could, legitimately, do what the Company's purported representatives were asking of him.

Also of significance, Haynie completed his latest BAI Course regarding money laundering and financial fraud schemes just over four months before accepting the job. The court must presume, then, that Haynie had some subjective appreciation of what money laundering is and how to detect financial fraud schemes. Yet, as set forth more fully below, Haynie testified that, notwithstanding his BAI Course training, he did not appreciate that personally receiving money from one third party (at the direction of someone else), and then transferring the bulk of the money to another third party, was a money laundering red flag (although Haynie admits that, in hindsight, it was). The fact that Haynie admittedly disregarded this hallmark of money laundering is difficult to accept given that Haynie never attested to making any investigation concerning whether he could legitimately receive and transfer third party investments in the Company using his personal checking account (something that someone of Haynie's background and experience would reasonably be expected to do).

Further, as set forth above, Haynie attested to conducting only minimal due diligence concerning the proposed position with the Company before taking the job. At the Trial Haynie summed up his due diligence as follows: "I wouldn't say [I took the job] without any vetting. I mean I did…check to see that [the Company] was a real corporation" and that "the people who were emailing me were listed on their website." (Trial Audio.) Many of the Admitted Company Emails include a Company logo, a Company mailing address, titles for the purported representatives of the Company (including the CFO and the Director), and other identifying information (including a Company website ending in a ".org" TLD and a Company registration number). The parties stipulate that there is a legitimate entity having the same name as the Company, and there is no evidence of record to refute Haynie's testimony that the individuals with whom he believed himself to be communicating were listed on said entity's website. Further, based on the evidentiary record, the court cannot say whether the other Company information contained in the Admitted Company Emails was inaccurate, or whether it was readily identifiable as such.

That said, there also is no evidence to substantiate Haynie's testimony that the information Haynie gathered from his limited online search was consistent with the Company information he had received from the purported Company representatives, and the court questions whether any such evidence exists. For instance, while it is possible that a large, for-profit, multinational, commercial business might choose a ".org" TLD for its company website and company email addresses, it is not probable. Further, one would not typically expect a large, multinational company to misspell corporate as "coperate" in a company email username, nor would one expect such a company's chief financial officer and its executive director to share a company email address. As set forth above, Haynie regards himself as computer-literate, can create websites, and

insists he was qualified to take the job as it was presented to him, yet Haynie never testified as to whether he failed to notice, or noticed but disregarded, these things.

Moreover, as the above quotations illustrate (and as further illustrated by the quotations set forth hereinafter), the Admitted Company Emails and the Consulting Agreement, as well as the power of attorney that Haynie would later receive, contain several (obvious) linguistic errors. Haynie does not deny that he noticed these errors at the time, but Haynie testified that the language did not seem "off" to him because he believed the documents to be coming "from South Korea." (*Id.*) Haynie further testified that he attributed such errors to his belief that he was dealing with individuals for whom English was not their first language and to his belief that he was being hired to act as a "communicator" with "investors in North America." (*Id.*)

Objectively, Haynie's attested to rationale for disregarding these linguistic errors strains credulity. It also should go without saying that many individuals who learn English as a second language are able to speak and write English fluently. Additionally, Haynie admitted, during the Trial, that he never met any of the purported representatives of the Company, nor spoke with any of the purported representatives of the Company by telephone, either before or after taking the job. There also was no job interview or job application. In other words, apart from submitting his (unoffered and unadmitted) resume and communicating with purported Company representatives by email, Haynie was not required to show his purported employer that he possessed superior written communication skills, and Haynie's verbal communication skills were not evaluated by his purported employer at all. Moreover, as will be discussed more fully below, other evidence of record shows that Haynie's stated rationale for disregarding the aforementioned linguistic errors is, more likely than not, inauthentic.

Finally, it is notable that Haynie listed USAA as his financial institution for salary/benefit remuneration in his February 12, 2020 email to Company Email Address 2, a decision that Haynie did not explain at the Trial or during his deposition (despite being asked the question in a variety of ways). While Haynie had a checking account with USAA, it was not a checking account that he routinely used, and the account had only a very small balance. As such, the court draws a negative inference from Haynie's failure to explain his initial plans to use his USAA account for salary/benefit remuneration (i.e., that Haynie's obfuscation indicates that Haynie subjectively appreciated at least certain of the risks of the job when he accepted it—for instance that he was being asked to use a personal bank account to facilitate transfers to and from third parties, which would place his account at risk, or that he was being asked to share his personal banking account information with someone he did not know or trust).

F.    The Power of Attorney

On February 13, 2020, Haynie received an email from Company Email Address 2, purportedly signed by Barrister Zhong Yin (the "Attorney"), which states (in pertinent part):

FROM THE OFFICE OF [the Attorney]
THROUGH: [the Company]
TO: CHAD HAYNIE,

18

Hello Chad Haynie,

I am the Zonal Attorney of [the Company]. I have been asked to serve you a Power of Attorney bearing every legal right to represent the company internationally.
You will find a copy of the power of attorney as an attachment to this email. If you have further questions regarding this, kindly contact [the Company].

I will have you counter sign and send me a copy as an email attach for documentation purpose. Please note that this document will stand as an evidence while communicating with the company's client.

(Def.'s Ex. D at 4.) Although the attachment to this email is not part of the record, Haynie attested to receiving a power of attorney via email, as well as to signing and returning the power of attorney.

At the Trial, Haynie authenticated Plaintiff's Exhibit 5 as a true and correct copy of this power of attorney (the "Power of Attorney").[22] The Power of Attorney is dated February 14, 2020 and includes handwritten signatures for the CFO and the Attorney (but no handwritten signature for Haynie). The Power of Attorney also appears to include electronic signatures for the CFO, the Attorney, and Haynie. The provisions of the Power of Attorney highlighted by Bryant Bank are as follows:

I DISPOSE AN OATH AND HEREBY APPOINT CHAD HAYNIE…(hereinafter called "the Agent") to be my lawful agent for managing and transacting my business in USA & CANADA. with full power and authority for me and in my name, and for my account and benefit.
…
5.      To settle, compromise or submit to arbitration all accounts, claims and disputes between me and any other person or persons.
…
7.      To invest any of my money in such manner, at such rate of interest, and upon such securities as the Agent shall in his absolute discretion think fit and from time to time to vary the said investments or any of them and in the meantime, and pending any such investments as aforesaid, to deposit the said money or any part thereof with any bank, building society or other institution authorised by law to accept money on deposit to whom or to which the Agent shall think fit to entrust the same.
…
I hereby ratify and agree to ratify everything, which the Agent under this power of attorney shall do or purport to do by virtue of this power of attorney.

(Power of Attorney at 1-2.)

---

[22] The Power of Attorney also is admitted as Defendant's Exhibit E.

19

G.    The Potential Investors

On February 15, 2020, Haynie sent emails to both Investor Email Address 1 and Investor Email Address 2.[23]  The body of each such email reads:

> I'm Chad Haynie, an external representative for [the Company] in North America. I am reaching out because [the Company] identified you as an investor [who/you][24] would potentially be interested in opportunities for investment in North America. I have attached three PDFs from [the Company] outlining current opportunities for investment with further details.

> If you would like more information or if you are interested in investing, please let me know.

(Def.'s Ex. G at 1, 3.)[25]

Also, on February 15, 2020, Haynie sent an email to Company Email Address 2, which states: "After signing and sending back the Power of Attorney, I have reached out to the two contacts identified (Mr. Crandon and Mr. Freeman) and will let you know if I hear back from them."  (Def.'s Ex. D at 5.)

On February 17, 2020, Haynie received an email from Company Email Address 2, purportedly signed by the CFO, stating that Haynie's employment with the Company had begun with Haynie's (February 15, 2020) emails to the assigned investors, entitling Haynie to a seven percent commission on investment funds "paid through" Haynie, as well as a monthly salary of $5,000 "at the end of every 30 working days…via investment check deposit into [Haynie's] provided bank account." (*Id.* at 8.)  On February 18, 2020, Haynie responded to this email, writing:

> This is confirmation of my receipt of your email.  Just for clarification, does [the Company] provide a monthly check for salary or am I supposed to withhold it from any investment I receive?

> The latter, which is what your previous email sounded like, isn't really a salary it would be a form of commission.  That would certainly be different than what was

---

[23] Defendant's Exhibit G includes copies of a February 15, 2020 email from the Haynie Email Address to Investor Email Address 2 (attachments omitted), as well as copies of email chains, or portions of email chains between the Haynie Email Address and Investor Email Address 1 sent or received by Haynie on February 15, February 23, February 24, March 3, March 9, March 11, and March 17, 2020 (attachments omitted). Page 15 of Defendant's Exhibit D appears to be a copy of an email sent by Haynie to the Investor on March 11, 2020 at 1:48 p.m., though no recipient email address appears in the Exhibit copy.  The foregoing Exhibits are referred to herein, collectively, as the "Admitted Investor Emails."

[24] The email to Investor Email Address 1 says "you" (*see* Def.'s Ex. G at 3); the email to Investor Email Address 2 says "who." (*See id.* at 1.)

[25] As noted above, the attachments referenced in the Admitted Investor Emails are not part of the record, and only the email to Investor Email Address 2 includes the names of three (3) attachments—"Real Estate Approval.pdf," "INVESTMENT MANUAL AND FLIER.pdf," and "[Company] Super Project Chart.pdf." (*Id.* at 1.)

originally described to me. I appreciate your clarification and assistance clearing this up.

Thank you,
Chad

(*Id*.)

It does not appear that Haynie received a response to his February 18, 2020 inquiry until February 23, 2020 at 11:23 p.m. (shortly after Haynie's below-described email exchange with Investor Email Address 1 on the evening of February 23, 2020). This is the date and time of receipt (by Haynie) of an email from Company Email Address 2, which is purportedly signed by the CFO. The body of this email reads:

We received your last mail to us and we appreciate your show of commitment so far to this project. Please be advised that all regional representatives of this Company will be eligible for salary payment after the first 30 (Thirty) official working days with our interested investors.

Method of salary remuneration (either by investment funds deduction, direct account crediting, etc.) will be made known to qualified representative after an approval from the executive board of [the Company] has been granted.

Please kindly proceed with your appointed task and do keep us informed of your progress as you do.

Thanks for your Understanding.

(*Id*. at 10.)

H.    The Investment

At the Trial Haynie testified that he never received a response to his email to Investor Email Address 2 but that he did receive a response to his email to Investor Email Address 1. The email, sent from Investor Email Address 1 and received by Haynie at 9:10 p.m. on February 23, 2020, purports to be signed by the Investor. The body of the email reads:

Thanks for your mail and my apology for not responding sooner, I have reviewed your investment packages and will be investing $50,000 in your S-Shares, I have been authorization to make remittance to you by [the Company] as their Regional Representative.

Kindly complete the questionnaire below and call me before noon tomorrow to discuss so we can proceed, my contact number is stated below.
1) Your Full Name:
2) Name Check Should Be Made Payable To:

21

3) Your Complete Mailing Address To Mail The Check:
4) Your Mobile Number:
5) Name Of Your Bank:

(Def.'s Ex. G at 2-3.)

Haynie responded to the email a little over an hour later, at 10:20 p.m., stating: "Thank you for your response.  Please find the requested information below.  I will give you a call in the morning if that works for you." (*Id*. at 2.)  For the field "Name Check Should Be Made Payable To," Haynie listed his name; for "Your Complete Mailing Address To Mail The Check," Haynie listed his personal mailing address; and for "Name Of Your Bank," Haynie listed "Bryant Bank (Tuscaloosa, Alabama)" (not USAA).  (*Id*.)

Haynie testified to speaking by telephone with a person purporting to be the Investor on February 24, 2020, who Haynie described as a native English speaker in his deposition.  Haynie further testified that it was his belief, based on this February 24, 2020 telephone conversation, that the Investor planned to withdraw funds from another investment to invest in the Company.  Although Haynie twice testified at the Trial that he learned the exact amount of the investment— $48,400—during his February 24, 2020 telephone call with the person claiming to be the Investor; during his deposition Haynie testified, "I think he had sent it in an email, what the amount was going to be." (Deposition Transcript 36:20-21.)

Haynie recalled of this February 24, 2020 telephone conversation that the person purporting to be the Investor asked if Haynie "owed any money to the IRS or anything that would have a block on, you know, funds deposited into an account." (*Id*. 32:9-12.)  Haynie testified at the Trial that these questions did not strike Haynie as "odd" because "looking through [the Investor's] shoes, he's sending money to someone." (Trial Audio.)  Haynie admitted that, "in hindsight," these questions by the (purported) Investor were "red flags," as was the fact that Haynie was being asked to "run investments" in the Company through his personal checking account.  (*Id*.)  However, when asked at the Trial whether Haynie's BAI Course in "money laundering, fraud, and suspicious activities…told [Haynie]" that "solicit[ing] investments" in a "multibillion-dollar company" and "run[ning] these investments through [Haynie's] personal checking account" was suspicious, Haynie responded, "negative, no, apparently it didn't."  (*Id*.)

On the morning of February 24, 2020, Haynie sent a response to the aforementioned February 23, 2020 Admitted Company Email regarding the method of Haynie's salary payment (e.g., by Company check or withholding from investment funds), stating:

Thank you for the clarification!

I have heard back from [the Investor] and spoke with him over the phone this morning.  He is planning to make an investment of S-Shares between $10,000-$50,000 USD.  He said he would let me know the final number when he has the check cut later this week, although he did say it would likely be $50,000.  I will let you know when I have that confirmation from him and when I receive the check.

22

I have not gotten any response from [the other assigned investor].

If you have any other contacts you would like me to reach out to in the mean time, please just let me know.

(Def.'s Ex. D at 10.)

Later that morning, Haynie received an email from Investor Email Address 1, purportedly signed by the Investor, which states: "It was nice speaking to you today, you should inform [the Company] about our phone call today and also that the investment check will be mailed this week and you will receive it early next week." (Def.'s Ex. G at 4.)

Haynie responded to Investor Email Address 1 the same day: "I have already emailed [the CFO] with [the Company] to notify him. If you have any questions in the meantime, please let me know. I will send a confirmation when I receive the check." (*Id*.)

The body of a February 27, 2020 email from Company Email Address 2 to Haynie, purportedly signed by the CFO, reads:

> We received your last mail to us, and I will like to inform you that [the Company] received a mail of notification, notifying us of the partial payment of $48,400.00, which was mailed out to your provided address from [the Investor] (Our Investor).
>
> READ CAREFULLY: Upon confirmation and pick up of this parcel, kindly visit your banking institution to make a DIRECT DEPOSIT into your account, and send via email to us a Mobile Snapped/Captured copy of the cheque mailed out to you from [the Investor] (Our Investor) as well as a scanned copy of the deposit receipt after formally making a deposit to your Bank , and on availability of funds, you are to inform this office so that you will be provided with the appropriate designated account needed to make such payments into.
>
> NOTE: You are to send a copy of the cheque via email back to us for confirmation before you proceed with deposit.

(Def.'s Ex. D at 11.) Haynie responded to this email the same day, writing: "Please accept this as confirmation I have received this email. I will send a copy of the check via email when I receive it and deposit it." (*Id*.)

An Admitted Investor Email dated March 3, 2020, from Investor Email Address 1 to the Haynie Email Address, states: "This is to advise that the investment check for $48,400.00 has been mailed to your address and will be delivered in your mailbox by USPS this week, kindly notify me when the check is received and deposited. Note: You should acknowledge receipt of this email by responding." (Def.'s Ex. G at 4.)

Haynie testified that, on or about Saturday, March 7, 2020, Haynie received a $48,400 check payable to him (the "Check")[26] by mail. The Check is dated February 24, 2020 (the date of Haynie's first telephone call with the purported Investor) and identifies EQT Production Company ("EQT Production") as the maker of the Check and the Bank of New York Mellon Pittsburgh, Pennsylvania as the drawee (the "Drawee"). Haynie testified that he did not find it odd that the Check (purportedly) was issued by EQT Production (a third party with whom Haynie had never communicated), as Haynie believed the Investor had withdrawn funds from another investment to make the $48,400 investment in the Company.

The Check includes a post office box mailing address for EQT Production (in Pittsburgh, Pennsylvania) but no telephone or fax number for EQT Production. According to Haynie's testimony, and Defendant's Exhibit A, the Check was enclosed in a blank window envelope (the "Inner Envelope") and placed in an outer envelope hand addressed to Haynie at his personal residence (the "Outer Envelope," and together with the Inner Envelope, the "Enclosure Envelopes").[27] The Outer Envelope bears a handwritten return address for the purported Investor in Barrie, Ontario and a Canadian postmark.

During his deposition, Haynie was asked if it struck him as "odd" that a "multi[-]national, multi[-]billion[-]dollar company didn't have their own bank account in the United States they could have their investments wired directly to…" (Deposition Transcript 33:3-8.) Haynie responded: "Obviously, in hindsight." (*Id*. 33:9.) However, Haynie further testified that, given the way the job was presented to him ("they wanted people who were North Americans to speak with other North Americans"), he "really didn't find that as being that odd" at the time. (*Id*. 33:16-20.) When asked during the deposition, "But did you not think it was odd that these people are going to send you a check personally for tens of thousands of dollars?" (*id*. 33:22 to 34:2), Haynie responded, "I guess maybe having not served in a role like that, I guess not." (*Id*. 34:3-4.) And when pressed, "That didn't strike you as odd? I mean, they're sending you personally tens of thousands of dollars" (*id*. 34:11-14), Haynie responded, "I mean, I guess, apparently, it didn't." (*Id*. 34:15-16.)

I.    The Deposit

Haynie indorsed the Check without restriction or limitation (the "Indorsement") and, on Monday, March 9, 2020, Haynie deposited the Check in the Account (the "Deposit"). Haynie did not attempt to verify that the Check was good before presenting the Check for payment—i.e., Haynie did not attempt to contact EQT Production or the Drawee to determine if the Check was valid before making the Indorsement or the Deposit.[28]

---

[26] One admitted Exhibit, Plaintiff's Exhibit 6, consists of a copy of an image of the front of the Check (account number and routing number redacted) and an image of the back of the Check, and another admitted Exhibit, Defendant's Exhibit A, includes a copy of an image of the front of the Check (at page 1) and a copy of a picture of the front of the Check (at page 3) (collectively, the "Check Copies"). But for the handwritten signature of the Check signatory (whose name the undersigned could not decipher due to the signatory's penmanship), two of the three Check Copies are largely legible, whereas one is almost entirely illegible.

[27] Black and white copies of digital images of the Enclosure Envelopes are included as part of Defendant's Exhibit A. (*See* Def.'s Ex. A at 2, 4.)

[28] When Haynie was asked, during his deposition, if Haynie ever had "any communication with anyone at EQT Production" (Deposition Transcript 37:16-17), Haynie responded:

On March 9, 2020, Haynie went to the Main Branch, where he had worked from August 2018 to January 2020, to make the Deposit in person. Haynie testified to chatting with "two of [Bryant Bank's] VP bankers" while filling out the slip for the Deposit (the "Deposit Slip"). (Deposition Transcript 51:14-20.) Haynie testified that he did not remember the Bryant Bank teller's name, that he did not ask the teller when the Check funds would be made available, and that he did not make any affirmative representations to the teller regarding the Check or his job with the Company at the time of the Deposit.

Neither party offered evidence regarding the Bryant Bank teller's statements (if any) to Haynie regarding the Check or the Deposit, and the teller was not identified by either party or called to testify at the Trial. Typically, under Regulation CC and the Funds Availability Disclosure, a Bryant Bank customer like Haynie (an individual customer making an in-person deposit of a large check in the customer's personal checking account) would be notified at the time of the deposit if the bank was electing to place a hold due to the deposit's size, and a customer like Haynie also would be notified of the time period within which the funds would be made available for withdrawal.[29] Further, if, in such circumstances, the bank elected to place a hold after its customer left the premises, the bank typically would mail notice of its decision to the customer by the day after the deposit.[30] As discussed more fully below, Haynie testified to (repeatedly) overhearing customer complaints about holds placed on large deposits during his time as a Bryant Bank employee, but Haynie does not assert that Bryant Bank ever notified him that Bryant Bank had made the decision to place a hold on the Deposit or to delay funds availability.

Plaintiff's Exhibit 9—an excerpt (pages 34 and 35) of an August 23, 2021 "temporary statement from Bryant Bank" showing Account activity between March 9 and April 17, 2020 (the "Partial Account Statement")—indicates that, prior to the Deposit, Haynie's Account balance was $2,025.70. The Partial Account Statement further shows that Haynie made no other deposits to the Account on or after March 9, 2020.

When asked why he did not "run" the Check through his USAA checking account, Haynie testified: "I could not have ran it through that account because there's no USAA branches here, and they have a limit on mobile deposits." (Trial Audio.) Haynie does not purport to have attempted to deposit the Check in his USAA account (the account Haynie originally provided in his February 12, 2020 email to Company Email Address 2), and it is notable that, in his February 23, 2020 email to Investor Email Address 1, Haynie identified his depositary bank as Bryant Bank

---

Just after the bank had, you know, had told me that the check didn't clear after they posted it, you know, to my account, I had called the number that I found for them. And they referred me to the bank that the check came from. But that's the only conversation I've ever had with them.

(*Id*. 37:19 to 38:3.)

[29] *See* Regulation CC § 229.13(g); Funds Availability Disclosure at 1 ("If we are not going to make all of the funds from your deposit available on the first business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the day after we receive your deposit….[F]unds you deposit by check may be delayed…under the following circumstances…You deposit checks totaling more than $5,000 on any one day….We will notify you if we delay your ability to withdraw funds for…[this] reason[], and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.")

[30] *See id*.

Case 20-70036-JHH    Doc 40    Filed 09/28/23    Entered 09/28/23 14:56:59    Desc Main
Document      Page 25 of 76

(not USAA). In other words, although Haynie did not testify as to when he made the decision to deposit Company investments in his Bryant Bank Account, it appears Haynie made the decision on or before February 23, 2020—the date of the (above-quoted) email from Haynie to Investor Email Address 1, wherein Haynie directed the purported Investor to make his investment check payable to Haynie, personally, and to mail it to Haynie's residence, and wherein Haynie told the purported Investor that Haynie would be depositing the Investor's check in an account with Bryant Bank.

Haynie testified that, per the instructions contained in the February 27, 2020 Admitted Company Email from Company Email Address 2 (quoted above), Haynie took a picture of the Check with his phone before making the Deposit, and after making the Deposit, Haynie sent the Check picture (along with a picture of the Deposit Slip) to the Company by email on March 9, 2020.[31]

Also on March 9, 2020, Haynie sent an email to Investor Email Address 1, which reads: "I just wanted to let you know that I received your check over the weekend and deposited it today. I will follow back up with an email when the funds have cleared. I have also notified [the Company] and will let them know when the check clears as well." (Def.'s Ex. G at 6.)

On the evening of March 9, 2020, Haynie received an email from Company Email Address 3, purportedly signed by the CFO, which reads: "We received your last mail to us and [the Company] do commend you on excellence indeed. Please do inform this office of when funds will be made available to you by your bank." (Def.'s Ex. D at 13.)

J.    The Provisional Credit

Pursuant to Regulation CC, and by virtue of Haynie's Indorsement and Deposit, Bryant Bank was obligated to make the entirety of the funds represented by the $48,400 Check (the "Check Funds") available for withdrawal by the second business day following the Deposit— unless Bryant Bank elected to delay availability of a portion of the Check Funds due to the size of the Deposit.[32] Specifically, at the time of the Deposit, Regulation CC required Bryant Bank to make only $5,000 available for withdrawal by the second business day after the Deposit (Wednesday, March 11, 2020) and permitted (but did not require) Bryant Bank to delay availability of the remaining Check Funds for five business days or more.[33] The Funds Availability Disclosure

---

[31] This email is not part of the record. However, as noted above, copies of digital photos of the front of the Check and the Enclosure Envelopes are included as part of Defendant's Exhibit A. Also included as part of Defendant's Exhibit A is a one-page "temporary statement" from Bryant Bank dated March 19, 2020—the date a Bryant Bank employee, John Mize ("Mize"), notified Haynie by email that the "check issued to you is clearly fraud" (Def.'s Ex. H at 10)— which statement includes images of the front of the Check and Haynie's March 9, 2020 Deposit Slip. The Deposit Slip includes the Account number and identifies Bryant Bank as Haynie's depositary bank. As such, although the evidentiary record is (somewhat) ambiguous, Haynie's testimony and Exhibits indicate that Haynie shared both his Account number, and the identity of his depositary bank (Bryant Bank), with a purported representative of the Company by email on March 9, 2020.

[32] *See* Regulation CC § 229.12; *id.* § 229.13.

[33] *See id.* § 229.13(b), (e), (g), and (h); *see also id* § 229.11(c) (increasing the dollar amount in § 229.13(b) from $5,000 to $5,525, effective July 1, 2020); *id.* app. E, pt. VII(C)(2). Explaining the large-deposit exception to Regulation CC's funds availability rules, the commentary to Regulation CC states:

also obligated Bryant Bank to make $5,000 of the Check Funds available by the second business day after the Deposit and permitted (but did not require) Bryant Bank to place a hold on the remainder of the Deposit for up to seven business days.[34]

There is no evidence that Bryant Bank placed a hold on the Deposit, and it is undisputed that Bryant Bank made the entirety of the Check Funds available for withdrawal by March 11, 2020 (the second business day after the Deposit).[35]  Further, it is stipulated that, as of March 11, 2020, the Drawee retained the right to revoke any settlement for the Check (i.e., the Check had not yet cleared the banking process and remained subject to timely return by the Drawee) and that Bryant Bank's credit of the Check Funds to the Account was provisional (the "Provisional Credit").

The record is ambiguous as to whether Bryant Bank affirmatively elected not to place a hold on the Deposit, or whether, by mistake, Bryant Bank failed to place a hold on the Deposit. No Bryant Bank employee or representative was called to testify at the Trial, and, while it is stipulated that Haynie was a known customer in good standing with Bryant Bank, and also that Haynie made the Deposit in person, Bryant Bank offered no evidence to substantiate its counsel's argument that Bryant Bank elected not to place a hold on the Deposit because of these facts. Notably, the Deposition Transcript (among other Exhibits) includes Haynie's statement that Mize, a Bryant Bank employee, admitted to Haynie that Bryant Bank made a mistake when it made the entirety of the Check Funds available for withdrawal on (or before) March 11, 2020.  However, Haynie did not offer Mize's out-of-court statement as the admission of a party-opponent at the Trial, and, therefore, the evidentiary record does not establish that Bryant Bank's funds availability determination was the result of a mistake.

In either case, the court infers, from the evidentiary record (e.g., the Funds Availability Disclosure) and the legal authority cited by Bryant Bank in defense of its funds availability decision (e.g., Regulation CC), that Bryant Bank was aware of the risk that the Check remained subject to timely return when it extended the Provisional Credit. That said, Bryant Bank's funds availability decision did not give Haynie unfettered access to the Provisional Credit.  Limits on Haynie's ability to make cash withdrawals remained in place, as well as other restrictions on Haynie's use of the Check Funds.[36]  Further, there is no evidence to suggest that Bryant Bank had

---

Many checks will not be returned to the depositary bank by the time funds must be made available for withdrawal under the next-day (or second-day), local, and nonlocal schedules.  In order to reduce risk to depositary banks, the Board has exercised its statutory authority to adopt these exceptions to the schedules in the regulation to allow the depositary bank to extend the time within which it is required to make funds available.

*Id.* app. E, pt. VII(A)(2).

[34] *See* Funds Availability Disclosure at 1.

[35] The Partial Account Statement evidences that Bryant Bank may have made the Check Funds, in their entirety, available for withdrawal from the Account on the date of the Deposit, March 9, 2020.

[36] Under Regulation CC, making funds "available for withdrawal" means "available for all uses generally permitted to the customer for actually and finally collected funds under the bank's account agreement or policies, such as for payment of checks drawn on the account, certification of checks drawn on the account, electronic payments, withdrawals by cash, and transfers between accounts."  Regulation CC § 229.2(d).  However, funds availability notwithstanding, Bryant Bank reserved the right "to limit the amount of funds that may be withdrawn from [the Account] in cash for various reasons, including, without limit, the amount of currency that is available at a particular

any reason to anticipate that Haynie would immediately (upon funds availability) request to internationally wire more than $40,000 from the Account or that there were other reasons (apart from the size of the Deposit) for Bryant Bank to place a hold on the Deposit.

In this Part V, the court is not answering whether Bryant Bank's funds availability decision was justified (an answer reserved for Part VI), only whether Bryant Bank actually relied on Haynie's conduct when it extended the Provisional Credit in the full amount of the Check (a historical fact). Because Bryant Bank's obligation to extend the Provisional Credit to Haynie was triggered by Haynie's Indorsement and Deposit—and affirmative action was required on the part of Bryant Bank to trigger an exception to Regulation CC's funds availability rules (action that Bryant Bank was not legally or contractually obligated to take)—the court finds that it is more probable than not that Bryant Bank actually relied on Haynie's conduct when it extended the Provisional Credit. In other words, but for the Indorsement and Deposit, Bryant Bank would not have extended any Provisional Credit to Haynie for the Check by March 11, 2020 ($5,000 or $48,400).

Haynie testified that he learned that the Check Funds had posted to the Account when he checked the Account balance online on the morning of March 11, 2020 (the second business day after the Deposit). Haynie further testified that, online, the Check Funds were not listed as "pending" and that he, therefore, mistakenly believed that the Check had cleared. (Trial Audio.) Haynie admitted that he was a "little bit" surprised that the Check had cleared so quickly. (Deposition Transcript 42:10.) However, Haynie testified during the Trial, and during his deposition, that it was his belief that it was Bryant Bank's policy to hold large checks for "ten days or until [the check]…clear[s]" (Trial Audio; Deposition Transcript 19:17), explaining:

> [M]y year and a half working at the bank what I…would always overhear when someone was angry that funds weren't available, that it was bank policy, um, that you could either wait ten days or until the check was cleared, so when it was posted to my account, you know, it was the assumption that that check had been cleared.

(Trial Audio.) Notably, although Haynie's testimony indicates that he subjectively appreciated the distinction between funds availability and check clearing—and even expected Bryant Bank to place a hold on the Deposit and was surprised when the Check Funds were available for withdrawal on only the second business day after the Deposit—Haynie (admittedly) never took any steps to confirm his attested to assumption that the Check had cleared (e.g., Haynie did not ask Bryant Bank or the Drawee if the Check had cleared the banking process).

On the morning of March 11, 2020 at 9:59 a.m., Haynie sent an email to Company Email Address 3, stating: "These funds have now cleared." (Def.'s Ex. D at 13.) That morning, Haynie also sent an email to Investor Email Address 1 at 10:01 a.m., which states: "I just wanted to let you know the check has cleared and been posted to my account. I have already notified [the CFO] with [the Company]." (Def.'s Ex. G at 6.)

---

branch or ATM terminal." (Account Terms at 10.) Further, the EFT Disclosure contains limits on ATM cash withdrawals and debit card transactions.

K.     <u>The Wire Transfer</u>

Haynie testified that he received an email attaching wiring instructions (the "<u>Wiring Instructions</u>") for the transfer of the investment funds, less Haynie's seven percent instant commission and first month's salary of $5,000, on the morning of March 11, 2020. The body of an Admitted Company Email received by Haynie (from Company Email Address 3) on March 11, 2020, at 10:58 a.m., reads:

> The receipt of your message has been received and acknowledged. You are therefore instructed to deduct your 7.0% commission of $3,388.00, and do a Swift Wire Transfer of payment amounted to $45,012.00 to our raw material purchasing company account before 16:00 pm (GMT), using the following information provided on the attachment file included/attached in this email. Please find attached the account details of our raw material purchasing company, in which you are to make the necessary payments into.
>
> NOTE: Deduct any charges or commission requested by your bank from the funds.
>
> Upon completion of transfer, you are to send me a copy of the detailed Wire Transfer Slip for documentation and reference purpose (Mandatory).
>
> I await your response with compliance to my directive.

(Def.'s Ex. D at 14.) The Wiring Instructions are not part of the evidentiary record. However, Haynie testified at the Trial that he was not alarmed that the Wiring Instructions did not contain any information related to the Company (or any designation related to the Company), nor that the funds were being sent to Mexico (not South Korea), because the Wiring Instructions purportedly came from the CFO of the Company, and Haynie believed the funds were being sent to a "raw materials purchasing account" for a Company project in North America. (Trial Audio.)

At 11:42 a.m. on March 11, 2020, Haynie responded to Company Email Address 3:

> My deduction should be $8,388, after the 7% commission and $5,000 salary for the previous month (as I have not received or been alerted to any other payment for that). That would make the total Wire Transfer $40,012. Please reply back with confirmation of this corrected total and I will proceed with the transfer.

(Def.'s Ex. D at 14.)

If Haynie received a response to this email, it is not part of the record (i.e., the Admitted Company Emails do not substantiate Haynie's testimony that the Company told Haynie, via email, to retain both his seven percent instant commission and his first month's salary of $5,000 and to wire $40,012 in accordance with the Wiring Instructions). However, it is undisputed that, shortly after this email exchange, Haynie went to the Main Branch of Bryant Bank in person (during his UA lunch break) and submitted an international wire transfer request (the "<u>Wire Transfer Request</u>"), requesting that Bryant Bank wire $40,012 (not $45,012) from the Account to the HSBC account of MODEL TOL SA DE CV in Toluca Edo, Mexico (the "<u>Beneficiary</u>").

29

Haynie testified that he presented the Wire Transfer Request to Melissa Lee ("Lee"), a Bryant Bank customer service specialist. Haynie further testified that Lee experienced an unspecified issue with the Wire Transfer Request and brought in Regina Sharp ("Sharp"), the Main Branch manager, to assist with the Wire Transfer Request. Haynie testified that he did not know what the issue with the Wire Transfer Request was or how it was resolved.

At the Trial Haynie testified that he showed "the emails to the customer service specialist and the branch manager" and further testified that he "showed them the wiring instructions and the email that had been sent to me" by a purported Company representative. (Trial Audio.) During his deposition, Haynie testified that he gave Sharp "the instructions that were on my email." (Deposition Transcript 43:11-12.) After the close of the evidence at the Trial, counsel for Bryant Bank and counsel for Haynie stipulated that the only document(s) shared with Bryant Bank by Haynie at the time of the Wire Transfer Request were the (unoffered and unadmitted) Wiring Instructions and that Haynie did not show any emails to Lee or Sharp on March 11, 2020. The parties' counsel further stipulated that the information contained in the Wiring Instructions was consistent with the information contained in the Wire Transfer Request. Accordingly, the court presumes that the Wiring Instructions, like the Wire Transfer Request, do not include the Company's name or EQT Production's name or disclose the purpose of the Wire Transfer Request.

Importantly, the record before the court does not support a finding that Bryant Bank was obligated, by law or contract, to accept the Wire Transfer Request on March 11, 2020.[37] Moreover, unlike the Provisional Credit, affirmative action on the part of Bryant Bank was required to accept the Wire Transfer Request. However, it is undisputed that Bryant Bank did just that—agreeing, on March 11, 2020, to accept Haynie's request to internationally wire $40,012 to an entity in

---

[37] Pursuant to the Account Terms, the Account Agreement is subject to Article 4A of the Uniform Commercial Code – Fund Transfers, as adopted in Alabama. (*See* Account Terms at 7, ¶ 22.) Alabama's codification of Article 4A does not obligate a receiving bank to accept a sender's payment order, regardless of whether there is a withdrawable credit balance in an authorized account of the customer/sender sufficient to cover the payment order, absent an express agreement. *See generally* Ala. Code § 7-4A-103 (defining "[p]ayment order," "[b]eneficiary," "[b]eneficiary's bank," "[r]eceiving bank," and "[s]ender"); *id*. § 7-4A-105 (defining "[a]uthorized account" and "[c]ustomer"); *id*. § 7-4A-301 (defining "executed" and "[e]xecution date"); *id*. § 7-4A-209 (providing that a receiving bank, other than a beneficiary bank, accepts a payment order when it executes the order); *id*. § 7-4A-210(a)-(b) (requiring that a receiving bank provide notice of its rejection of a sender's payment order and further providing that, if there is a withdrawable credit balance in an authorized account of the sender sufficient to cover the order, the receiving bank must provide notice of the rejection on the execution date to avoid an obligation to pay interest on the amount of the order pending the earlier of cancellation of the unaccepted order or the day the sender learns that the order was not executed); *id*. § 7-4A-211(d) (providing for cancellation of unaccepted payment orders by operation of law after a prescribed time); *id*. § 7-4A-212 ("If a receiving bank fails to accept a payment order that it is obliged by express agreement to accept, the bank is liable for breach of the agreement to the extent provided in the agreement or in this article, but does not otherwise have any duty to accept a payment order, or before acceptance, to take any action, or refrain from taking action, with respect to the order except as provided in this article or by express agreement. Liability based on acceptance arises only when acceptance occurs as stated in Section 7-4A-209, and liability is limited to that provided in this article. A receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer, and the bank owes no duty to any party to the funds transfer except as provided in this article or by express agreement."). The Admitted Account Agreements do not obligate Bryant Bank to accept payment orders from Haynie. (*See* Admitted Account Agreements, *passim*.) Thus, to the extent Bryant Bank asks the court to find that Bryant Bank's funds availability decision (or mistake) regarding the Check (i.e., Bryant Bank's Provisional Credit of the Check Funds, in their entirety, to the Account, on or before the second business day after the Deposit) obligated Bryant Bank to accept the Wire Transfer Request, the evidentiary record does not support such a finding.

Mexico, executing the requested $40,012 international wire transfer order the same day (the "Wire Transfer"), and debiting the Account for the Wire Transfer later that afternoon (a reportable transaction).[38]

At the time the Wire Transfer posted to the Account, the Account balance was less than the amount of the $48,400 Provisional Credit (in other words, only provisionally credited Check Funds were available for withdrawal by Haynie when Bryant Bank debited the Account for the Wire Transfer). As set forth above, Bryant Bank does not claim to have lacked knowledge that the Check had not cleared and that the available Account balance consisted solely of the Provisional Credit on March 11, 2020 (and to the extent its filings in the AP could be so construed, the record does not support such a finding).

At the Trial Haynie authenticated Plaintiff's Exhibit 7 as a true and correct copy of his March 11, 2020 Wire Transfer Request and Bryant Bank's March 11, 2020 agreement to accept the request (the "Wire Transfer Acceptance," and together with the Wire Transfer Request, the "Wire Transfer Agreement").[39] As indicated above, neither the Company's name nor EQT Production's name appears in the Wire Transfer Agreement (only the aforementioned business entity purportedly located in Mexico). The Wire Transfer Request was signed by Haynie on March 11, 2020, as the requesting Bryant Bank customer, and the Wire Transfer Acceptance was signed by Lee, on March 11, 2020, and by Heika Harris ("Harris"), signature undated, on behalf of Bryant Bank.[40] In the Wire Transfer Acceptance, Lee certifies:

> The above authorization is accepted and I have determined that the account to be charged has sufficient collected funds to cover the amount of this wire. An online entry has been made according to procedures to withdraw funds from the customer's account. I am also agreeing that this transaction is consistent with customer's line of business.

(Wire Transfer Agreement.) All told, at least three Bryant Bank employees (Lee, Sharp, and Harris) were involved in making the decision, on behalf of Bryant Bank, to accept the Wire Transfer Request. However, no Bryant Bank employee or representative was called to testify at the Trial concerning the decision to accept the Wire Transfer Request.

---

[38] See 31 C.F.R. § 1010.311 ("Each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000, except as otherwise provided in this section."); see also id. § 1010.100 (general definitions). Such regulations are intended to aid investigations into a variety of criminal activities, from tax evasion to money laundering.

[39] The "BANK CODE (SWIFT)" and "ORIGINATOR TO BNF INFO" are redacted in Plaintiff's Exhibit 7. (See Pl.'s Ex. 7.) The Wire Transfer Agreement also is included as page two of Defendant's Exhibit F. Although portions of this copy of the Wire Transfer Agreement are illegible, the portions of the Wire Transfer Agreement that are redacted in Plaintiff's Exhibit 7 are not redacted (or illegible) in the copy of the Wire Transfer Agreement included as page two of Defendant's Exhibit F.

[40] Lee's signature on the line titled "Entered By" is dated March 11, 2020, and the selected box states: "I certify the customer appeared before me to request this wire transfer." (Pl.'s Ex. 7; Def.'s Ex. F at 2.) The signature of Harris on the line titled "Reviewed By" is not dated, and the box to indicate that Haynie appeared before Harris to request the wire transfer is not selected. (Id.) Haynie testified during the deposition that Harris was a Bryant Bank vice-president.

Moreover, no party offered evidence (or argument) as to what is meant by "collected funds" or "customer's line of business" in the Wire Transfer Acceptance, and the terms are not defined in the Wire Transfer Agreement or the Admitted Account Agreements. Thus, the court cannot conclusively say what meanings the parties intended such phrases to carry. Regardless, to the extent "collected funds" means something different than "available funds" (as the use of different terms in the Wire Transfer Acceptance and the Admitted Account Agreements suggests), Haynie does not purport to have relied on Lee's certification, in the Wire Transfer Acceptance, that the Account had sufficient "collected funds" to cover the Wire Transfer. Additionally, whatever Bryant Bank may have understood Haynie's "line of business" to be at the time Haynie made the Wire Transfer Request, Bryant Bank does not claim that Haynie made any representations to Bryant Bank regarding his job with the Company on or before March 11, 2020. In fact, there is no evidence to suggest that Haynie made any affirmative representations to Bryant Bank on March 11, 2020 (Haynie merely showed Bryant Bank the Wiring Instructions and presented the Wire Transfer Request). Further, per the evidentiary record, the only affirmative representations made by Bryant Bank to Haynie at the time of the Wire Transfer Request were that (1) there was an unspecified issue with the Wire Transfer Request that was resolved, and (2) Bryant Bank had agreed to accept the Wire Transfer Request and would send confirmation upon execution. The record does not evidence that Bryant Bank asked, or that Haynie answered, any questions regarding the Check, the Deposit, or the Wire Transfer Request on or before March 11, 2020 (or vice versa).

Based the evidentiary record, the court is left to presume that: (1) Haynie asked no questions of Bryant Bank (or of the Drawee, EQT Production, or the Beneficiary) regarding the Check, the Check Funds, the Wiring Instructions, or the Wire Transfer prior to the Check's timely return on March 12, 2020 (described more fully below); (2) Bryant Bank asked no questions of Haynie (or of the Drawee, EQT Production, or the Beneficiary) regarding the Check, the Deposit, the Wiring Instructions, or the Wire Transfer Request before the Check's timely return on March 12, 2020; (3) Bryant Bank made no present evaluation of Haynie's credit worthiness before extending the Provisional Credit or agreeing to accept the Wire Transfer Request; and (4) at the times of the relevant Account transactions, Haynie had no present ability, or plans, to reimburse Bryant Bank for the Wire Transfer if the Check proved invalid.

Notably, while there were numerous red flags apparent to Haynie at the times of his Indorsement, Deposit, and Wire Transfer Request, there also were multiple red flags apparent to Bryant Bank at the time of its Wire Transfer Acceptance. Without limitation, the source of the Check and the amount of the Check were inconsistent with Haynie's known occupation (a marketing manager for UA and former marketing coordinator for Bryant Bank) and the income derived by Haynie from his known occupation; the Deposit was of an anomalous size for the Account; the Wire Transfer Request was an anomalous Account transaction for Haynie; the Deposit and Wire Transfer Request (made only two business days after the Deposit) were not of the sort that Haynie would normally be expected to engage; the purported payor of the $48,400 Check was a business entity in Pittsburgh, Pennsylvania (with which Haynie had no known connection); the purported Beneficiary of the $40,012 Wire Transfer was a different business entity located in Mexico (with which Haynie also had no known connection); and, at the time of the Wire Transfer, the Check remained subject to timely return by the Drawee, and the Check Funds had only been provisionally credited to the Account. In other words, on March 11, 2020,

32

not only was the Wire Transfer reportable, but Bryant Bank had reason to suspect that there was a basis for filing a suspicious activity report,[41] and Haynie's credit worthiness was unknown. Despite all this, Bryant Bank offers no explanation for disregarding these apparent red flags. Further, Bryant Bank offers no explanation for its (presumed) determination that the Wire Transfer had a legitimate purpose or its (express) agreements that the Wire Transfer was consistent with Haynie's line of business and that the Account had sufficient collected funds to cover the Wire Transfer.

Instead, to prove that Bryant Bank actually and justifiably relied on Haynie's conduct when it made the decisions to accept and execute Haynie's request to internationally wire $40,012 in provisionally credited Check Funds to Mexico on March 11, 2020 (no questions asked), Bryant Bank points to the following facts: (1) the Account was in good standing and had sufficient available funds to cover the Wire Transfer; (2) Haynie was a known customer; (3) Haynie was a (recent) former employee; (4) Haynie left the bank on good terms; (5) Haynie completed multiple, online, training courses concerning money laundering and financial fraud schemes while employed by Bryant Bank; and (6) Haynie was contractually obligated to reimburse the bank if the Check was timely returned. From these facts (and without offering direct evidence of the reasons for Bryant Bank's decisions), Bryant Bank asks the court to find that Bryant Bank did, in fact, execute the Wire Transfer based on its trust in Haynie, and in Haynie's contractual promise to reimburse Bryant Bank, and that it was justified in doing so.

Setting aside (for now) the question of Bryant Bank's justifiable reliance on Haynie's conduct, the court finds the evidentiary record sufficient to establish that (more likely than not) Bryant Bank actually relied on Haynie's conduct when it accepted the Wire Transfer Request. In other words, Bryant Bank would not have made the Wire Transfer had Haynie not made the Indorsement and Deposit and submitted the Wire Transfer Request upon funds availability (and prior to the Check's timely return). For purposes of finding that Bryant Bank actually relied on Haynie's conduct, the undersigned presumes that had Haynie disclosed that he was funneling investments in a foreign entity through his personal checking account (which Haynie does not claim to have done), or had Haynie given Bryant Bank any indication that he suspected the Check was invalid, the Wire Transfer was illegitimate, or the person(s) at whose behest he was acting were engaged in wrongdoing (which suspicions Haynie does not admit to have harbored or claim to have shared with Bryant Bank), Bryant Bank would not have agreed to accept the Wire Transfer Request.

One Admitted Investor Email, addressed to the Investor and sent by Haynie on March 11, 2020 at 1:48 p.m., reads:

> The wire transfer has been initiated. My bank is going to email me confirmation upon completion of the transfer. I apologize I was not able to call you back over

---

[41] *See* 12 C.F.R. § 21.11(c)(4)(iii) (requiring financial institutions to file suspicious activity reports for transactions aggregating $5,000 or more that involve potential money laundering or violate the Bank Secrecy Act, including any transaction involving a transfer of $5,000 or more in funds "if the bank knows, suspects, or has reason to suspect that…[t]he transaction has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be excepted to engage, and the institution knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction").

33

the phone as I had to get back to the office for a meeting.  As soon as I receive the confirmation I will forward to you as well as [the Company].

(Def.'s Ex. D at 15.)[42]

An Admitted Company Email sent by Haynie to Company Email Address 3 at 4:39 p.m. on March 11, 2020, states:

Please see the Wire Transfer slip below.  I am sending to [the Investor] now as well.  Thank you!

Outgoing Wire – Advice of Debit

Date:  2020-03-11        Wire Create Time 14:05:26

        Account #         :
        Account Name    :  BRYANT BANK
        Amount             :  $40,012.00
        GFX Reference       :  031120 NKC 00681
        Receiving Bank   :  026005092
        Recv BK Name      :  WELLS FARGO BANK,

        Originator          :  Chadwick W Haynie

        Beneficiary          :  MODEL TOL SA DE CV
        Bene Acct #    :  [Omitted]

        Beneficiary Info (OBI):
        acct # [Omitted]

        Reference for Beneficiary (RFB):

        FED Reference Number (IMAD):
        20200311F2QCZ60C002592

(*Id*. at 16.)

An Admitted Investor Email sent by Haynie to Investor Email Address 1 at 4:41 p.m. on March 11, 2020, reads: "I apologize I have been unable to answer the phone as I've been in meetings this afternoon, however I did just receive confirmation from my bank that the wire transfer was completed. Please see the slip below for your reference."  (Def.'s Ex. G at 7.) Appearing in the body of this email is the same information regarding the Wire Transfer that appears in the body of the above-quoted March 11, 2020 Admitted Company Email to Company Email Address 3.

---

[42] Although addressed to the Investor, the recipient's email address is omitted from this Admitted Investor Email.

An Admitted Investor Email sent by Haynie to Investor Email Address 1 at 5:52 p.m. on March 11, 2020 states: "As we discussed on the phone, I have the Transfer Request form from my bank attached. This is the only other document I have other than the email confirmation slip." (*Id.*)[43] Haynie was not asked, at the Trial (or during his deposition), about the telephone call referred to in this Admitted Investor Email, and Haynie did not otherwise testify regarding the telephone call.

L.     The Other March 11, 2020 Provisional Credit Expenditures

Haynie testified that, after Bryant Bank agreed to accept the Wire Transfer Request, he gained greater confidence that the Check had cleared and was good and, therefore, began spending his share of the Check Funds. Specifically, Haynie testified to initiating a little over $4,000 in credit card payments on March 11, 2020. The Partial Account Statement evidences that, on March 11, 2020, after the $35 wire transfer fee posted to the Account (but before the Wire Transfer posted): (1) two debits authorized on March 10, 2020 posted to the Account (totaling $15.17); (2) a $65.40 payment to Alabama Power posted to the Account; and (3) credit card payments totaling $4,482.08 posted to the Account (specifically, the following credit card payments posted on March 11, 2020, in order, $485.22 for "EPAY...CHASE CREDIT CRD," $498.26 for "ACH PMT...AMEX EPAYMENT," $940.77 for "ACH PMT...AMEX EPAYMENT," $959.78 for "ACH PMT...AMEX EPAYMENT," and $1,598.05 for "MOBILE PMT CAPITAL ONE"). (Partial Account Statement at 34-35.) The Partial Account Statement further shows that, excluding the Provisional Credit, the Account lacked sufficient funds to cover the $940.77 "AMEX" payment (the Account had sufficient funds to cover $741.88 of this payment but was short $198.89) and all subsequent Account transactions (including the $959.78 "AMEX" payment, the $1,598.05 "CAPITAL ONE" payment, and the $40,012 Wire Transfer). (*Id.* at 35.)

Per the Partial Account Statement, two other debits were initiated by Haynie on March 11, 2020 but did not post to the Account until March 12, 2020: (1) a March 11, 2020 $25 "POS Pre-Authorized Debit - DDA" for "WFB OPEN DEP TO SAV" (the "New Savings Account Debit"); and (2) a March 11, 2020 $50 "POS Pre-Authorized Debit - DDA" for "WFB OPEN DEP TO CHK" (the "New Checking Account Debit," and together with the New Savings Account Debit, the "New Account Debits"). (*Id.*) When asked about his Account expenditures on and after March 11, 2020, Haynie made no mention of the New Account Debits, even though he was presented with a copy of the admitted Partial Account Statement at the Trial. As discussed more fully below, the court draws an adverse inference from Haynie's silence regarding the New Account Debits initiated on March 11, 2020 (i.e., prior to the Check's return on March 12, 2020).

M.     The Check's Return and the Failed Cancellation Request

As set forth above, the Drawee timely returned the Check on or about March 12, 2020. Haynie testified that he learned of the Check's return on the morning of March 12, 2020, during a telephone call from Bryant Bank president Claude Edwards ("Edwards"), at which point Haynie

---

[43] As previously noted, the Admitted Investor Emails do not include the email attachments. Presumably, the referenced email attachment is the Wire Transfer Agreement.

testified: "My heart fell out of my chest." (Trial Audio.)[44] Haynie stated that he answered all of Edwards' questions and agreed to come to Bryant Bank later that day. Haynie testified that he went to the bank around lunchtime that day, because he had meetings that morning, and met with Mize, who Haynie testified is a security officer for Bryant Bank, and Mike Mitchell ("Mitchell"), who Haynie testified is the bank's chief credit officer. Haynie testified that Mize and Mitchell asked him questions and that he "told them everything" and "showed them the emails." (Deposition Transcript 45:2-3.) Haynie further testified that the person purporting to be the Investor called during Haynie's meeting with Mize and Mitchell, but Mize and Mitchell told Haynie not to answer the call. Neither party offered other evidence of what was discussed, or exchanged, during this meeting or what occurred (e.g., the court cannot say, with any certainty, what Haynie did, or did not, tell or show Bryant Bank, or what Bryant Bank did or did not say to Haynie, on March 12, 2020).

The record reveals that Bryant Bank conducted an internal investigation following the Check's return on March 12, 2020, from which Bryant Bank gleaned that the Check was likely invalid. Specifically, an internal Bryant Bank email from Vickie Gillian ("Gillian") to Mize and others, sent at 12:26 p.m. on March 12, 2020, reported that another Bryant Bank employee, Amber Carroll ("Carroll"), copied, had spoken with a representative of the Drawee and had been told that "EQT made the decision to return the [C]heck as Refer To Maker." (Def.'s Ex. H at 1.)[45] Carroll responded to Gillian's email later that afternoon (at 2:22 p.m.), copying Mize (and others), stating that she called a certain number (presumably for EQT Production) and was transferred to an individual named Ruth Constantini ("Constantini"). Carroll further reported that Constantini told Carroll that EQT Production had searched its accounts for the Check number and amount but that nothing pulled up, that the Check number did not match anything in EQT Production's sequence, and that, according to Constantini, the Check was "definitely a bogus check." (Id.)

Although the Admitted Account Agreements permitted Bryant Bank to debit the Account for the amount of the Check on March 12, 2020, Bryant Bank did not do so until March 17, 2020, when it assessed a $35 overdraft fee to the Account (the "Overdraft Fee") and debited the Account in the amount of $48,400 (the "Chargeback"). Instead, on March 12, 2020, Bryant Bank redeposited the Check (the "Redeposit") and assessed a $6 redeposit fee to the Account (the "Redeposit Fee"). Moreover, although Regulation CC permitted Bryant Bank to place a hold on the remaining available funds in the Account following the Redeposit,[46] Bryant Bank elected not to do so. At his deposition, Haynie testified regarding the Redeposit that "[t]here was a period where [Bryant Bank] tried to, I guess, process the check again, had sent it back. And so there were—funds became available again for—I think it was about $5,000.00 that was available in my account, but I didn't touch, you know, any of that." (Deposition Transcript 55:4-10.)

---

[44] Haynie repeated this statement more than once during the Trial, and the refrain also appears in a March 26, 2020 email from Haynie to Edwards hereinafter quoted. (See Def.'s Ex. H at 16.)

[45] Defendant's Exhibit H consists of emails among Haynie and representatives of Bryant Bank sent or received by Haynie on March 12, March 17, March 18, March 19, March 20, March 26, March 27, April 7, April 8, April 30, May 18, and May 29, 2020. Defendant's Exhibit H also includes the above-referenced internal Bryant Bank email chain from March 12, 2020. (Id. at 1.) It appears that Bryant Bank may have forwarded this internal email chain to Haynie on the afternoon of March 19, 2020 (see id. at 1, 10), but this is not clear from the record. The emails comprising Defendant's Exhibit H are referred to herein, collectively, as the "Admitted Bryant Bank Emails."

[46] See Regulation CC § 229.13(c).

36

Although Bryant Bank made the Redeposit, delayed the Chargeback, and permitted Haynie's continued use of the Provisional Credit on and after March 12, 2020, Bryant Bank did attempt to cancel the Wire Transfer on March 12, 2020.  Included as part of Defendant's Exhibit F (pages 3 through 8) are a largely illegible "Outgoing FED Message" regarding the Wire Transfer (dated March 12, 2020), and a largely legible "Incoming FED Message" regarding the Wire Transfer (dated March 13, 2020), which states in the "Free Text":

> WE ACK RECEIPT OF YR CANCELLATION REQUEST DTD 3/12/2020 FOR USD40,012.00 IMAD 002592 REF 031120 NKC 00681 WE HAVE CONTACTED THE BBK FOR DEBIT AUTHORIZATION.  PLEASE QUOTE OUR CASE NUMBER IN ALL REPLIES WACNY2007320039

(Def.'s Ex. F at 5-6.)[47]

On the afternoon of March 12, 2020, Haynie emailed Mize:

> Hi John,
>
> I just got off the phone with the guy and he said he would call me back in 10 minutes.  Said he would wire the funds to resolve the situation.
>
> Are there any wiring instructions I could give him to an account where that could go if he does call back?
>
> Thanks,
> Chad

 (Def.'s Ex. H at 2.)

On March 12, 2020, Mize emailed Haynie: "Chad, Please use the attached PDF to have funds wired to your account.  John."  (*Id*. at 6.)[48]

On March 17, 2020, at 6:19 a.m., Haynie responded to Mize's March 12, 2020 email, writing:

> Hey John,
>
> What they're asking is if the bank can run a tracer on the wire.  This is the FED Reference Number (IMAD): 20200311F2QCZ60C002592 that Melissa had sent me after it went out.

---

[47] Based on the Admitted Company Emails hereinafter quoted and described, it does not appear that Haynie was notified by Bryant Bank of the bank's attempt to cancel the Wire Transfer until March 17, 2020, when Mize responded to an email from Haynie asking if it was possible to recall the Wire Transfer. (*See* Def.'s Ex. H at 2-7.)

[48] Included as page 1 of Defendant's Exhibit F are wiring instructions for Haynie's Bryant Bank Account.  These instructions list Lee as the Bryant Bank contact.  The court presumes that these wiring instructions were attached to Mize's March 12, 2020 email to Haynie.

37

I guess my question would be if that has been held up somewhere, if we could just recall the wire?

Thanks,
Chad

(*Id.* at 5-6.)

Mize forwarded this email to Bryant Bank employee Deanne King ("King") at 6:40 a.m. on March 17, 2020, explaining:

This is pertaining to my phone call to you late yesterday. The party that Chad is talking to says they need some confirmation that the wire was sent; can you look into the matter and confirm that it went as sent? I think this to be fraud but it might help Chad feel better about the process.

I will be working from home (once I get the PC operational) but will be available via phone and will be checking my email regularly.

I still believe this to be a scam but it is unusual that the "bad guy" would keep talking to the bank or Chad. Chad left us for the University about 8 months ago.[49]

John.

(*Id.* at 5.)

King responded to Mize at 8:17 a.m. that morning:

Here is the confirmation:

[illegible or redacted]

This Message originates from outside Bryant Bank. Please use caution when opening

BBVA Wire Transfer Dept.
701 S 32nd Street
Birmingham, AL 35233

Outgoing Wire – Advice of Debit

Date: 2020-03-11    Wire Create Time 14:05:26

_____

[49] Per the evidentiary record, Haynie left his job at Bryant Bank in late December 2019 or early January 2020 (i.e., a little over three months earlier).

```
Account #        :
Account Name     : BRYANT BANK
Amount           : $40,012.00
GFX Reference      : 031120 NKC 00681
Receiving Bank   : 026005092
Recv BK Name     : WELLS FARGO BANK,

Originator       : Chadwick W Haynie

Beneficiary      : MODEL TOL SA DE CV
Bene Acct #      : [Omitted]

Beneficiary Info (OBI):
acct # [Omitted]

Reference for Beneficiary (RFB):

FED Reference Number (IMAD):
20200311F2QCZ60C002592

[illegible or redacted]
```

I have also attached a copy of the recall request, the message that BBVA sent and the acknowledgement received. Please call me if you want to discuss.

```
Thanks,
Deanne King
Supervisor/Wire Transfer
```

(*Id*. at 3-4.)[50]

On March 17, 2020,[51] Mize forwarded his email correspondence with King to Haynie, writing: "See the attached documents that itemize the confirm the funds were received by the bank you instructed. Please let us know how you intend to clear this matter." (*Id*. at 3-6.)

On March 17, 2020 at 7:59 p.m., Haynie sent an email to Investor Email Address 1, with a copy to Company Email Address 3, the body of which states:

---

[50] The "wire confirmation" included in the body of King's March 17, 2020 email to Mize is largely identical to the "Wire Transfer slip" included in the bodies of Haynie's emails to Company Email Address 3 and Investor Email Address 1 on the afternoon of March 11, 2020. (*Compare* Def.'s Ex. D at 16, *and* Def.'s Ex. G at 7, *with* Def.'s Ex. H at 4.)

[51] The Admitted Bryant Bank Emails omit the date and time (and sender and recipient email addresses) for this email from Mize to Haynie. (*See* Def.'s Ex. H at 3-6.) However, from the Admitted Bryant Bank Emails between Haynie and Mize on March 18, 2020 (hereinafter quoted)—including, among other things, the descriptions and names of the attachments to the March 17 and March 18, 2020 Admitted Bryant Bank Emails (which appear to reference some or all of the documents admitted as Defendant's Exhibit F)—the court deduces that Mize forwarded this email chain to Haynie on March 17, 2020.

Please see the attached tracer as requested by [the Company] from the original wire transfer. My bank has confirmed that the funds were indeed successfully received by the bank that the company provided to me in the original wire transfer instructions.

Please complete the wire transfer to my account to cover the missing funds from the check that you sent me which was returned. I once again have the transfer instructions attached to this email and the total should be $48,400 USD. I will call you in the morning to confirm.

(Def.'s Ex. G at 8.) Three attachments—"Account-Summary.jpg," "CASE 28916 ACK RCVD, CONTACTING BBK FOR DEBIT AUTHRIZATION.PDF," and "Bryant-Bank-Wire-Instructions.pdf"—are referenced in this email sent by Haynie but are not part of Defendant's Exhibit G. (*Id.*)

On March 18, 2020 at 12:54 a.m., in response to a March 17, 2020 email from Mize at 7:02 p.m., Haynie emailed Mize:

John,

I forwarded the final PDF on to them and below is the response that I just received. Can the bank provide these tracer details or is there someone else who can? I'm honestly confused myself as the PDF states the destination bank is BBVA but the bank listed on the wire request was HSBC. I will give you a call in the morning to try to figure out what is going on.

Thanks,
Chad

Hello Mr Chad Haynie,

We received your last email to us, and we are NOT satisfied with the details provided at this time. Please kindly verify from your banking institution about the proper TRACER details, that clear shows and states out the money location Origin, Transition process and Destination of the wire transfer funds. i.e Call or visit your bank to check on the wire transfer since we the recipient has not received it by the expected date. Speak to a representative responsible for wire transfers. Ask the representative to place a proper tracer on the wire transfer. The tracer shows the processing path the transfer has taken with corresponding banks, as well as the current location. Give the representative the Federal Reference Number you received for the transaction. Wait for the tracking results.

When the money has not arrived at its destination, it's usually because there is some delay at a corresponding bank. However, it is possible for the money to end up in

40

the wrong account or get lost during the transfer. If this is the case, your bank can be able to clear up every pending issue

Get as much information as possible about the wire from the representative responsible for wire transfers. For example, your bank can make more accurate inquiries with the sender's confirmation number for the transaction and the sending bank's SWIFT number.

As we also seem to notice in the attached file (CASE 28916 ACK RCVD, CONTACTING BBK FOR DEBIT AUTHRIZATION) you sent to us previously that there seem to have been a cancellation request put forward, which is stated below as:

Free Text: WE ACK RECEIPT OF YR CANCELLATION REQUEST DTD 3/12/2020 FOR USD40,012.00 IMAD 002592 REF 031120 NKC 00681WE HAVE CONTACTED THE BBK FOR DEBIT.

Please kindly clarify this development to us also.

Once more, please kindly seek for a more detailed, clearly stated and specific tracer details on this wire transfer, as this will help both parties understand the situation at the moment more.

We sincerely apologize for this unforeseen inconveniences, as we hope to resolve this as quickly as possible.

(Def.'s Ex. H at 7.) The sender of this copied and pasted email is not identified (by name or email address) in Haynie's March 18, 2020 email to Mize, nor does the Company's (or the Investor's or EQT Production's) name appear anywhere in the email.

On March 18, 2020 at 7:00 p.m., Mize emailed Haynie: "Attached is the summary of the wire transfer you made on March 11, 2020 to HSBC. The wire was sent via BBVA Bank to their correspondent bank, Wells Fargo Bank, and indicates it was received by HSBC. Please have the party you are working with confirm this with HSBC." (*Id*. at 8.)

On March 18, 2020 at 7:45 p.m., Haynie responded to Mize: "Thanks John. I will forward this on and see what they say. Were you able to talk with Deanna about requesting a trace on it as they were requesting?" (*Id*.)

On March 19, 2020 at 1:33 p.m., Haynie followed up on his email to Mize, writing: "I just wanted to check back in to see if you've had the chance to speak with Deanne about requesting a Trace on the wire with BBVA. If you have any update, please let me know." (*Id*. at 9.)

On March 19, 2020 at 4:45 p.m., Mize emailed Haynie, stating (in pertinent part): "In reviewing my notes I found this item above showing the check issued to you is clearly fraud. We

41

have yet to hear from the HSBC bank in Mexico. Given this notation there is no reason to expect payment to be returned." (*Id.* at 10.)[52] As noted previously, Haynie points to his receipt of this email from Mize as the time he learned of Bryant Bank's belief that the Check was fraudulent.

Haynie testified that, from March 12 to March 19, 2020, Haynie still expected the Check Funds to "show up." (Trial Audio.) During this time, Haynie attested to communicating by telephone and email with the purported Investor, by email with the purported Company representative(s), and via LinkedIn with the Recruiter.[53] Haynie further testified that the Investor assured Haynie that there was a mistake and that, if the mistake was not corrected, the Investor would wire funds to resolve the situation. Haynie testified that Mize told him that "in 50 years of banking [Mize] had never seen anything like that." (*Id.*)

During his deposition, Haynie testified concerning his conversations with the purported Investor on and after March 12, 2020, stating:

> [The Investor] had said that it was a mistake on his end. He said at first that if it wasn't corrected, that he would have those funds wired into my account and asked for wiring instructions where they could do that. That's in an email with Mr. Mize, which [Mize] sent to me, and I forwarded it onto [the Investor]. And, obviously, that never happened.

(Deposition Transcript 47:5-13.)

Although Haynie testified that he did not learn of Bryant Bank's belief that the Check was fraudulent until March 19, 2020, Haynie admitted that he began harboring some suspicions of wrongdoing when he learned of the Drawee's return of the Check on March 12, 2020. Furthermore, Haynie cannot credibly deny that he lacked knowledge that he likely was caught up in a fraudulent scheme after the Check's return on March 12, 2020, after Haynie's March 12, 2020 telephone call with Edwards, and after Haynie's March 12, 2020 meeting with Mize and Mitchell, during which Mize informed Haynie of his plan "to reach out to Tuscaloosa Police and also contact the head at the FBI office in Birmingham to see if there was anything that could be done." (*Id.* 45:8-11.) Nevertheless, on and after March 12, 2020, Haynie admittedly continued communicating with the suspected scammers. Further, Haynie testified that it was the purported Recruiter, the purported Investor, and purported Company representative(s) who cut off communications with him—on or around March 19 (i.e., the date Haynie admits to learning of Bryant Bank's belief that the Check was fraudulent) or March 20, 2020.

---

[52] The attachments to this email are not included as part of Defendant's Exhibit H.

[53] The only admitted email sent by Haynie to the purported Investor, or to a purported Company representative, on or after March 12, 2020, is the (above-quoted) email sent by Haynie to Investor Email Address 1, with a copy to Company Email Address 3, on March 17, 2020 at 7:59 p.m. One Admitted Bryant Bank Email, sent by Haynie to Mize on March 18, 2020 at 12:54 a.m. (also quoted above), has copied and pasted, in the body of the email, the salutation and body of an email which Haynie tells Mize he "just received." (*See* Def.'s Ex. H at 7.) However, the sender is not identified therein, and the header fields (sender, recipient, date, time, and subject) are omitted. The evidentiary record does not include any other emails received by Haynie from purported representatives of the Company or the purported Investor on or after March 12, 2020, and, as noted previously, Haynie's LinkedIn communications with the Recruiter are not part of the record.

On March 20, 2020, Haynie emailed Mize, stating: "Hi John, I just wanted to check in to see if there was any update?"  (Def.'s Ex. H at 11.)

On March 26, 2020, Haynie emailed Edwards (copying Mize and Mitchell), stating (in pertinent part):

Dear Claude,

I want to apologize again for this entire situation.  It has been a hard few weeks and something I never would've imagined being involved in.  While I was skeptical and cautious, I was still none the less caught up in what was apparently an elaborate scheme.  This has taught me a valuable lesson in trust.

While I failed myself in some ways through this, I was also failed by the bank with safeguards that should've been in place to prevent something like this from ever happening – and as John admitted to me over the phone in one of our conversations, are in place for most customers – being questionably absent, which has left my account overdrawn in an amount that I cannot fully repay.  Obviously, I would never wire funds out of my account if I knew the funds weren't there to cover the wire.  I can't even count the number of times I sat in my office off the lobby floor at the main branch and overheard a teller explaining to a customer that the funds from the large check they were depositing would be held until the check cleared.  When the hold from this large out-of-state check, which I did not otherwise have the funds to cover, was removed and the funds were posted to my account, I assumed, as any reasonable person would, that the check had cleared as I had no reason to expect that it wouldn't.  I never asked for the funds to be made available before the check cleared and never would have.  When you called me the morning after the wire had gone out to tell me that the check had been returned, my heart fell out of my chest.

One of the most disheartening things about this experience has been what I've experienced from the bank.  It's not what I came to know in my year and a half as an employee and it definitely does not live up to the bank's first core value of putting family first.  I share the bank's sense of need to recover these funds and have done everything I can to help facilitate that.  While John has certainly been cordial in our conversations, there has not at all been a sense of caring throughout the situation.  At the same time I apologized for the situation, I have never received anything remotely close to an apology from anyone at the bank in regards to the bank's failings which allowed this to happen.

There have been mistakes by both parties in this situation, yet every indication I've gotten thus far has been that the bank wants me to pay for both my mistake and the bank's mistake as well.  As I'm sure you know, I don't have the means to make that happen but even if I did, it still wouldn't be right.
…

43

(*Id.* at 15-16.)[54]

Given Bryant Bank's subjective appreciation of the high probability that the Check was invalid on March 12, 2020, a question exists as to whether Bryant Bank was relying on anything Haynie did or said (or failed to do or say) when it made the decisions to Redeposit the Check, permit Haynie's continued use of the Provisional Credit on and after March 12, 2020, and delay the Chargeback until March 17, 2020 (the sixth business day after the Deposit and the third business day after the Redeposit). However, the Admitted Company Emails hereinabove quoted and discussed evidence that Haynie affirmatively represented to Bryant Bank that the Beneficiary had not confirmed receipt of the Wire Transfer, that Haynie was still communicating (by email and by telephone) with someone, and that said person would have funds wired to Haynie's Account to cover the Check if it was not honored. However, excepting the email text that Haynie copied and pasted in the body of one of his March 18, 2020 emails to Mize (quoted above), the emails that Haynie claims to have received from the purported Investor and purported Company representative(s) between March 12 and March 19 or 20, 2020, as well as the LinkedIn messages that Haynie claims to have received from the Recruiter during the same time period, are not part of the evidentiary record. This is a conspicuous omission given that other emails purportedly sent to Haynie by the Investor and Company representatives on and before March 11, 2020 were offered by Haynie, and given that Haynie purports to have relied on the communications received by Haynie from purported Company representatives and the purported Investor on and after March 12, 2020 when making the aforementioned affirmative representations to Bryant Bank (and to substantiate his professed belief that what had occurred was a mistake). Again, setting aside (for now) the question of whether Bryant Bank was justified in relying on Haynie's conduct, the court infers from the record that, more likely than not, Bryant Bank actually relied on Haynie's affirmative representations when it decided to make the Redeposit, elected not to place a hold on the unspent balance of the Provisional Credit, and delayed the Chargeback until March 17, 2020.

N.    The Other Provisional Credit Expenditures and Chargeback

As set forth above, from March 12 (the date Bryant Bank learned of the Check's return) until March 17, 2020 (the date of the Chargeback), the unspent balance of the Provisional Credit remained available for withdrawal by Haynie. Haynie made no deposits to the Account after March 9, 2020, and only a few debits posted to the Account on or after March 12, 2020. Specifically, other than the New Account Debits (initiated by Haynie on March 11, 2020), the only debits that posted to the Account on or after March 12, 2020, include: (1) a $49.99 March 12, 2020 "POS Debit-DDA" for "YouTube TV," which posted on March 16, 2020; and (2) a $114.22 "ACH Debit" for "AUTOPAY USAA P&C EXT," which posted on March 17, 2020. (Partial Account Statement at 35.) Notably, Haynie testified at the Trial (and during his deposition) that he made *no* expenditures of the Provisional Credit after March 12, 2020. While it is possible that Haynie authorized the March 16 and March 17, 2020 Account debits before learning of the Check's return on March 12, 2020, Haynie did not specifically attest to this at the Trial when presented with the Partial Account Statement and questioned about his Provisional Credit expenditures, and the fact remains that there is no evidence that Haynie took steps to cancel these debits (if they were pre-authorized by him) on or after March 12, 2020.

---

[54] The remaining Admitted Bryant Bank Emails largely consist of irrelevant settlement negotiations.

Haynie's personal expenditures of the Provisional Credit make up $2,995.93 of the (stipulated) Account deficit (the "Personal Expenditures"), and the balance of the (stipulated) Account deficit is comprised of the $40,012 Wire Transfer, the $6 Redeposit Fee, and the $35 Overdraft Fee. The Personal Expenditures and the Wire Transfer are referred to herein, collectively, as the "Provisional Credit Expenditures." The Provisional Credit Expenditures, together with the Redeposit Fee and the Overdraft Fee, make up the stipulated amount of Haynie's total indebtedness to Bryant Bank (collectively, the "Debts"). It is undisputed that Haynie has not compensated Bryant Bank for any of the Debts.

O.      Haynie's Subjective Mental State at the Times of the Account Transactions

Hereafter, in Part VI, the court makes factual findings regarding the elements of the 523(a) Claims. In this subpart, the court endeavors to explain (in detail) the reasoning underpinning the court's findings regarding Haynie's knowledge and intent in Part VI.

Like Bryant Bank, the court finds it difficult to reconcile Haynie's self-professed tech-savvy and business acumen, as well as Haynie's background and experience, with both the red flags Haynie claims not to have noticed and the nonfraudulent explanations Haynie offers for disregarding the red flags that he admittedly appreciated. First, and perhaps foremost, the court did not find credible Haynie's testimony that he honestly believed he could: (1) send emails to unknown (to Haynie) individuals for the purpose of soliciting investments in S-Shares in the Company (a foreign entity based in South Korea); (2) direct one such individual (residing in Canada) to make his $48,400 investment in Company S-Shares payable to Haynie personally and to mail the individual's check for the investment to Haynie's personal residence in the United States; (3) receive a check, made payable to Haynie, from an unknown (to Haynie) business entity located in Pittsburgh, Pennsylvania for the individual's investment in the Company's S-Shares; (4) indorse and deposit such a check in a personal checking account; (5) collect a transaction-based commission on the investment (as well as a monthly salary payment) from the check funds; and (6) wire the remaining check funds, internationally, to an unknown (to Haynie) business in Mexico. While Haynie asks the court to accept that he was simply too trusting, and it never crossed his mind to question what he was being asked to do, such a finding is not supported by the evidence of record.

At the Trial, Haynie's testimony, to a large extent, concerned Haynie's attested to belief that the Check was good on March 11, 2020, which belief Haynie claims to have gained confidence in based on Bryant Bank's decisions to make the Check Funds available for withdrawal and to accept the Wire Transfer Request (decisions that Haynie attested to assuming Bryant Bank would not have made had the Check not cleared). Haynie also points to Bryant Bank's post-Deposit decisions to justify Haynie's professed belief that the Check was good, and that he had no reason to suspect otherwise, when he made the Indorsement and Deposit on March 9, 2020. The only other explanation Haynie offers for harboring the belief that the Check was good at the time(s) of the Indorsement and Deposit is Haynie's attested to trust in what the purported Company representative(s) and the purported Investor were telling him. Haynie asks the court to accept that Haynie's trust was sincere and that he had no reason to be suspicious because things "checked out." (Trial Audio.)

Haynie's testimony is belied by, among other things, the circumstances admittedly known to Haynie concerning the Check at the time of the Indorsement and Deposit. First, the $48,400 Check was for an individual's investment in a foreign entity, but it was made payable to Haynie personally (at Haynie's direction to the purported Investor). Second, the Check, which was mailed to Haynie's Tuscaloosa, Alabama residence (again at Haynie's direction), arrived in a hand-addressed envelope from the purported Investor bearing a handwritten Canadian return address and a Canadian postmark; however, the enclosed Check, dated February 24, 2020 and received by Haynie 12 days later, was purportedly made by a United States business entity unknown to Haynie. Finally, Haynie was being instructed by someone purporting to be the CFO of the Company (a foreign entity) to deposit the $48,400 Check (described to Haynie as the purported Investor's investment in the Company's S-Shares) in a personal checking account and to promptly notify the CFO upon funds availability, at which time Haynie would be given instructions for wiring the Check Funds, less Haynie's compensation (which Haynie believed to be $8,388), to a "designated account." (Def.'s Ex. D at 11.)

In other words, at the times of the Indorsement and Deposit, Haynie (objectively) had no legitimate reason for believing that the Check was valid and properly payable to him, and every (objective) reason to suspect otherwise. And yet, Haynie admittedly took no steps to learn whether the Check was valid before making the Indorsement and Deposit (or requesting the Wire Transfer), nor did Haynie ask Bryant Bank to place a hold on the Deposit (or endeavor to learn whether the Check had, in fact, cleared before requesting the Wire Transfer). Without limitation, Haynie did not contact EQT Production or the Drawee to determine if the Check was valid before making the Indorsement or Deposit, nor did Haynie ask Bryant Bank or the Drawee if the Check had cleared before making the Wire Transfer Request. Haynie also did not contact the purported Beneficiary before making the Wire Transfer Request in accordance with the Wiring Instructions he received from the purported CFO. In fact, Haynie conducted no independent investigation concerning whether he could legitimately do what he was being asked to do by the purported Investor and purported Company representative(s).

Instead, Haynie just did as instructed by the purported Company representative(s)—at least up until the point at which Haynie demanded that he be paid both his $3,388 commission and his first month's salary of $5,000 from the Check Funds as a condition of his agreement to transfer the remaining Check Funds in accordance with the Wiring Instructions. Presumably, had Haynie disclosed the circumstances of how he came to have the Check to Bryant Bank, or had he asked Bryant Bank to place a hold on the Deposit until the Check cleared, Bryant Bank would have done so, if it did not outright reject the Deposit (a more likely outcome if Haynie volunteered what he knew about the Check to the bank).

To be fair to Haynie, Bryant Bank's actions in reliance on Haynie's Indorsement, Deposit, and Wire Transfer Request (e.g., making the Check Funds available for withdrawal, accepting the Wire Transfer Request, initiating the Wire Transfer, and debiting the Account for the Wire Transfer), lend credence to Haynie's attested to subjective (albeit erroneous) belief that the Check had cleared on March 11, 2020. However, given the information known to Haynie (and not disclosed to Bryant Bank), Bryant Bank's reliance on Haynie's conduct hardly justifies Haynie's actions. As set forth above, Haynie had vastly more knowledge and information than Bryant Bank regarding the Check, and the purpose of the Wire Transfer, between March 9 and March 11, 2020.

Also importantly, although Haynie is not a lawyer, banker, or securities broker/dealer, Haynie, at the times of the relevant Account transactions, had more knowledge and training than the average consumer concerning financial fraud schemes, risks of loss to financial institutions in such schemes, and suspicious banking activities. Additionally, Haynie's testimony shows that: (1) Haynie was aware of the distinction between funds availability and check clearing at the times of the Account transactions; (2) Haynie possessed some knowledge of Bryant Bank's policies regarding holds on large check deposits; and (3) Bryant Bank never notified Haynie that it intended to place a hold on the Deposit. Thus, the court finds that it is more probable than not that Haynie subjectively appreciated that Bryant Bank might have made the Check Funds available for withdrawal before the Check had cleared.

Moreover, and unquestionably, altered checks and forged checks (of which counterfeit checks are a variety) sometimes clear even though they are invalid and are not properly payable. As such, the Uniform Commercial Code contains several provisions that allocate losses for such invalid checks, including between the depositary and payor banks.[55] Further, as noted above, Regulation CC is structured not only to facilitate timely funds availability determinations but also to minimize the risks of loss to financial institutions attendant thereto.

Haynie attested to completing at least ten BAI Courses on topics ranging from CIP compliance, identity theft, financial fraud schemes, money laundering, suspicious activities, privacy compliance, the Patriot Act, and cybercrimes during his time as a Bryant Bank employee (August 2018 to late December 2019 or early January 2020). Although Haynie testified that he did not recall taking any BAI Courses on check scams, Haynie also never testified regarding his personal knowledge or beliefs concerning invalid checks at the times of the relevant Account transactions. The court draws an adverse inference from Haynie's evasive testimony (particularly in light of Haynie's background, training, and admitted knowledge) and finds that Haynie subjectively appreciated, on March 11, 2020, that invalid checks sometimes clear and that the Check clearing (if the Check had, in fact, cleared) meant only that the immediate risks of losses for Haynie's expenditures of the Check Funds had shifted to someone other than Haynie (e.g.,

---

[55] For a succinct summary of the Uniform Commercial Code's allocations of losses for altered and forged items as between depositary and paying banks, see Availability of Funds and Collection of Checks, 83 Fed. Reg. 46849-01 (Sept. 17, 2018) (amending Regulation CC):

> Under the Uniform Commercial Code (UCC), an alteration is a change to the terms of a check that is made after the check is issued that modifies an obligation of a party by, for example, changing the payee's name or the amount of the check.[] By contrast, a forgery is a check on which the signature of the drawer (i.e., the account-holder at the paying bank) was made without authorization at the time of the check's issuance.[] In general, under UCC 4–401, the paying bank may charge the drawer's account only for checks that are properly payable.[] Neither altered checks nor forged checks are properly payable. In the case of an altered check under the UCC, the banks that received the check during forward collection, including the paying bank, have warranty claims against the banks that transferred the check (e.g., a collecting bank or the depositary bank). In the case of a forged check, however, the UCC places the responsibility on the paying bank for identifying the forgery.[] Therefore, the depositary bank typically bears the loss related to an altered check, whereas the paying bank bears the loss related to a forged check.

*Id.* (footnotes omitted).

47

Bryant Bank or the Drawee). In other words, the court finds Haynie appreciated that there was a chance (more or less great) that the Check was not valid when he made the Indorsement and Deposit, and Haynie also appreciated, when he made the Wire Transfer Request, that there remained a chance (more or less great) that the Check had not cleared and, even if it had, could still be invalid. Nevertheless, and although Haynie had no present ability to cover the Wire Transfer he initiated if the Check proved invalid, Haynie proceeded to make the Wire Transfer Request and, as soon as Bryant Bank accepted it, Haynie began spending his share of the Check Funds.

Stated plainly, at best, Haynie hoped the Check was good, even though he subjectively appreciated that there was a risk (of an undetermined extent) that it was not. Thus, Haynie proceeded to make the Indorsement and Deposit on March 9, 2020, but he also decided to wait until the Check cleared (or at least until it appeared to clear) before requesting the Wire Transfer, and to wait until Bryant Bank accepted the Wire Transfer (by which Haynie could gain confidence that the Check had cleared) before spending his share of the Check Funds. Of course, even giving Haynie the benefit of this slightly less blameworthy inference,[56] it still supports the finding that Haynie consciously acted to protect his own interests and to shift the risks of immediate financial losses to the other parties to the financial transactions if the Check turned out to be invalid (as Haynie suspected it might). In other words, Haynie knew that all he stood to lose (at least immediately) was the ability to spend the Check Funds, and so, once Bryant Bank agreed to accept the Wire Transfer Request, Haynie started spending the remaining Check Funds for personal purposes, using $2,831.72 in Check Funds to pay credit card debts and open new checking and savings accounts with a different financial institution before the Wire Transfer posted to the Account on March 11, 2020 and before the Check was timely returned the following day, and another $164.21 in Check Funds to pay bills thereafter.

Of course, even if the court were to accept that Haynie honestly believed the Check was good on March 11, 2020, Haynie's belief in the Check's validity lends little credence to Haynie's attested to beliefs that he could legitimately use his Account to: (1) receive funds from an unknown (to Haynie) United States business entity for a Canadian individual's (almost $50,000) investment in a multinational company based in South Korea, (2) collect a (sizable) transaction-based commission and (considerable) salary from the funds received, and (3) internationally transfer the remaining funds to an unknown (to Haynie) business entity in Mexico—all with no questions asked by Haynie other than how his salary was to be paid. Haynie appears to presuppose that the court will find that Haynie was, in fact, so inexperienced, untrained, and lacking in both wisdom and judgment to notice that anything about this set of circumstances was suspicious. However, Haynie professes no such naivety, and the evidentiary record, instead of substantiating Haynie's innocent explanations for his conduct, reveals that Haynie was (more likely) excessively and unjustifiably confident in his own ability to protect himself from liability for his role in the fraudulent scheme and that Haynie gave little (if any) thought to protecting the other parties to the fraudulent Account transactions he facilitated.

---

[56] More blameworthy inferences that could (conceivably) be drawn from the evidentiary record are that Haynie was aware that Bryant Bank had failed to place a hold on the Deposit; Haynie knew that the Check likely had not cleared on March 11, 2020; and Haynie was intentionally manipulating Bryant Bank's funds availability decision when he requested the Wire Transfer on March 11, 2020.

Significantly, less than five months before Haynie (1) accepted the job with the Company, (2) received and deposited an unknown third party's noncertified Check for the purported Investor's $48,400 investment in the Company's S-Shares, and (3) requested to internationally wire the bulk of the Check Funds (less Haynie's commission and first month's salary) to another third party in Mexico upon funds availability, Haynie completed the BAI Course titled "Money Laundering, Fraud, and Suspicious Activities [Mini-Course]," scoring 100% (Pl.'s Ex. 1 at 7)—one of at least three BAI Courses related to money laundering, anti-money laundering laws, or a financial institution's compliance therewith that Haynie completed while employed by Bryant Bank.[57] Haynie admitted that the purpose of the aforementioned BAI Course was to teach bank employees about suspicious activities that may signal money laundering and other financial fraud schemes. Nevertheless (i.e., despite Haynie's admitted knowledge concerning, at a minimum, what money laundering is), Haynie dismissed his BAI Course training as inadequate to cause him to have any suspicions regarding the fact that he was being asked to use a personal checking account to receive a third party's investment in a foreign entity and to transfer the bulk of the funds for the investment to another (unknown) third party. The court did not find this testimony credible. More likely, Haynie did appreciate the risk that the transactions he was facilitating were illegitimate, but he presumed that financial institutions bear the greatest (immediate) risk of financial loss in financial fraud schemes and (typically) will take steps to minimize risks to themselves and their customers.

It must also be emphasized that Haynie admitted to irrevocably transferring illegally acquired money to a third party at the request of someone else—i.e., Haynie admittedly requested the Wire Transfer at the direction of a purported Company representative, by which $40,012 of the $48,400 Provisional Credit for the worthless Check (a Check that Haynie indorsed and deposited in his Account at the direction of a purported Company representative) was converted to money and irrevocably transferred, internationally, to the account of a third party. As the $40,012 Wire Transfer has not been recovered, one can reasonably assume that the illegally obtained money will be, or has been, put to illegal ends (i.e., the potential harms to the broader public are difficult, if not impossible, to quantify). Objectively, by now, Haynie should appreciate that, even if he was an unwitting participant in the scheme, he exposed himself to potential liability, both civil and criminal, by using the Account to Deposit the worthless Check and to facilitate the unrecoverable $40,012 Wire Transfer. And yet, Haynie not only remains indignant, but he exhibits no signs of remorse, insisting that his only error was to be too trusting and that he does not believe that he did anything wrong.

Haynie also expresses anger at Bryant Bank's decisions to extend the Provisional Credit and to accept the Wire Transfer Request, as well as contempt for Bryant Bank's expectation that Haynie reimburse Bryant Bank for the Wire Transfer (even though Haynie made the Indorsement and Deposit and requested the Wire Transfer). Instead of substantiating Haynie's innocent explanations for his conduct, Haynie's indignation supports the opposite inference.

Further, the record evidences that it is more probable than not that Haynie intentionally avoided disclosing information to Bryant Bank that might have alerted Bryant Bank that Haynie was caught up in a scam; that Haynie deliberately avoided asking questions of Bryant Bank that might have suggested Haynie harbored suspicions about the Account transactions he was facilitating; and that Haynie intentionally used his status as a former employee to lend legitimacy

---

[57] *See* Pl.'s Ex. 1 at 1, 7, and 10.

to the Account transactions. Without limitation, Haynie did not deposit the Check in his USAA account, having decided as soon as he heard from the purported Investor (or before) that he would use his Bryant Bank Account to receive and transfer the purported Investor's investment payment. When he received the Check, Haynie went to the Main Office where he (recently) used to work, in person, to make the Deposit. Haynie chatted with some Bryant Bank VP bankers he knew while filling out the Deposit Slip. He made the Indorsement, without any limitation or restriction. Haynie admittedly was aware that Bryant Bank had the ability to place a hold on the Deposit, but Haynie did not ask Bryant Bank to place a hold on the Deposit or even if Bryant Bank intended to place a hold. Instead, as soon as the Check Funds appeared as available for withdrawal online (as opposed to pending), and without asking Bryant Bank or the Drawee if the Check had cleared, Haynie proceeded to make the Wire Transfer Request in person at the Main Branch, showing only the Wiring Instructions to Lee and Sharp, which, admittedly, did not identify the Company or EQT Production (and which the court presumes did not state the nature or purpose of Haynie's requested Account transaction). And, when Lee identified an issue with the Wire Transfer Request and brought in Sharp to assist, Haynie remained silent, disclosing nothing of the true nature of his Account transactions (e.g., how Haynie came to possess the Check, what the Check was for, why Haynie was sending the Wire Transfer, and who had instructed Haynie to request the Wire Transfer). Haynie did not even attempt to confirm his professed assumption that the Check had cleared.

By Haynie's own admission, the only actions he took to verify the legitimacy of what he was being asked to do were to: (1) check that the Company was real and that the Company's purported representatives were real, (2) sign and send back the Consulting Agreement and the Power of Attorney, (3) exchange a few short emails and have a telephone call (or two) with the purported Investor (all largely pertaining to how the Investor's investment was to be paid to Haynie), (4) indorse and present the purported Investor's Check to Bryant Bank for payment, and (5) make the Wire Transfer Request upon availability of the Check Funds. Although Haynie was admittedly cognizant at the time of his Wire Transfer Request that it was unusual that the Check Funds would be available for withdrawal so quickly, Haynie asked no questions of Bryant Bank, the Drawee, or EQT Production before Haynie, on March 11, 2020: (1) demanded that the Company confirm Haynie was permitted to collect $8,388 for his services (not just $3,388) as a condition to his initiating the Wire Transfer of the Check Funds; (2) with or without receiving such confirmation, requested an international wire transfer of $40,012 from the Account (i.e., $8,388 less than the amount of the Check); (3) began spending his share of the Check Funds; and (4) took steps to open new bank accounts with a different financial institution.

Haynie did not testify as to his decision to open new bank accounts on March 11, 2020, despite having been asked about his Account transactions and being presented with the Partial Account Statement evidencing the New Account Debits at the Trial. As Haynie offered no innocent explanation for opening new bank accounts on March 11, 2020, the court draws an adverse inference. It is possible that Haynie merely appreciated that he had placed his own financial account information at risk by sharing it with untrustworthy third parties, and not that the Check would (necessarily) be timely returned or later determined to be invalid, but even this less culpable explanation for Haynie's conduct demonstrates that Haynie subjectively suspected wrongdoing on the part of one or more persons at whose direction he was acting on March 11, 2020. Stated differently, even after Haynie made the Indorsement and the Deposit and

50

(purportedly) made the (admittedly erroneous) assumption that the Check had cleared, Haynie continued to suspect wrongdoing on the part of one or more of the third parties with whom he was communicating and with whom he had shared his Account information, yet Haynie proceeded to make the Wire Transfer Request, all the while endeavoring to protect himself from the risks he exposed himself to by using his Account to facilitate the subject transfers. In sum, Haynie's self-serving characterization of his mistake as being too trusting is irreconcilable with the steps Haynie took to protect himself before March 12, 2020—e.g., opening new bank accounts on March 11, 2020, making no deposits to the Account after March 9, 2020, demanding that he be permitted to collect his $5,000 monthly salary from the Check Funds as a condition to initiating the Wire Transfer, and spending the bulk of his commission on March 11, 2020.

It also bears mention that when explaining the linguistic errors that he admittedly observed but disregarded, Haynie focused on the language barriers that he assumed to exist on the part of the Company's (purported) South Korean representatives and his belief that he was being hired to facilitate communications with North Americans. However, certain of the Admitted Investor Emails purportedly sent by the Investor, who Haynie described as North American, contain similar linguistic errors to those found in the Admitted Company Emails, and certain of the Admitted Investor Emails are worded similarly to the Admitted Company Emails. Additionally, the Admitted Investor Emails and the Admitted Company Emails evidence that, in late February 2020, the purported Investor and purported Company representative(s) were in direct communication with one another (and said as much to Haynie in their emails to him). Thus, in addition to the objective considerations discussed above, Haynie's subjective explanation for disregarding the unintuitive verbiage and linguistic errors in the Admitted Company Emails rings hollow.

Further—despite Haynie's self-professed knowledge regarding websites and how to create them and despite Haynie's BAI Course training—Haynie offered no explanation for harboring no suspicions regarding the following facts: (1) Haynie was solicited by the Recruiter, via LinkedIn, to apply for the job with the Company; (2) all of Haynie's communications with the Company's purported representatives were conducted via email; (3) Haynie never communicated by telephone with the Company's purported representatives or met them in person; (4) one Company Email Address contained a username that misspelled corporate as "coperate;" (5) each of the Company Email Addresses used a TLD of ".org" or ".net;" (6) the Admitted Company Emails identify a website for the Company having a ".org" TLD; (7) multiple representatives of the Company, and an attorney for the Company, purported to email Haynie from two email addresses sharing a single username containing the name of the CFO; and (8) the purported Investor used a Gmail account in communications with Haynie.

To be sure, the fraudster(s) did things to convince Haynie that he was being asked to do a legitimate job, including sending Haynie the Consulting Agreement and the Power of Attorney. However, the Consulting Agreement and Power of Attorney (which Haynie purportedly believed were official Company documents) are, themselves, rife with linguistic errors and unintuitive verbiage; therefore, the Consulting Agreement and Power of Attorney do more to indicate that the job was illegitimate and too good to be true than to support the opposite conclusions.

Also pertinent are the representations that Haynie made to Bryant Bank on and after March 12, 2020, concerning the Wire Transfer, Haynie's communications with a third party, and his

51

beliefs that what had occurred was a mistake and that funds would be wired to resolve the situation. Notably, after the Check was returned, Haynie claims to have answered all of Bryant Bank's questions; however, Haynie did not say what those questions were or how he answered them. Haynie also claims to have shown Mize and Mitchell "the emails" (Trial Audio); however, Haynie did not specify which emails he showed to Bryant Bank or when. Even the Admitted Bryant Bank Emails offered by Haynie show continued obfuscation on the part of Haynie on and after March 12, 2020. Without limitation, Haynie never refers, by name, to "the guy" with whom Haynie claims to be in communication in the Admitted Bryant Bank Emails; none of the names of the persons or entities at whose directions or orders Haynie claims to have believed he was acting appear in the Admitted Bryant Bank Emails (not the Company, not the CFO, not the Investor, and not EQT Production); the Admitted Bryant Bank Emails include no forwards of, and reference no attachments of, emails sent by Haynie to, or received by Haynie from, the purported Investor or purported Company representatives (before or after March 12, 2020); and only a single communication purportedly received by Haynie from an unidentified third party is included in the Admitted Bryant Bank Emails (a communication copied and pasted by Haynie from an email that was not offered or admitted at the Trial).

As previously noted, conspicuously missing from the evidentiary record are any of the emails *from* the purported Investor or purported Company representative(s) that Haynie points to as giving him confidence, on and after March 12, 2020, that what had occurred was a mistake (beyond the body of an email that Haynie copied and pasted into an email to Mize on March 18, 2020, concerning the purported Beneficiary's nonreceipt of the Wire Transfer). Undoubtedly, by March 12, 2020, both Haynie and Bryant Bank realized that there was a high probability that Haynie was caught up in a scam. The Check had been returned on March 12, 2020, the day after the Wire Transfer. Haynie, at the request of Edwards, had gone to Bryant Bank that day and met with Mize and Mitchell, during which meeting Mize apprised Haynie of his plans to contact the authorities.

The court can (to some extent) understand why Haynie might not have subjectively appreciated that Bryant Bank believed the Check (itself) to be invalid for fraud before March 19, 2020—Bryant Bank made the Redeposit on March 12, 2020; Bryant Bank elected not to place a hold on the Account pending the Redeposit; Bryant Bank delayed the Chargeback until March 17, 2020; (it appears) Bryant Bank did not disclose to Haynie, until March 17, 2020, that it had attempted to cancel the Wire Transfer on March 12, 2020; and (it appears) Bryant Bank did not share with Haynie, until March 19, 2020, that EQT Production had determined the Check to be invalid on March 12, 2020. However, Haynie seemingly ignores that it was likely his conduct and affirmative representations to Bryant Bank, on and after March 12, 2020, that induced Bryant Bank to make the Redeposit and delay the Chargeback. If Haynie had made fulsome disclosure to Bryant Bank concerning the transactions Haynie was facilitating and his expected role (i.e., to deposit a check from an unknown third party in his personal checking account, on behalf of someone else, and then transfer the bulk of the check funds to another unknown third party upon funds availability)—instead of trading on his relationships and good standing with Bryant Bank to make it appear as if he had done nothing wrong and using the bank's delay of the Chargeback to pay a couple of bills from the remaining Check Funds—a positive inference might have been drawn from Haynie's conduct (i.e., that Haynie's professed subjective beliefs were honest, even if they

52

were mistaken). Instead, the court draws an adverse inference, i.e., that Haynie did not honestly hold the beliefs he stated and implied through his conduct on and after March 12, 2020.

Notably, Haynie points to Mize's statement(s) that it was unusual that a fraudster would still be communicating with Haynie, and to a call that Haynie claims to have received from the purported Investor during his March 12, 2020 meeting with Mitchell and Mize, to validate Haynie's continued attempts at communications with the suspected fraudster(s) on and after March 12, 2020. Additionally, Haynie points to Mize's alleged statement that Mize intended to contact the authorities to explain Haynie's own failure to contact law enforcement. In other words, Haynie points fingers at everyone but himself. Therefore, the court also draws an adverse inference from Haynie's (attempts) at continued communications with the suspected fraudster(s) after being notified by Bryant Bank that Haynie was potentially caught up in a fraudulent scheme.

Additionally, the court draws an adverse inference from Haynie's continued unwillingness to acknowledge his role in the fraudulent scheme's success on and after March 12, 2020. Specifically, the court infers from the record that, on and after March 12, 2020, Haynie undoubtedly knew he had been scammed; thus, Haynie's repeated representations to Bryant Bank that what had occurred was a mistake, that the Beneficiary had not received the Wire Transfer, and that a third party would be wiring funds to Haynie's Account to resolve the situation could not have been based on Haynie's honest belief that such things were true or likely to occur. Of course, by March 12, 2020, the bulk of the damage was done. Bryant Bank could have saved itself an additional $164.21 in losses by placing a hold on the Account balance (a conspicuous failure); however, Haynie could have spared Bryant Bank these additional losses by cancelling these debits (if they were pre-authorized) or not making them (if they were not pre-authorized) and by being fulsome in his disclosures to Bryant Bank regarding his March 9 and March 11, 2020 Account transactions.

Finally, Haynie's financial motivations cannot be overlooked. Haynie stood to be paid upwards of $13,228 (his seven percent commission, ten percent dividend, and first month's $5,000 salary) for sending a few emails, having one (or two) telephone call(s) with the purported Investor, agreeing to receive and deposit the $48,400 Check from an unknown third party, and agreeing to transfer between $40,012 and $45,012 in Check Funds to another unknown third party. Haynie's demand to be paid $8,388 (not $3,388) in exchange for his agreement to make the Wire Transfer—which demand Haynie did not make until after he received, indorsed, and deposited the $48,400 Check in his Account and after Bryant Bank made the Check Funds available for withdrawal in their entirety—is further evidence that Haynie was motivated by financial gain.

Ultimately, (1) Haynie's refusal to acknowledge his own role in the fraudulent scheme's success; (2) Haynie's continued attempts at communications with the suspected fraudster(s) after having been advised of the potential fraudulent scheme by Bryant Bank; (3) Haynie's knowledge, background, training, and experience regarding, among other things, money laundering, financial fraud schemes, funds availability, Bryant Bank's policies regarding large deposits, and creating websites; (4) Haynie's financial motivations; (5) the actions Haynie took to protect himself and to shift the risk of immediate loss for the Wire Transfer to the other parties to the Account transactions on March 11, 2020; (6) Haynie's expenditures of Check Funds for personal purposes on and after March 11, 2020; and (7) Haynie's uncredible and inauthentic explanations for his conduct, combine

53

to support the finding that it is more probable than not that Haynie was, at the times of the relevant Account transactions, and remains today cognizant of the high probability of wrongdoing on the part of the third part(ies) at whose direction Haynie was acting. Further, these facts evidence that it is more probable than not that Haynie consciously avoided learning the truth of his role in the fraudulent scheme, before, while, and after facilitating it.

At the Trial Bryant Bank's counsel asked the court to infer far worse of Haynie—accusing Haynie (a former employee who left the bank on good terms) of orchestrating the entire scheme and creating the counterfeit Check (as well as the Consulting Agreement, the Power of Attorney, and the emails between Haynie and the fraudster(s)). At all times during the Trial, Haynie appeared unperturbed by Bryant Bank's allegations, and, perhaps rightly so, as Bryant Bank failed to substantiate its more egregious allegations at the Trial by a preponderance of the evidence. However, based on the evidentiary record, Haynie's explanations for his dealings with the fraudulent Check and the criminally derived proceeds thereof fell short of substantiating Haynie's claim that he was an unwitting participant in the fraudulent scheme.

P.    The EQT Production Letter

Admitted of record, as Plaintiff's Exhibit 8, is a letter dated June 17, 2020, which is signed by Jeffrey D. Roberts, as senior counsel for EQT Corporation, and addressed to an attorney for Bryant Bank (the "EQT Letter"). The EQT Letter reads, in pertinent part:

> EQT has received your May 27, 2020 correspondence regarding an alleged EQT Production Company check that was deposited with your client, Bryant Bank, on March 9, 2020. The February 24, 2020 check, numbered 002996674[58] and made out to Chadwick Haynie, was not issued by EQT Production Company. An internal investigation revealed that the check was a counterfeit: it did not have the correct account number, the phone and fax numbers were not in the correct locations,[59] the payee information was the wrong color,[60] and, most importantly, our bank would not confirm that EQT Production Company issued the check. Please do not hesitate to contact me if you have any questions, or if you would like to discuss this matter further.

(EQT Letter.) As set forth above, it is stipulated that the Check was invalid as counterfeit, and Haynie does not dispute that EQT Production did not authorize the Check. Thus, the sufficiency (or insufficiency) of the EQT Letter (or the other evidence of record) to establish such facts is not at issue.

---

58 The referenced check number contains one less zero than the check number that appears on the face of the Check.
59 Per the admitted Check Copies, no telephone or facsimile numbers appear on the front or the back of the Check.
60 Each of the admitted Check Copies is printed in black and white (not in color).

Q.     Haynie's Bankruptcy Filing

Haynie testified at the Trial that he was unable to repay Bryant Bank—and electing not to challenge liability for his alleged debts to Bryant Bank under applicable commercial law—Haynie filed for bankruptcy on September 2, 2020, scheduling Bryant Bank as a nonpriority unsecured creditor with a liquidated, undisputed, and non-contingent claim in the amount of $43,194.93 for "COLLECTION ACCOUNT" (i.e., a claim exceeding the stipulated Debts by $146).  (Case Doc. 1 at 24.)  In his chapter 13 plan, Haynie proposed to pay zero percent to nonpriority unsecured creditors not separately classified by the plan (including Bryant Bank).  Bryant Bank did not timely file a proof of claim in the Case; however, Bryant Bank timely filed its original complaint in the AP on November 10, 2020.  Although Bryant Bank objected to confirmation of Haynie's proposed plan on December 1, 2020, alleging bad faith, Bryant Bank withdrew its objection to confirmation on the record of the December 8, 2020 confirmation hearing in the Case, and the order confirming Haynie's plan entered on December 10, 2020.  As of the date hereof, the Case remains pending, and a discharge order has not yet entered in the Case.

R.     Haynie's Fees and Costs of Defending the AP

At the Trial Haynie did not offer evidence of his fees or costs of defending the AP. However, the court takes judicial notice of the fact that the law firm retained by Haynie to file the Case requested and was awarded a $3,750 "no-look" fee (i.e., compensation for which no fee application was required) for representing Haynie in connection with the Case.[61]  Although the firm's disclosure of compensation (Case Doc. 1 at 60) (the "Disclosure of Compensation") excepts adversary proceedings from the services covered by counsel's $3,750 fee, Rule 2016-1 of the Local Rules of this court (the "Local Rules")[62] conditions the award of a "no-look" fee to a chapter 13 debtor's attorney on the attorney's agreement to perform certain services for the chapter 13 debtor in connection with the chapter 13 case (all for said fee), including "vigorously defending all adversary proceedings filed against the debtor to a final order or judgment."[63]

Further, even if the Disclosure of Compensation controls over the Local Rule,[64] Haynie's counsel may not be paid more than $3,750 from the bankruptcy estate unless and until Haynie's counsel files a detailed application for additional compensation and secures court approval of the application.[65]  To date, Haynie's bankruptcy attorneys (who also represented Haynie in the AP) have not applied for additional compensation in the Case.[66]  Moreover, whether or not Haynie's counsel intends to apply for additional compensation in the Case, Haynie's counsel is required to disclose any compensation paid or agreed to be paid in connection with the Case, including any

---

[61] See Case Doc. 46 (confirming Haynie's chapter 13 plan and awarding a $3,750 fee to Haynie's bankruptcy counsel); see also Case Doc. 22 at pt. 4.3 (providing for Haynie's counsel to receive a fee of $3,750 in the Case to be paid as an administrative expense, under Haynie's chapter 13 plan, via disbursements by the chapter 13 trustee).

[62] The Local Rules are accessible at https://www.alnb.uscourts.gov/court-info/local-rules-and-orders/local-rules (last visited Sept. 28, 2023).

[63] Local Rule 2016-1(*l*)(I).

[64] No party objected to the Disclosure of Compensation (despite its nonconformity), and the court awarded the requested $3,750 fee without requiring Haynie's bankruptcy counsel to file an application for compensation.  (See Case Docket, passim.)

[65] See Local Rule 2016-1; see also Fed. R. Bankr. P. 2016.

[66] See Case Docket, passim.

fees paid or agreed to be paid for representing Haynie in the AP.[67]  No such statement of compensation has been filed in the Case.[68]  Accordingly, based on the foregoing, the court presumes that Haynie had incurred no additional attorney's fees or costs associated with the AP (apart from the $3,750 "no-look" fee for his Case), as of the date the court took the AP under advisement.

## VI.  Conclusions of Law and Findings of Ultimate Facts

### A.  Statement of Jurisdiction and Authority

This court has jurisdiction and the requisite authority to adjudicate the AP pursuant to 28 U.S.C. §§ 151, 157, and 1334 and the United States District Court for the Northern District of Alabama's General Order of Reference dated July 16, 1984, as amended by the General Order of Reference dated July 17, 1984.

Congress has statutorily designated dischargeability proceedings as core proceedings under 28 U.S.C. § 157(b)(2)(I), and, prior to the Trial, and pursuant to 28 U.S.C. § 157(c)(2), the parties expressly consented to this court's entry of a final order or judgment in the AP, subject to normal appellate review under 28 U.S.C. § 158.  (*See* Scheduling Order at 1; Pre-Trial Order at 1.)

### B.  Burden of Proof

To obtain a nondischargeability determination, the plaintiff must establish that it has a valid claim (i.e., that the debtor is liable to the plaintiff for a debt), which inquiry is governed by applicable nonbankruptcy law.  *See Grogan v. Garner*, 498 U.S. 279, 283-84 (1991).  A plaintiff who has established a valid claim must then establish its entitlement to except the debt (i.e., the debtor's liability for the claim) from the debtor's discharge, which is "a matter of federal law governed by the terms of the Bankruptcy Code." *Id.* at 284.  As Haynie does not contest liability for the Debts, this court's inquiry is limited to the federal law question of whether the Debts are dischargeable.

In a proceeding to except a debt from discharge under 11 U.S.C. § 523(a), the plaintiff has the burden of proving each element of its claim by a preponderance of the evidence.  *See id.* at 291; *see also In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994) ("If any one of the[] elements is not met, the debt is dischargeable.").  In the Eleventh Circuit, courts generally construe the statutory exceptions to discharge "liberally in favor of the debtor."  *See In re Griffith*, 206 F.3d 1389, 1394 (11th Cir. 2000) (citations omitted).

Under Bankruptcy Code § 1328(a), debts of the kind specified in § 523(a)(2) and (4) are excepted from discharge.  *See* 11 U.S.C. § 1328(a).  Debts of the kind specified in § 523(a)(6) are dischargeable under § 1328(a), although not under § 1328(b) (hardship discharge) or § 727 (chapter 7 discharge).  *See id.* § 523(a).  Given the pendency of the Case (i.e., it remains to be seen whether the Case will be converted, dismissed, or conclude with a regular chapter 13 discharge or

---

[67] *See* 11 U.S.C. § 329(a).

[68] *See* Case Docket, *passim*.

a chapter 13 hardship discharge), the court will address each of Bryant Bank's alleged bases for excepting the Debts from discharge.

C.     The 523(a)(2)(A) Claim

Bankruptcy Code § 523(a)(2)(A) excepts from an individual debtor's discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by…false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). Courts have long construed § 523(a)(2)(A), and prior iterations of the statute, as limited to debts obtained by[69] positive fraud. *See Neal v. Clark*, 95 U.S. 704, 709 (1877) (construing the discharge exception for fraud under the Bankruptcy Act of 1867 to mean "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, as does embezzlement; and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality"); *see also In re Villa*, 261 F.3d 1148, 1150-51 (11th Cir. 2001), *cert. denied*, 535 U.S. 1112 (2002); *In re Harris*, 3 F.4th 1339, 1350 (11th Cir. 2021).[70]

"The problems inherent in ascertaining whether a debtor has acted with fraudulent intent are obvious….'Because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce fraudulent intent from all the facts and circumstances of a case.'" *Williamson v. Fireman's Fund Ins. Co*., 828 F.2d 249, 252 (4th Cir. 1987) (quoting *In re Devers*, 759 F.2d 751, 754 (9th Cir. 1985) and citing *Farmers Co-op. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982)). More often than not, a determination of fraudulent intent depends upon the trial court's "assessment of the credibility and demeanor of the debtor." *Miller*, 39 F.3d at 305.

In addition to requiring evidence of positive fraud, "[c]ourts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud." *In re Bilzerian* (*Bilzerian II*), 153 F.3d 1278, 1281 (11th Cir. 1998); *see also Field v. Mans*, 516 U.S. 59, 68 (1995). As the United States Supreme Court stated in *Field v. Mans*, the "most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts" when Congress first added the "actual fraud" language to § 523(a)(2)(A) in 1978. 516 U.S. at 70. Therefore, the Restatement (Second) of Torts may be utilized as a source of "generally shared common law" to find "Congress's meaning…when common-law terms are used without further specification." *See id.* at 70–74

---

[69] "[T]he phrase 'to the extent obtained by' in § 523(a)(2)(A)…does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge." *Cohen v. De La Cruz*, 523 U.S. 213, 218 (1998). In other words, § 523(a)(2)(A) "encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." *Id*. at 223. That said, in the Eleventh Circuit at least, for the plaintiff to make out a violation of § 523(a)(2)(A), the debtor must have received some "benefit," either directly or indirectly, from the money, property, services, or credit obtained from the plaintiff by fraudulent means. *In re Bilzerian (Bilzerian I)*, 100 F.3d 886, 891 (11th Cir. 1996), *cert. denied*, 523 U.S. 1093 (1998). This element is satisfied, here, by Haynie's Personal Expenditures, by which he paid off more than $2,500 in credit card debt, opened new checking and savings accounts, and paid bills.

[70] Where a debtor is vicariously liable for the positive fraud of another under agency principles, this requirement is satisfied. *See Strang v. Bradner*, 114 U.S. 555, 561 (1885); *Villa*, 261 F.3d at 1151; *see also Bartenwerfer v. Buckley*, 598 U.S. 69 (2023). However, as noted above, the court need not reach the question of Haynie's vicarious liability given the court's findings regarding Haynie's knowledge and intent.

(relying on the Restatement (Second) of Torts to hold that a plaintiff must show actual and justifiable reliance to except a debt obtained by a fraudulent misrepresentation from discharge).

While there are other species of positive fraud that are actionable under § 523(a)(2)(A), and that do not require a showing of all of the elements of common law fraud (*see Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (holding that the actual fraud prong encompasses "anything that counts as 'fraud' and is done with wrongful intent")), it is stipulated that Bryant Bank's 523(a)(2)(A) Claim is premised on common law fraud and that Bryant Bank must prove each of the elements of its federal common law fraud claim, including justifiable reliance, to except the Debts from discharge under Bankruptcy Code § 523(a)(2)(A). (*See* AP Doc. 14 ¶¶ 6-11; Pre-Trial Order at 3.) Accordingly, to recover under § 523(a)(2)(A), Bryant Bank must prove, by a preponderance of the evidence: (1) that Haynie made fraudulent misrepresentation(s) to Bryant Bank; (2) that Bryant Bank relied on Haynie's fraudulent misrepresentation(s); (3) that Bryant Bank's reliance was justified; and (4) that Haynie's fraudulent misrepresentation(s) caused Bryant Bank's losses. *See Harris*, 3 F.4th at 1347.

Per the Restatement (Second) of Torts:

One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

Restatement (Second) of Torts § 525 (Am. L. Inst. 1977). "Misrepresentation" is used in the Restatement (Second) of Torts "to denote not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth. Thus, words or conduct asserting the existence of a fact constitute a misrepresentation if the fact does not exist." *Id*. at cmt. b.

Bankruptcy Code § 523(a)(2)(A) is in accord, excepting from discharge debts for property, money, services, or credit obtained by a false representation—i.e., an "express" misrepresentation—or by false pretenses—i.e., an "implied" misrepresentation or "conduct intended to create and foster a false impression." *In re Gilmore*, 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998) (Cohen, J.). The Eleventh Circuit quoted Judge Cohen's *Gilmore* decision favorably in an unpublished opinion, stating:

False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive.... It is a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor.... Silence or concealment as to a material fact can constitute false pretenses.

*In re Wood*, 245 F. App'x 916, 918 (11th Cir. 2007) (quoting *Gilmore*, 221 B.R. at 872).

While Haynie denies knowingly making any misrepresentations to Bryant Bank (express or implied), Haynie does not dispute that a payee of a counterfeit check who indorses and deposits the counterfeit check, with knowledge of the check's invalidity, impliedly makes fraudulent misrepresentations concerning the payee's beliefs in the check's validity, and the payee's entitlement to the check funds, for the purpose of inducing the financial institutions that receive the counterfeit check to advance funds for the worthless item. *See* Restatement (Second) of Torts § 532.[71]  Further, Haynie does not deny that his conduct created the impression that he believed the Check was valid and that he was entitled to be paid the Check Funds, or that his actions (at a minimum) induced Bryant Bank to present the Check for payment.  However, Haynie maintains that his implied representations were not false because he honestly held such beliefs, and Haynie argues that Bryant Bank's decisions to extend the Provisional Credit and accept the Wire Transfer Request, in reliance on Haynie's beliefs, were not justified.

Of course, Haynie's representations to Bryant Bank are not limited to Haynie's implied representations that he believed the Check was valid and that the Check Funds were properly payable to him.  Haynie's interactions with Bryant Bank—making the (unlimited and unrestricted) Indorsement on or before March 9, 2020; making the Deposit, in person, on March 9, 2020; requesting the Wire Transfer, in person, on March 11, 2020; making expenditures of the provisionally credited Check Funds for personal purposes on and after March 11, 2020; making various affirmative representations to Bryant Bank, on and after March 12, 2020, regarding actions to be taken by a third party to reimburse Bryant Bank for the Wire Transfer and regarding the Beneficiary's nonreceipt of the Wire Transfer; at all times, before and after March 11, 2020, acting as if Haynie's Account transactions were legitimate; and denying to Bryant Bank, on and after March 12, 2020, that Haynie, personally, did anything wrong and had failed only himself—combined to create the impression to Bryant Bank that Haynie not only believed the Check was valid and properly payable to Haynie but that he believed the Account transactions, including the Wire Transfer, were legitimate at the times of the relevant Account transactions and thereafter.

It is stipulated that the Check was counterfeit and that Haynie, through his actions, facilitated a fraudulent financial scheme.  Thus, the court must decide whether one or more of

---

[71] Section 532 states:

> One who embodies a fraudulent misrepresentation in an article of commerce, a muniment of title, a negotiable instrument or a similar commercial document, is subject to liability for pecuniary loss caused to another who deals with him or with a third person regarding the article or document in justifiable reliance upon the truth of the representation.

Restatement (Second) of Torts § 532.  The commentary to § 532 explains:

> [W]hen the names of the makers or endorsers of negotiable instruments are forged or the amounts payable are altered,…the maker has reason to expect that the document…in which the misrepresentation is incorporated will pass into the hands of persons other than the one to whom he immediately delivers it and that the misrepresentation will influence their conduct.

*Id*. at cmt. c.  It follows, then, that a payee of a counterfeit check, who indorses and deposits it with knowledge that the instrument is counterfeit (or without an honest belief as to the instrument's validity), is likewise culpable for a fraudulent misrepresentation.  The *Kucera* case cited by Haynie does not hold otherwise.  *See In re Kucera,* 373 B.R. 878 (Bankr. C.D. Ill. 2007) (Gorman, J.).

Haynie's representations to Bryant Bank (implied or express) amount to a fraudulent misrepresentation. In other words, the court is tasked with deciding whether Haynie did or did not honestly believe what he implied through his conduct and stated to Bryant Bank. If Haynie's representation(s) amount to fraudulent misrepresentation(s), the court must decide whether Haynie intended to deceive Bryant Bank. If intent to deceive is established, the court must decide whether Bryant Bank justifiably relied on Haynie's fraudulent misrepresentation(s). Finally, provided the court finds Bryant Bank has established that Haynie intentionally made fraudulent misrepresentation(s) to Bryant Bank, and that Bryant Bank justifiably relied on Haynie's fraudulent misrepresentation(s), the court must determine whether Bryant Bank's financial loss(es) were caused by its justifiable reliance on Haynie's fraudulent misrepresentation(s).

 i. *The Knowledge Requirement*

Under the Restatement (Second) of Torts:

A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

Restatement (Second) of Torts § 526. Comment e to § 526 explains:

[S]ince knowledge implies a firm conviction, a misrepresentation of a fact so made as to assert that the maker knows it, is fraudulent if he is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented. This is often expressed by saying that fraud is proved if it is shown that a false representation has been made without belief in its truth or recklessly, careless of whether it is true or false.

*Id.* at cmt. e; *see also Birmingham Tr. Nat'l Bank v. Case*, 755 F.2d 1474, 1476 (11th Cir. 1985), *superseded by statute on other grounds,* Pub. L. No. 98–353, 98 Stat. 333 (1984) (holding that "reckless disregard for the truth or falsity of a statement constitutes a 'false representation' under § 523(a)(2)(A) of the Bankruptcy Code"); *Wood*, 245 F. App'x at 918 (holding "false pretenses contemplate a misrepresentation that is intentional or made with reckless indifference to the truth") (citing *In re Booth*, 174 B.R. 619, 623 (Bankr. N.D. Ala. 1994) (Wright, C.J.)). It is not sufficient, however, to show that the defendant/debtor "should have known the representation was false," i.e., a negligent misrepresentation will not support a claim for fraud under the federal common law. *Harris*, 3 F.4th at 1349-50 (internal quotation omitted).

Intentional concealment of material information is treated as a statement of the nonexistence of the matter under the Restatement (Second) of Torts. *See* Restatement (Second) of Torts § 550 ("One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering."). Comment b to § 550 explains that the rule applies "when the defendant successfully prevents the plaintiff from making an investigation that he would otherwise

have made, and which, if made, would have disclosed the facts; or when the defendant frustrates an investigation." *Id*. at cmt. b.  As comment b further explains:

> Even a false denial of knowledge or information by one party to a transaction, who is in possession of the facts, may subject him to liability as fully as if he had expressly misstated the facts, if its effect upon the plaintiff is to lead him to believe that the facts do not exist or cannot be discovered.

*Id*.

Nondisclosure of facts basic to a business transaction may also be a basis for liability under the Restatement (Second) of Torts where there is a duty of care or disclosure:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

>> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

>> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

>> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

>> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

>> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551.  The commentary on clause (e) states: "A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with." *Id*. at cmt. j.  Further, explaining the rationale for requiring disclosure of basic facts to a transaction, the comments to § 551 state:

The rule stated in Subsection (1) reflects the traditional ethics of bargaining between adversaries, in the absence of any special reason for the application of a different rule. When the facts are patent, or when the plaintiff has equal opportunity for obtaining information that he may be expected to utilize if he cares to do so, or when the defendant has no reason to think that the plaintiff is acting under a misapprehension, there is no obligation to give aid to a bargaining antagonist by disclosing what the defendant has himself discovered. To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no liability. The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indolent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies….

The continuing development of modern business ethics has, however, limited to some extent this privilege to take advantage of ignorance. There are situations in which the defendant not only knows that his bargaining adversary is acting under a mistake basic to the transaction, but also knows that the adversary, by reason of the relation between them, the customs of the trade or other objective circumstances, is reasonably relying upon a disclosure of the unrevealed fact if it exists. In this type of case good faith and fair dealing may require a disclosure.

It is extremely difficult to be specific as to the factors that give rise to this known, and reasonable, expectation of disclosure. In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware.  In such a case, even in a tort action for deceit, the plaintiff is entitled to be compensated for the loss that he has sustained….

There are indications, also, that with changing ethical attitudes in many fields of modern business, the concept of facts basic to the transaction may be expanding and the duty to use reasonable care to disclose the facts may be increasing somewhat. This Subsection is not intended to impede that development.

*Id*. at cmts. k-*l*.

Based on the court's findings regarding Haynie's subjective mental state in Part V above, the court determines that Haynie knew what his conduct implied to Bryant Bank on and before March 11, 2020—i.e., that Haynie believed the Check was valid, that Haynie believed he was legitimately entitled to indorse the Check and present it for payment, that Haynie believed he was legitimately entitled to spend the Check Funds, and that Haynie believed the Wire Transfer Request had a legitimate purpose.  Although Haynie attested to honestly holding such beliefs when

he made the Indorsement, the Deposit, and the Wire Transfer Request, the court did not find Haynie's testimony credible—i.e., from the circumstantial evidence of record, the court infers that it is more probable than not that Haynie harbored no such beliefs, or, if he did, that Haynie nevertheless subjectively appreciated that there was a chance (more or less great) that the Check was not valid and also that there was a high probability of wrongdoing on the part of one or more of the third parties at whose behest he was acting (i.e., that his Account transactions had no legitimate purpose), and yet Haynie deliberately made no investigation, closing his eyes to the critical facts that would have confirmed his suspicions. In other words, Haynie was at least conscious that there was a high probability that the facts were not as he believed, and Haynie deliberately avoided learning the truth. As such, the court finds that Haynie's implied representations to Bryant Bank regarding Haynie's Account transactions, on and before March 11, 2020, were made with the knowledge that such representations were untrue or were made without care as to whether they were true or false. Therefore, Haynie's implied representations to Bryant Bank on and before March 11, 2020 amount to fraudulent misrepresentations.

Further, the court finds Haynie's intentional concealment, or nondisclosure, of material facts known to Haynie at the time of the Wire Transfer Request (and which served as indicia of the financial fraud scheme Haynie was facilitating) amounted to a misrepresentation by Haynie to Bryant Bank that no such facts existed. Specifically, even giving Haynie the benefit of his erroneous belief that the Check had cleared, Haynie admittedly possessed superior information to Bryant Bank regarding the Check and the purpose of the Wire Transfer and further admits that he did not share all that he knew with Bryant Bank when he made the Wire Transfer Request. Without limitation, Haynie (admittedly) did not disclose that: (1) Haynie had received the Check, by mail, from an individual in Canada for the individual's investment payment in the Company, a foreign entity based in South Korea; (2) Haynie did not know the payor of the Check (identified in the Check as a United States business) or have any business relationship with the payor of the Check; and (3) Haynie had been instructed by a representative of the Company, with the individual investor's permission, to deposit the Check in his Account and to wire the Check Funds, less Haynie's transaction-based commission and monthly salary, to an unknown business entity in Mexico upon funds availability. All of these facts were indicia that the Check was not good and, even if it was, that the Wire Transfer had no legitimate purpose. However, instead of sharing any of this information with Bryant Bank—by which the court might have inferred that Haynie was honest in his dealings with Bryant Bank—Haynie remained silent, sharing only the Wiring Instructions for the requested funds transfer and allowing Bryant Bank to mistakenly assume that Haynie honestly believed the Wire Transfer was legitimate and that Haynie was entitled to expend the Check Funds (beliefs Haynie did not honestly hold).

The legal authorities hereinabove cited support the conclusion that a sender's beliefs in the legitimacy of his payment order to a receiving bank (specifically, the sender's belief that his account(s) with the receiving bank have sufficient withdrawable funds to cover the requested transfer, his belief that the requested funds transfer has a legitimate purpose, and his belief that he is entitled to expend the funds he orders transferred) are basic facts to a funds transfer transaction. Further, because of the parties' relationship—Haynie was not only a known customer in good standing with Bryant Bank, but a (recent) former Bryant Bank employee who had, at Bryant Bank's requirement and expense, completed regulatory compliance courses on money laundering and financial fraud schemes—Haynie likely appreciated that Bryant Bank would reasonably expect

Haynie to disclose facts known to him that signaled a financial fraud scheme. However, instead of disclosing what he knew to Bryant Bank, Haynie did the opposite, sharing only minimal information with Bryant Bank and making no investigation. For the foregoing reasons, the court concludes that Haynie had a legal duty to disclose to Bryant Bank basic facts known to Haynie regarding the Check and the purpose of the Wire Transfer (specifically, those facts that would have signaled to Bryant Bank that Haynie was facilitating a fraudulent scheme). Further, the court finds that, it is more probable than not, that Haynie intentionally concealed, or failed to disclose, facts that Haynie subjectively appreciated were indicative of the fraudulent scheme he was facilitating (and that would have allowed Bryant Bank to correct its mistaken belief that no such facts existed). As such Haynie's intentional concealment, or nondisclosure, amounted to a fraudulent misrepresentation to Bryant Bank that no such indicia of fraud existed on March 11, 2020.

Between March 12 and March 17, 2020, Haynie made additional representations to Bryant Bank (express and implied)—i.e., that Haynie believed what had occurred was a mistake; that Haynie still believed the Check was valid; that Haynie was still communicating with a third party; that Haynie believed the third party would have funds wired to his Account to cover the Check if it was not honored by the Drawee; that Haynie still believed that the Wire Transfer had a legitimate purpose; and that the Beneficiary had not received the Wire Transfer. Of course, what had occurred was not a mistake. The Check was not valid. The Wire Transfer had no legitimate purpose. No funds transfer would be made to Haynie's Account to cover the worthless Check. Haynie had no ability or plans to personally repay Bryant Bank for the Wire Transfer on or after March 12, 2020. Haynie had not been legitimately retained by the Company. Haynie could not legitimately sell Company securities or receive or transfer payments for Company securities. And, beyond a single telephone call to EQT Production, on March 12, 2020, during which an EQT Production representative directed Haynie to contact the Drawee, there is no evidence that Haynie ever communicated with EQT Production, the Drawee, or the Beneficiary. As such, and as with Haynie's other testimony, Haynie's professed beliefs on and after March 12, 2020 strain credulity, and, based on the evidentiary record, the court finds it more probable than not that Haynie did not harbor the beliefs he stated and implied, or that Haynie was at least conscious that there was a high probability that the facts were not as he believed and deliberately avoided learning the truth, on and after March 12, 2020. Thus, Haynie's express and implied misrepresentations to Bryant Bank after the Check's return also were fraudulent.

The court further finds that Haynie continued to conceal from Bryant Bank, or failed to disclose to Bryant Bank, material information that Haynie knew regarding the Check and Wire Transfer, on and after March 12, 2020, and took no steps to correct his prior misrepresentations (concerning the legitimacy of the Check and Wire Transfer Request), even after learning that Bryant Bank had relied on Haynie's misrepresentations and would continue to rely on them by making the Redeposit, delaying the Chargeback, and allowing Haynie's continued access to the Provisional Credit. Specifically, during this time, instead of making fulsome disclosure to Bryant Bank, Haynie made ambiguous and partial statements to Bryant Bank regarding his Account transactions, misleading Bryant Bank as to the truth. Haynie also continued spending the Provisional Credit, failed to contact law enforcement, continued efforts to communicate with the suspected orchestrators of the fraudulent scheme, and continued to proclaim his innocence (in all respects) to Bryant Bank. Accordingly, the court finds that, between March 12 and March 17,

2020, Haynie's continued, intentional concealment, or nondisclosure, of critical facts known to Haynie amounted to fraudulent misrepresentations to Bryant Bank that no such facts existed.

ii.        *The Intent Requirement*

Intent to induce reliance upon a fraudulent misrepresentation (i.e., deceit) is a distinct element of a claim for fraudulent misrepresentation.  *See Harris*, 3 F.4th at 1350.  Per the Restatement (Second) of Torts:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

Restatement (Second) of Torts § 531.  "A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct."  *Id*. at cmt. c.

The Supreme Court, when construing Bankruptcy Code § 523(a)(4), has held that intentional conduct includes not only conduct that the actor knows is improper "but also reckless conduct of the kind that the criminal law often treats as the equivalent."  *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 274 (2013) (holding that "[w]here actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the [actor] 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk'").  The Third Circuit Court of Appeals has relied on *Bullock* to hold that the intent element of Bankruptcy Code § 523(a)(2)(A) may also be satisfied by a showing of gross recklessness on the part of the debtor.  *See In re Bocchino*, 794 F.3d 376, 382 (3d. Cir. 2015).  Eleventh Circuit precedent is in accord.  *See, e.g., Miller*, 39 F.3d at 305 ("A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive.  'Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference [sic] of intent [to deceive].'") (quoting *In re Albanese*, 96 B.R. 376, 380 (Bankr. M.D. Fla. 1989) (citations omitted)).

In *Bullock*, the Supreme Court explained that the risk that the debtor consciously disregards "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, [the actor's] disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation."  569 U.S. at 274 (quoting the Model Penal Code § 2.02(2)(c), p. 226 (Am. L. Inst. 1985) (emphasis in original)).  In *Global-Tech Appliances, Inc. v. SEB S.A.*, the United States Supreme Court articulated the doctrine of willful blindness as having two basic requirements, "(1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  563 U.S. 754, 769 (2011).  The Supreme Court distinguished a willfully blind defendant ("one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known

65

the critical facts") from a reckless defendant ("one who merely knows of a substantial and unjustified risk of such wrongdoing") and a negligent defendant ("one who should have known of a similar risk but, in fact, did not"). *Id*. at 769-70.

Multiple factors combine to support the inference that Haynie intended to induce Bryant Bank's reliance on Haynie's fraudulent misrepresentations. First, in his dealings with Bryant Bank on March 9 and March 11, 2020, Haynie acted, in all respects, as if the Check were valid (when it was not, and Haynie subjectively appreciated that there was a risk, more or less great, that it was not). Second, Haynie designed his interactions with Bryant Bank to lend legitimacy to his Wire Transfer Request (even though the Wire Transfer was illegitimate, and Haynie subjectively appreciated the high probability that it was illegitimate on March 11, 2020). Third, Haynie deliberately avoided making any reasonable investigation (concerning the Company, the job with the Company, the Investor, the Check, EQT Production, the Check Funds, the Wire Transfer Request, and the Beneficiary) before proceeding, in person, to make the Deposit and the Wire Transfer Request. Fourth, Haynie knowingly concealed from Bryant Bank, or failed to disclose to Bryant Bank, facts indicating that the Check and Wire Transfer were fraudulent (before and after March 12, 2020). Finally, Haynie took measures to protect himself (opening new bank accounts on March 11, 2020, conditioning his agreement to make the Wire Transfer Request on the purported CFO's acquiescence to Haynie's request to collect both his transaction-based commission and monthly salary from the Check Funds, and spending Check Funds for personal purposes on and after March 11, 2020), expecting that Bryant Bank, the Drawee, or EQT Production would be left holding the proverbial bag if they did not timely intervene to stop the fraud.

For the foregoing reasons, the court finds Haynie intended that his fraudulent misrepresentations would influence Bryant Bank's decisions and that Haynie intended the results that flowed from his actions, specifically Bryant Bank's decision to extend the Provisional Credit, Bryant Bank's acceptance of the Wire Transfer Request, Bryant Bank's Redeposit of the Check, Bryant Bank's delay of the Chargeback, and Bryant Bank's decision not to place a hold on the Account balance in the interim. Whether Haynie knew (or had reason to know) that his conduct was substantially certain to cause injury to Bryant Bank remains relevant to Bryant Bank's 523(a)(6) Claim, but Bryant Bank's proof, by a preponderance of the evidence, that Haynie subjectively desired to induce Bryant Bank's reliance on his fraudulent misrepresentations regarding the Check's validity and the legitimacy of the Account transactions he initiated is sufficient to establish that Haynie's fraudulent misrepresentations to Bryant Bank were intentional and deceitful for purposes of the elements of Bryant Bank's 523(a)(2)(A) Claim.

iii.    *The Justifiable Reliance Requirement*

Summarizing the court's findings from Part V, the court finds, based on the evidentiary record (even without the benefit of testimony from a Bryant Bank representative), that it is more probable than not that Bryant Bank actually relied on Haynie's fraudulent misrepresentations when Bryant Bank made the decisions to extend the Provisional Credit, accept the Wire Transfer Request, initiate the Wire Transfer, make the Redeposit, delay the Chargeback, and allow Haynie to make expenditures of the remaining balance of the Provisional Credit in the interim. However, the added element of justifiability requires that Bryant Bank provide some objective corroboration

66

to its claim that it relied on Haynie's fraudulent representations. *See In re Vann*, 67 F.3d 277, 283 (11th Cir. 1995). More specifically, to establish that Bryant Bank's reliance on Haynie's fraudulent misrepresentations was justified, Bryant Bank is required to have established, by a preponderance of the evidence, that its conduct was not "so utterly unreasonable, in the light of the information apparent to" Bryant Bank "that the law may properly say that [its] loss is [its] own responsibility." *Id*.

Explaining the element of "justifiable reliance," the Eleventh Circuit has stated:

Justifiable reliance is gauged by 'an *individual standard* of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case.' *Prosser & Keeton on Torts* [§ 108], at 751 [(5th ed. 1984)] (emphasis added). Additionally,

[i]t is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.

*Id*. at 752 (footnotes omitted); *see also Mayer v. Spanel Int'l Ltd.* (*In re Mayer*), 51 F.3d 670, 676 (7th Cir. 1995) ("A victim who lacks access to the truth, and has not been alerted to the facts that would alert him to the truth, is not to be ... blocked by a discharge under the bankruptcy laws—just because he did not conduct a more thorough investigation.").

*Vann*, 67 F.3d at 283. Putting it another way:

[R]eliance is not justified "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the *use of his senses*. Thus a defect that any experienced horseman would at once recognize at *first glance* may not be patent to a person who has had no experience with horses."

*In re Denise Roberts-Dude*, 597 F. App'x 615, 618 (11th Cir. 2015) (unpublished opinion) (emphasis added) (quoting *Field*, 516 U.S. at 71).

Because each of Bryant Bank's decisions—to extend the Provisional Credit, to accept the Wire Transfer Request, to make the Redeposit, to delay the Chargeback, and to allow Haynie continued access to the Provisional Credit in the interim—contributed to Bryant Bank's financial losses, the court will separately consider whether each of Bryant Bank's decisions was justified.

Beginning with Bryant Bank's decision to extend the Provisional Credit, whether Bryant Bank affirmatively elected not to place a hold on the Deposit or whether Bryant Bank failed to place a hold on the Deposit by mistake, the court cannot say that Bryant Bank's funds availability election was utterly unreasonable in light of the information apparent to it. Haynie shared no information with Bryant Bank regarding the Check and acted in all respects as if he was

67

legitimately entitled to make the Indorsement and Deposit. Bryant Bank had no reason to expect that Haynie would, only two days later, request to internationally wire $40,012 from his Account. Limits on cash withdrawals and Account debits remained in place, and Bryant Bank did not obligate itself to accept the Wire Transfer Request by extending the Provisional Credit. Thus, the court cannot say that Bryant Bank's election or failure to place a hold on the Deposit, was unjustified, particularly given Haynie's contractual and commercial law liability for any expenditures of the Provisional Credit he might (thereafter) elect to make. Certainly, Bryant Bank was aware that its decision to extend the Provisional Credit (be it intentional or a result of having insufficient safeguards in place) was risky—as the Check remained subject to timely return by the Drawee—but the court cannot say that Bryant Bank's funds availability decision (and the risks attendant to such decision) were per se unjustifiable under the circumstances, even though Bryant Bank would have been better served by placing a hold on the Deposit.

However, as set forth above, Bryant Bank's funds availability decision (or lack thereof) did not obligate Bryant Bank to accept the Wire Transfer Request; therefore, Bryant Bank's decision to accept the Wire Transfer Request (as opposed to its decisions to extend the Provisional Credit and permit the Personal Expenditures on March 11, 2020) proves a more complicated analysis. A Provisional Credit is just that—provisional. The credit can be revoked. Once funds are transferred via wire (and there often is little or no delay in the transfer of funds after the wire is initiated), it can be difficult or even impossible to recover the transfer (which is why fraud in the payment space often occurs via wire). Haynie, of course, had some training on money laundering, fraud, and suspicious activities while employed by Bryant Bank. However, the expectation is that the employees responsible for processing international wire transfer requests for Bryant Bank will have a much greater appreciation of these risks than a former Bryant Bank marketing coordinator.

Significantly, even though the Wire Transfer was reportable due to its size (i.e., one for which information must be collected and shared to permit investigations into tax evasion and money laundering, among other things), and even though Bryant Bank was capable of appreciating that the Wire Transfer was one for which Bryant Bank might be required to file a suspicious activity report, Bryant Bank accepted Haynie's request to wire $40,012 in provisionally credited Check Funds, and irrevocably transferred $40,012 of Bryant Bank's own money to the account of an unknown third party in Mexico (ostensibly on Haynie's implicit promise that the Check was good and the Wire Transfer legitimate), no questions asked.

Necessarily, then, the risk assessment that Bryant Bank performed (if any) when it extended the Provisional Credit is no substitute for the risk assessment that Bryant Bank was expected to perform when it accepted the Wire Transfer Request. At the point Bryant Bank initiated the Wire Transfer, the risk of harm was not only to itself but to others. Thus, Bryant Bank's reliance on the fact that Haynie was a "known" customer in "good standing" who was contractually obligated to reimburse Bryant Bank (and the court presumes Bryant Bank did, in fact, rely on these facts) would not justify Bryant Bank's decisions to contractually agree to accept the Wire Transfer Request and to execute the Wire Transfer on March 11, 2020 (by which the Provisional Credit for the Check was converted to money and irrevocably transferred internationally).

Case 20-70036-JHH    Doc 40    Filed 09/28/23    Entered 09/28/23 14:56:59    Desc Main
Document      Page 68 of 76

The Check remained subject to timely return by the Drawee. The Deposit was an anomalous Account transaction. The timing and amount of the Wire Transfer, the source of funds for the Wire Transfer, and the Beneficiary were all apparent red flags to a financial institution such as Bryant Bank. Haynie's business (to Bryant Bank's knowledge) was serving as a marketing coordinator for UA, not working for a business entity in Pittsburgh, Pennsylvania or a business entity in Mexico. Although Haynie was transferring funds purportedly paid to him by EQT Production, EQT Production's name does not appear in the Wire Transfer Agreement or the Wiring Instructions, and the Wire Transfer Request (and presumably the Wiring Instructions) did not contain sufficient information for Bryant Bank to determine that the Wire Transfer had a legitimate, business purpose. Further, there is no evidence to suggest that Bryant Bank made any evaluation of Haynie's credit worthiness (beyond whatever evaluation it might have made when Haynie opened the Account) before accepting the Wire Transfer Request (i.e., before affirmatively agreeing to permit Haynie to expend $40,012 of the $48,400 Provisional Credit). There also is no evidence to suggest that Bryant Bank made any investigation before agreeing to accept the Wire Transfer (beyond Lee's involvement of Sharp due to an unspecified issue with the Wire Transfer Request). In sum, Bryant Bank offered no justifiable explanation for its decision to accept the Wire Transfer Request, and, unlike the Provisional Credit, the court cannot infer one from the record. To be sure, honoring ordinary payment orders from known business customers is not per se unjustifiable, but Haynie is not a business customer, and his Wire Transfer Request was not ordinary. As such, the court finds that Bryant Bank failed to prove, by a preponderance of the evidence, that it justifiably relied on Haynie's conduct when it accepted the Wire Transfer Request.

As for the Redeposit, the delay of the Chargeback, and Bryant Bank's decision not to place a hold on the Account funds before making the Chargeback, the record evidences that Bryant Bank was induced to permit the Redeposit, delay the Chargeback, and decline to place a hold on the remaining Account balance based on Haynie's express and implied fraudulent misrepresentations to Bryant Bank following the Check's return on March 12, 2020 (without limitation, that Haynie believed that his contact would be wiring funds to resolve the situation and that what had occurred was a mistake). Given that the bulk of the Provisional Credit had already been spent by Haynie on March 11, 2020, the court cannot say that Bryant Bank's (apparent) willingness to give a known customer and former employee the benefit of the doubt was patently unjustified. To be sure, Bryant Bank could have minimized its losses by placing a hold on the Account pending the Redeposit, but reasonable reliance is not the standard under Bankruptcy Code § 523(a)(2)(A).

iv.     *The Cause Requirement*

"The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss." Restatement (Second) of Torts § 546. "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." *Id*. § 548A. "In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates." *Id*. at cmt. a.

Because Bryant Bank failed to establish that it justifiably relied on Haynie's fraudulent misrepresentations when it agreed to accept the Wire Transfer Request, and then executed the Wire Transfer, on March 11, 2020, Bryant Bank also has failed to establish that its reliance on Haynie's fraudulent misrepresentations were the cause of Bryant Bank's pecuniary loss resulting therefrom (i.e., the unreimbursed Wire Transfer). Accordingly, Haynie's Debt for the $40,012 Wire Transfer is not excepted from discharge under Bankruptcy Code § 523(a)(2)(A).

However, as to Haynie's Personal Expenditures, the Redeposit Fee, and the Overdraft Fee, cause is established because (1) Bryant Bank actually and justifiably relied on Haynie's conduct when it extended the Provisional Credit, delayed the Chargeback, made the Redeposit, and declined to put a hold on the Account until March 17, 2020; and (2) Bryant Bank's resulting losses (for the unreimbursed Personal Expenditures, the unpaid Redeposit Fee, and the unpaid Overdraft Fee) were losses that might reasonably be expected to result from Bryant Bank's reliance on Haynie's fraudulent misrepresentations. Accordingly, and pursuant to Bankruptcy Code § 523(a)(2)(A), Haynie's Debts for the Personal Expenditures, the Redeposit Fee, and the Overdraft Fee are excepted from any discharge Haynie may hereafter receive.

Given the court's conclusion that Haynie's Debt to Bryant Bank for the Wire Transfer is not excepted from discharge under Bankruptcy Code § 523(a)(2)(A), the court will proceed to consider whether the Debt for the Wire Transfer is excepted from discharge under Bankruptcy Code § 523(a)(4) or § 523(a)(6).

D.     The 523(a)(4) Claim

Bankruptcy Code § 523(a)(4) excepts from an individual's discharge any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C.§ 523(a)(4). In *Bullock*, the United States Supreme Court explained:

> As commonly used, "embezzlement" requires conversion, and "larceny" requires taking and carrying away another's property…."Fraud" typically requires a false statement or omission…."Defalcation," as commonly used (hence as Congress might have understood it), can encompass a breach of fiduciary obligation that involves neither conversion, nor taking and carrying away another's property, nor falsity.

569 U.S. at 275; *see also* Wayne R. LaFave, 3 Subst. Crim. L. § 19.2 (3d ed.) ("Larceny at common law may be defined as the (1) trespassory (2) taking and (3) carrying away of the (4) personal property (5) of another (6) with intent to steal it."); *id*. § 19.2(a) (stating that "[i]f the wrongdoer fraudulently converts property already properly in his possession, he does not take it from anyone's possession and so cannot be guilty of larceny"); *id*. § 19.4 (explaining that, at common law, "larceny was limited to the taking away of tangible personal property"); *id*. § 19.6 (explaining that embezzlement is a statutory crime that generally may be defined as: "(1) the fraudulent (2) conversion of (3) the property (4) of another (5) by one who is already in lawful possession of it").

As set forth above, Bryant Bank does not plead (or argue) fraud or defalcation by a fiduciary or larceny, and although Bryant Bank makes passing reference to embezzlement in the

Pre-Trial Order, Bryant Bank does not plead embezzlement in its Amended Complaint, or characterize its 523(a)(4) Claim as one for embezzlement in Bryant Bank's Post-Trial Brief. Instead, Bryant Bank pleads, and argues in its post-Trial brief, that it has proven the elements of a claim for theft by deception, under Alabama Code § 13A-8-2 or Alabama Code § 13A-9-13.1, and, therefore, Haynie's Debt for the Wire Transfer may be excepted from discharge under Bankruptcy Code § 523(a)(4). (*See* AP Doc. 14 ¶ 12; Bryant Bank's Post-Trial Brief at 30-33.)

Notably, theft by deception, under Alabama law, is a statutory crime that is distinct from larceny, embezzlement, and fraud or defalcation by a fiduciary. Furthermore, § 523(a)(4) does not, on its face, apply to debts for theft by deception, and the court is mindful of the long-standing principle that "exceptions to discharge 'should be confined to those plainly expressed.'" *Kawaauhau v. Geiger,* 523 U.S. 57, 62 (1998) (quoting *Gleason v. Thaw,* 236 U.S. 558, 562 (1915)); *see also Carter v. U.S.*, 530 U.S. 255, 265 (2000) ("[A] 'cluster of ideas' from the common law should be imported into statutory text only when Congress employs a common-law term.") (citations and emphasis omitted).

That said, Bryant Bank stipulates, in Bryant Bank's Post-Trial Brief, that justifiable reliance is an element of its 523(a)(4) Claim for theft by deception and that the elements of Bryant Bank's theft by deception claim under Alabama law are (in all material respects) identical to Bryant Bank's federal common law fraud claim under § 523(a)(2)(A). (*See* Bryant Bank's Post-Trial Brief at 30-33.) Furthermore, Bryant Bank cites a § 523(a)(2)(A) case construing Alabama Code §§ 13A-8-1, 13A-8-2, and 13A-8-3, not a § 523(a)(4) case, to support its assertion that a claim for theft by deception under Alabama law will serve as a basis for excepting a debt from discharge under Bankruptcy Code § 523(a). (*See id.* (citing *In re Farris*, No. 05-13253-BGC7, 2007 WL 4533503 (Bankr. N.D. Ala. Dec. 19, 2007) (Cohen, J.).) Because Bryant Bank's own characterization of its 523(a)(4) Claim, and the legal authority cited by Bryant Bank in support thereof, require the same result under § 523(a)(4), as under § 523(a)(2)(A), the court accepts, for purposes of this opinion, that Bryant Bank's claim for theft by deception may be brought under § 523(a)(2)(A) or § 523(a)(4), but the court necessarily concludes that Haynie's Debt to Bryant Bank for the Wire Transfer is dischargeable under § 523(a)(4) for the same reason the Debt for the Wire Transfer is dischargeable under § 523(a)(2)(A) (i.e., because Bryant Bank did not establish, by a preponderance of the evidence, that it justifiably relied on Haynie's fraudulent misrepresentations when it accepted the Wire Transfer Request).

E.  The 523(a)(6) Claim

Bankruptcy Code § 523(a)(6) excepts from some individual discharges any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Willfulness and maliciousness are distinct elements of a § 523(a)(6) claim. "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability [under § 523(a)(6) takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau*, 523 U.S. at 61 (emphasis in original). In other words, the debtor must have intended the consequences of an act, not merely the act.

In the Eleventh Circuit, "[a] debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain

to cause injury." *In re Jennings*, 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting *In re Walker*, 48 F.3d 1161, 1165 (11th Cir. 1995) and citing *Kawaauhau*, 523 U.S. at 61-62). "Malicious," on the other hand, "means wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will." *Jennings*, 670 F.3d at 1334 (internal quotations omitted). Further, a showing of "specific intent to harm another is not necessary" to establish malice. *Id*.

To date, the Eleventh Circuit has yet to definitively answer whether substantial certainty of injury is a subjective standard, "requiring a creditor to prove that a debtor actually knew that the act was substantially certain to injure the creditor, or an objective standard, requiring a creditor to show only that a debtor's act was in fact substantially certain to cause injury" to the creditor. *In re Kane*, 755 F.3d 1285, 1293 (11th Cir. 2014), *cert. denied*, 574 U.S. 1027 (2014); *see also In re Monson*, 661 F. App'x 675, n.9 (11th Cir. 2016) (unpublished opinion). However, the court need not answer this question to adjudicate Bryant Bank's 523(a)(6) Claim, as the evidentiary record does not show, by a preponderance of the evidence, that Haynie acted with the specific purpose of causing injury to Bryant Bank, that Haynie subjectively appreciated that his actions were substantially certain to injure Bryant Bank, or that, objectively, Haynie's actions were substantially certain to injure Bryant Bank. In other words, even though the court has little trouble finding (for the reasons set forth above) that Haynie's conduct was malicious (i.e., it was wrongful and without just cause), the evidentiary record does not support a finding of willful injury to Bryant Bank or its property.

As discussed above, the court found credible (to an extent) Haynie's attested to presumption that Bryant Bank would not have accepted the Wire Transfer Request had the Check not cleared (i.e., until after both Bryant Bank and the Drawee had the opportunity to dishonor the Check). While this belief does little to explain Haynie's conduct, it does mitigate against a finding that Haynie intended specific harm to Bryant Bank. More likely than not, Haynie subjectively appreciated that there was a risk (of some undetermined extent) that the Check had not cleared and that, even if it had, the Check might still be invalid, but the risk of the Check's timely return was something Bryant Bank undoubtedly had a greater appreciation of than Haynie (i.e., Bryant Bank knew, for a certainty, that the Check had not cleared on March 11, 2020). Because the Check clearing presumably would have shifted the risk of loss from Bryant Bank to the Drawee (or EQT Production) if the Check was later determined to be invalid as counterfeit, the court cannot say that Haynie subjectively appreciated, or that Haynie objectively should have appreciated, that harm to Bryant Bank was certain. Stated another way, if the Drawee had finally paid the Check before the Wire Transfer was initiated (i.e., if the Check had cleared), as Haynie surmised (but lacked certainty of), the Drawee, not Bryant Bank, might very well have borne the risk of the loss if the Check was subsequently determined to be invalid as counterfeit (at least as between the financial institutions to the transactions).[72]

Moreover, while Haynie's fraudulent misrepresentations were designed to influence Bryant Bank's decision to accept the Wire Transfer Request, Bryant Bank nevertheless had ample reasons for rejecting the Wire Transfer Request and was free to do so. Because Bryant Bank has not shown that it justifiably relied on Haynie's fraudulent misrepresentations when deciding to accept the Wire Transfer Request and execute the Wire Transfer, the court cannot say that (objectively) Haynie's actions were substantially certain to injure Bryant Bank or that it was unreasonable for

---

[72] *See supra* n.55.

Haynie to expect that Bryant Bank would reject the Wire Transfer Request if the Check had not yet cleared. In other words, while Haynie likely knew (or willfully blinded himself to the fact that) the Wire Transfer had no legitimate purpose, Haynie did not have reason to expect that Bryant Bank would necessarily be harmed by his conduct (though, undoubtedly, the Wire Transfer would potentially harm someone if Bryant Bank executed Haynie's illegitimate payment order). If Bryant Bank had rejected Haynie's Wire Transfer Request (which it had ample reasons to do), or if Bryant Bank had at least delayed its acceptance of the Wire Transfer Request pending the Check clearing, Bryant Bank likely could have avoided all, or substantially all, of its losses.

Stated another way, Bryant Bank had reasons to place a hold on the Check and even more reasons to deny the Wire Transfer Request (not the least of which being the timing of the Wire Transfer Request), but Bryant Bank accepted the Wire Transfer Request anyway. Haynie readily admits that this gave him confidence that the Check had, in fact, cleared. Although Haynie's testimony underscores that Haynie did not honestly believe the Check had cleared (or was valid) merely because the Check Funds were available for withdrawal on March 11, 2020, the court cannot say it was (objectively) unreasonable for Haynie to presume that Bryant Brank would not have accepted the Wire Transfer Request had the Check not been finally collected (particularly since the plain language of the Wire Transfer Agreement says as much). And, it is at least probable (given the timing of the Check's return), that had Bryant Bank placed a hold on the Deposit, denied the Wire Transfer Request, or delayed its acceptance of the Wire Transfer Request, none of the parties to the transactions (including Bryant Bank) would have incurred any financial losses.

The foregoing does not excuse Haynie's conduct. Given what Haynie knew about the Account transactions, his conduct was substantially certain to harm someone if his Wire Transfer Request was accepted, and yet Haynie proceeded to ask Bryant Bank to make the Wire Transfer, he desired that Bryant Bank do so, and he took steps to convince Bryant Bank that what he was doing was legitimate (i.e., Haynie intended to deceive Bryant Bank, and proceeded unreasonably, recklessly, and willfully blind to the fraud he was helping perpetrate), but it remains that the court cannot find, based on the record, that Haynie did believe, or even that Haynie should have believed, that harm to Bryant Bank was substantially certain on March 11, 2020 (i.e., Haynie credibly presumed that Bryant Bank would take some steps to protect itself from the risks of loss attendant to Haynie's implicit funds availability request on March 9, 2020 and Haynie's explicit request to irrevocably transfer $40,012 in Check Funds from his Account on March 11, 2020).

For the foregoing reasons, Haynie's Debt for the Wire Transfer is not excepted from discharge under Bankruptcy Code § 523(a)(6).

F.     The 523(d) Counterclaim

Bankruptcy Code § 523(d) states:

If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not

substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

Haynie's Debt for the Wire Transfer is not subject to classification as a "consumer debt" under the Bankruptcy Code. *See* 11 U.S.C. § 101(8) (defining "consumer debt" to mean "debt incurred by an individual primarily for a personal, family, or household purpose"). Thus, the fact that the court has not excepted the Debt for the Wire Transfer from discharge under Bankruptcy Code § 523(a)(2)(A) has no bearing on Haynie's 523(d) Counterclaim.

Conversely, the court's determination that Haynie's Personal Expenditures, the Redeposit Fee, and the Overdraft Fee (which may be subject to characterization as consumer debts) are excepted from discharge under Bankruptcy Code § 523(a)(2)(A), forecloses any award of attorney's fees or costs to Haynie under Bankruptcy Code § 523(d).

## VII. Summary of Ultimate Findings and Conclusions

### A. The Judgment in Favor of Bryant Bank on the 523(a)(2)(A) Claim and Against Haynie on the 523(d) Counterclaim

For the detailed reasons set forth above, the court finds that Bryant Bank proved, by a preponderance of the evidence, that Haynie made multiple representations (express and implied) to Bryant Bank regarding Haynie's belief in the Check's validity; Haynie's beliefs in the legitimacy of his Indorsement, Deposit, and Wire Transfer Request; and Haynie's lack of knowledge regarding undisclosed facts that might have signaled to Bryant Bank that Haynie was perpetrating a financial fraud scheme.

As to Haynie's representations regarding his belief in the Check's validity, these representations were at least reckless as to the truth and, therefore, were fraudulent. In other words, the court finds that Haynie subjectively appreciated that there was a risk (more or less great) that the Check was not valid when he made the Indorsement and Deposit, and the court further finds that Haynie subjectively appreciated that there remained a chance (more or less great) that the Check was not valid when he made the Wire Transfer Request. Nevertheless, Haynie proceeded with the Account transactions without making any inquiry (reasonable or otherwise) concerning the Check's validity or collection status.

As to Haynie's representations regarding his beliefs in the legitimacy of his Account transactions on and after March 9, 2020 (i.e., the Indorsement, Deposit, and Wire Transfer), and as to Haynie's admitted nondisclosure of facts known to Haynie that were indicative of a financial fraud scheme (i.e., that Haynie knowingly was using his Account to (1) receive funds from an unknown check payor in the United States for the investment of an individual residing in Canada in a foreign entity based out of South Korea, (2) collect a transaction-based commission and salary from the funds received, and (3) transfer the remaining funds to an unknown beneficiary in Mexico), Haynie's representations were, at a minimum, grossly reckless. Stated differently, the court finds that Haynie subjectively appreciated the high probability that his Account transactions

were illegitimate, and in the face of this known risk, he both consciously avoided making any investigation into the matters and deliberately concealed, or failed to disclose, facts known to Haynie that likely would have heightened Bryant Bank's suspicions. Therefore, the court finds that Haynie's representations to Bryant Bank concerning his beliefs in the legitimacy of his Account transactions, as well as his concealment or nondisclosure of material facts related thereto, were both fraudulent and intentional.

The court further finds that Bryant Bank proved, by a preponderance of the evidence, that it actually and justifiably relied on Haynie's intentional, fraudulent misrepresentations when it extended the Provisional Credit, made the Redeposit, delayed the Chargeback, and declined to place a hold on the available Account funds pending the Chargeback. Additionally, the court finds that Bryant Bank proved, by a preponderance of the evidence, that Bryant Bank's reliance on Haynie's intentional, fraudulent misrepresentations caused its losses for the unreimbursed Personal Expenditures, the unpaid Redeposit Fee, and the Overdraft Fee.

Based on the foregoing findings, the court concludes that Haynie's Debts for the Personal Expenditures, the Redeposit Fee, and the Overdraft Fee are excepted from discharge under Bankruptcy Code § 523(a)(2)(A), as debts for monies obtained by false pretenses, false representation, or actual fraud. The court further concludes that this adjudication of nondischargeability forecloses an award of fees or costs to Haynie under Bankruptcy Code § 523(d). Therefore, Haynie's 523(d) Counterclaim is denied.

B.     The Judgment Against Bryant Bank and in Favor of Haynie on the 523(a)(2)(A), 523(a)(4), and 523(a)(6) Claims

As to Haynie's Debt for the Wire Transfer, the court finds that Bryant Bank did not establish, by a preponderance of the evidence, that it was justified in accepting the Wire Transfer Request, even though the court finds that, more likely than not, Bryant Bank's stated reasons for agreeing to accept the Wire Transfer Request and execute the Wire Transfer on March 11, 2020 were true (i.e., that Bryant Bank did, in actuality, rely on the facts that Haynie was a known customer, and former employee, in good standing and, therefore, trusted Haynie's implied representations and nondisclosure of critical facts known to Haynie when making the decisions to act in the ways that it did). However, a showing of actual reliance will not suffice to show justifiable reliance under the particularized circumstances of this AP. Specifically, the record evidences that Bryant Bank affirmatively decided to contractually accept Haynie's Wire Transfer Request, and to execute the Wire Transfer, in the face of multiple, apparent, red flags—e.g., the Check remained subject to timely return, the withdrawable Account balance consisted entirely of the provisionally credited Check Funds, the Deposit and Wire Transfer were not transactions that Haynie normally would be expected to engage in, Haynie had no known business relationship with EQT Production, Haynie had no known business relationship with the Beneficiary, the Wire Transfer was of a reportable size, the amount and timing of the Wire Transfer Request were suspicious, and the Wire Transfer Request and Wiring Instructions revealed no business purpose (legitimate or otherwise) for the Wire Transfer.

It cannot be understated that the evidentiary record shows that, by affirmatively agreeing to accept the Wire Transfer Request on March 11, 2020 and proceeding to execute the Wire

Transfer the same day, Bryant Bank facilitated the conversion of $40,012 in provisionally credited Check Funds for the worthless Check to actual money and the illegitimate and irrevocable transfer of the illegally acquired money internationally. As such, the espoused reasons for Bryant Bank's decision to accept the Wire Transfer Request do not hold up against the risks (to Bryant Bank and others) that Bryant Bank disregarded in doing so, and the undersigned can glean no other justification for Bryant Bank's reliance on Haynie's representations (however fraudulent and intentional) from the evidentiary record. Therefore, the court finds Bryant Bank's decision to offer no direct evidence of the reasons for its decisions—Bryant Bank called no Bryant Bank employee or representative to testify at the Trial—inexplicable, and the court is left to draw an adverse inference (i.e., that Bryant Bank did not offer such direct evidence of justifiable reliance because it was unable to do so). As such, the court finds that Bryant Bank failed to meet its burden of proof on a required element of both its 523(a)(2)(A) Claim and its 523(a)(4) Claim to except Haynie's Debt for the Wire Transfer from discharge.

The court further finds that Bryant Bank failed to prove, by a preponderance of the evidence, that Haynie's conduct was intended to, or (subjectively or objectively) substantially certain to, injure Bryant Bank. As such, Bryant Bank's 523(a)(6) Claim to except Haynie's Debt for the Wire Transfer from any chapter 7 or chapter 13 hardship discharge Haynie may hereafter receive also fails.

Based on the foregoing, the court concludes that Haynie's Debt to Bryant Bank for the Wire Transfer is dischargeable under Bankruptcy Code §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

A final judgment consistent with this memorandum opinion and order will enter separately.

DONE and ORDERED this the 28th day of September, 2023.

/s/ JENNIFER H. HENDERSON
UNITED STATES BANKRUPTCY JUDGE